

*U.S. Department of Justice*

*United States Attorney
Eastern District of New York*

PB
F. #2013R01046

*271 Cadman Plaza East
Brooklyn, New York 11201*

June 30, 2017

**By ECF**

The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re: United States v. Ahmad Sheikhzadeh
       Criminal Docket No. 15-182 (PKC)

Dear Judge Chen:

  The government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for July 17, 2017, at 10:00 a.m. On November 21, 2016, the defendant pled guilty before Your Honor to counts two and six of a seven-count indictment, which charged him with violations of 26 U.S.C. § 7206(2) and 50 U.S.C. § 1705, respectively. For the reasons discussed herein, the government respectfully requests that the Court impose a custodial sentence above the applicable Sentencing Guidelines range of 46 to 57 months.

I. Applicable Law

  A. Tax Fraud

  Title 26, United States Code, Section 7206(2) provides that "[a]ny person who . . . willfully aids or assists in . . . the preparation . . . of a return . . . which is fraudulent or is false as to any material matter . . . shall be fined not more than $100,000 . . . or imprisoned not more than three years, or both[.]"

  B. The International Emergency Economic Powers Act

  Pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701, et seq., the President of the United States is granted the authority to deal

The Honorable Pamela K. Chen
June 30, 2017
Page 2

with unusual or extraordinary threats to the national security, foreign policy, and economy of the United States, including the authority to declare a national emergency through Executive Orders which have the full force and effect of law. (Presentence Report ("PSR") ¶ 7.)

On March 15, 1995, the President issued Executive Order 12957, finding the actions and policies of the Government of Iran constituted an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and declared a national emergency to deal with that threat. (Id.) Executive Order 12957 was expanded and continued by Executive Orders 12959 and 13059. (Id.) Pursuant to these Executive Orders, the Department of the Treasury, through its Office of Foreign Assets Control ("OFAC"), promulgated the Iranian Transactions Regulations ("ITR"), codified at 31 C.F.R. §§ 560.101, et seq. (Id.) In October 2012, the ITR were renamed the Iranian Transactions and Sanctions Regulations ("ITSR"). (Id.)

The ITSR prohibit "the exportation . . . or supply, directly or indirectly, from the United States or by a United States person, wherever located, of any goods, technology, or services to Iran" without first having obtained a valid license from OFAC. (Id. ¶ 8.) The ITSR also prohibit any "new investment" in Iran, including any "commitment or contribution of funds," without a valid license from OFAC. (Id.) Since October 2012, the ITSR have also specifically prohibited United States persons from transacting in or making disbursements from accounts at Iranian financial institutions under their control. (Id.)

II.     The Offense Conduct

Since approximately 2007, the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS") have been investigating the defendant for, among other things, tax fraud, violations of IEEPA, and money laundering. (PSR ¶ 9.) The investigation uncovered the following:

    A.     Tax Fraud

From the 1990's until his arrest in March 2016, the defendant worked as a consultant to the Government of Iran's Permanent Mission to the United Nations ("IMUN") in New York, New York. (PSR ¶ 12.) A review of, among other things, the IMUN's domestic bank records, the defendant's bank records, intercepted telephone calls, witness interviews, and the defendant's statements to law enforcement, revealed that, between 2007 and 2012, the defendant regularly received cash payments from the IMUN that he failed to report on his personal income tax returns for those years. (Id.) Specifically, the investigation revealed that, between 2007 and 2012, the defendant failed to report income of approximately $171,355, which resulted in a tax loss to the U.S. government of approximately $51,959. (Id.) The tax losses from the defendant's unreported income from the IMUN for each year are included in the following table:

The Honorable Pamela K. Chen
June 30, 2017
Page 3

| Year | Unreported Income | Tax Loss |
|---|---|---|
| 2007 | $23,784.71 | $6,675.00 |
| 2008 | $20,753.05 | $5,827.00 |
| 2009 | $13,871.40 | $3,895.00 |
| 2010 | $36,900.00 | $11,777.00 |
| 2011 | $46,066.00 | $14,729.00 |
| 2012 | $29,980.00 | $9,056.00 |
| **Total:** | **$171,355.16** | **$51,959.00** |

(Id.)

During his post-arrest interview with law enforcement agents, the defendant admitted that the income reported on his personal tax returns was false, that he had lied to his tax preparer about his income from the IMUN, and that he received cash income from the IMUN that exceeded the income reported on his tax returns.

B.   IEEPA

Between 2007 and 2013, the defendant facilitated the transfer of approximately $187,200 between individuals in the United States and Iran. (PSR ¶ 10.) These transfers violated the ITSR because the defendant did not have a license from OFAC. (Id.) Specifically, the defendant provided "hawala" services whereby he facilitated the transfer of funds between bank accounts he controlled in the United States and Iran. (Id.)[1]

The defendant was able to provide hawala services to individuals in the United States who wanted to transfer money to Iran because he controlled Iranian bank accounts through a relative in Iran. (Id. ¶ 11.) The defendant's hawala service operated in the following manner. First, the defendant would receive a request from an individual in the United States who wanted to transfer funds to another individual in Iran. (Id.) Second, the defendant would instruct a family member in Iran to make the requested disbursement of funds from the defendant's Iranian bank accounts to the Iranian bank accounts designated by the requesting individual. (Id.) Third, the requesting individual would cause a corresponding deposit of funds into one of the defendant's bank accounts in the United States. (Id.) After receiving the funds from the requesting individual, the defendant typically transferred them into another U.S.-based account that he controlled. (Id.)

During his post-arrest interview with law enforcement, the defendant admitted to facilitating the transfer of funds from individuals in the United States to individuals in

---

[1]   As noted in the PSR, hawala is an informal method of transferring money via a worldwide network of brokers who operate outside of traditional banking, finance, and remittance systems. (PSR ¶ 10.)

The Honorable Pamela K. Chen
June 30, 2017
Page 4

Iran.  The defendant further admitted he was aware of the prohibitions against such financial transactions involving Iran, and he admitted that, by conducting the transactions in question, he knew that he was violating U.S. laws.

III.    The Presentence Report

The Probation Department calculated the defendant's total offense level as follows:

Count 2

| | |
|---|---|
| Adjusted Offense Level (Section 2T4.1(E)) | 14 |

Count 6

| | |
|---|---|
| Adjusted Offense Level (Section 2M5.1(a)(1)(B)) [2] | 26 |

Grouping

| | |
|---|---|
| Combined Adjusted Offense Level | 26 |
| Acceptance of Responsibility (Section 3E1.1) | –3 |
| **Total Offense Level:** | **23** |

(PSR ¶¶ 19-38.)  The Probation Department also concluded that the defendant had no criminal history points, resulting in a Criminal History Category of I.  (Id. ¶¶ 39-41.)  Thus, the applicable advisory Sentencing Guidelines range of imprisonment is 46 to 57 months.  (Id. ¶ 70.)  The government agrees with the Probation Department's calculation of the defendant's applicable Sentencing Guidelines range.

---

[2]     With respect to the base offense level for Count 6, the government submits that Section 2M5.1(a)(1)(A) also is applicable to the offense conduct and, if applied, also would result in a base offense level of 26.  Section 2M5.1(a)(1)(A) provides that a base offense level of 26 should apply if "national security controls . . . were evaded."  As noted above, the ITSR were promulgated following the issuance of a series of Executive Orders wherein it was determined that the Government of Iran constituted an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States.  See infra; see also, e.g., United States v. Hanna, 661 F.3d 271, 294 (6th Cir. 2011) (holding that any transaction prohibited by the Executive Order implicated Section 2M5.1(a)(1)(A) because the President had determined that the country in question was a "threat to national security").

The Honorable Pamela K. Chen
June 30, 2017
Page 5

IV.     Additional Information Regarding the Defendant's Activities on Behalf of the IMUN

As described above, the defendant has worked for years as a paid consultant to the IMUN. However, although the IMUN has regularly paid the defendant for his work, the defendant always has been an unofficial and unacknowledged employee of the IMUN. The defendant's work for the IMUN principally has involved: (1) producing lengthy, weekly reports for the IMUN; (2) attending weekly meetings at the IMUN; (3) gathering information for Iranian officials, including information about United States persons and information that would assist in advocating for Iran's ability to achieve nuclear enrichment; and (4) recruiting other individuals in the United States to work on behalf of Iran.

    A.     The Defendant's Statements Regarding His Work for the IMUN

In numerous recorded telephone conversations, the defendant has admitted that he works for the IMUN, and he has recognized that his work for the IMUN is regular, contractual, and paid. For example:

- In December 2007, the defendant stated that the IMUN was his only source of income, that he worked for the IMUN as a consultant, and that he went to the IMUN for approximately two hours each week. See Exhibit ("Ex.") 1.[3]

---

[3]     Because the exhibits to this sentencing letter are voluminous, they will be provided in electronic format on a DVD to the Court and Probation. The exhibits previously were provided to the defendant on or about June 5, 2017. The government respectfully requests that the exhibits be filed under seal. The government makes this request because the exhibits contain sensitive personal information – including, among other things, names, addresses, telephone numbers, and financial information – of the defendant, as well as various uncharged third parties. As such, to protect the personal information of the defendant and, more importantly, any uncharged third parties whose information is included in the exhibits, the government respectfully submits that sealing the exhibits is appropriate. Under these circumstances, the government's countervailing interests in ensuring the security of the personal identifying information of the defendant and other individuals outweigh the public's qualified right to access. As the facts set forth above provide ample support for the "specific, on the record findings" necessary to support sealing, Lugosch v. Pyramid Co., 435 F.3d 110, 120 (2d Cir. 2006), the government respectfully requests that the Court record those findings and file the exhibits under seal. See also, e.g., United States v. Riley, 15-cr-77 MHH-SGC, 2015 U.S. Dist. LEXIS 107824, at *8-9 (N.D. Al. Aug. 17, 2015) (sealing exhibits because they contained personal identifying information of third parties).

The Honorable Pamela K. Chen
June 30, 2017
Page 6

- In January 2008, the defendant explained that the IMUN paid him in cash because it was difficult to cash checks issued by the IMUN. See Ex. 2.

- In March 2010, the defendant stated that he preferred to speak in person, rather than by telephone, about how he reported his work for the IMUN on his income taxes. See Ex. 3.

- In July 2010, the defendant stated that he spent 60-70 hours per week gathering information for the IMUN and that his work required him to stay on top of current events. See Ex. 4.

- In May 2011, the defendant stated that Iran's Permanent Representative to the United Nations asked to have the weekly meetings at the IMUN take place in his – i.e., the Permanent Representative's – office. See Ex. 5.

Further, in multiple interviews with law enforcement agents both before and after his arrest in connection with this case, the defendant admitted to being employed as a paid consultant to the IMUN.

B.   Payments to the Defendant by the IMUN

A review of bank records for domestic accounts controlled by the IMUN and the defendant reveals that the defendant was paid in a manner that likely was meant to disguise the nature and frequency of the payments from the IMUN.

Notably, beginning in approximately September 2005, the IMUN began to pay the defendant through an intermediary, rather than directly. Specifically, a series of checks drawn from the IMUN's bank account were issued on an approximately monthly basis to two known IMUN officials. These checks included the words "Ahm She Da" or a variant thereof written in the memo line. Shortly after the negotiation of the "Ahm She Da" checks by the IMUN officials, the defendant typically made a cash deposit into a domestic checking account in his own name in an amount similar to the "Ahm She Da" checks.

C.   The Defendant's Weekly Responsibilities: Written Reports and Meetings

Up until the date of his arrest in March 2016, the defendant prepared a weekly report containing news articles and his own analysis. The defendant distributed these weekly reports – usually via email – to multiple Iranian government officials at the IMUN. Altogether, during the period of time that he was employed by the IMUN, the defendant disseminated over 800 weekly reports. Iranian officials on the distribution list of the defendant's weekly reports have included, among others, Mohammad Javad Zarif (the

former Iranian Permanent Representative to the United Nations and current Iranian Foreign Minister) and Mohammad Khazaee (the former Iranian Permanent Representative to the United Nations).

The defendant's weekly reports for the IMUN generally had the same format: a table of contents followed by a collection of recent news articles, primarily obtained from U.S. publications. The news articles related principally to Iran's relations with the United States, events in the Middle East, and Iran's nuclear program. The weekly reports also often included collections of the views on Iran by U.S. politicians, journalists, and other prominent individuals. The defendant typically transmitted his weekly reports to IMUN officials late Thursday evening or early Friday morning.

In addition to preparing the weekly reports, the defendant conducted weekly, in-person briefings for Iranian officials at the IMUN. These meetings typically were held on Friday afternoons at the IMUN. Various IMUN officials – including, among others, Zarif and Khazaee, as well as diplomatic representatives, press attaches, and a representative of the Government of Iran's broadcasting agency – attended these meetings.

D.   Gathering Information on Specific Topics and Individuals

As discussed above, the defendant's work for the IMUN during the relevant time period principally involved the preparation of the weekly reports and the leading of weekly meetings for Iranian officials at the IMUN. In addition, intercepted telephone and email conversations indicate that Iranian officials at the IMUN directed the defendant to (1) research and brief Iranian officials on specific issues, (2) obtain information about specific U.S. persons, and (3) assist the IMUN with disseminating information. For example:

- In April 2009, the defendant stated that Iran's Permanent Representative to the United Nations had tasked the defendant to brief Iranian officials on the "positioning" of the editors of the New York Times, ahead of meeting between Iranian diplomats and the newspaper's editors. See Ex. 6.

- In September 2009, an Iranian official and the defendant discussed specific individuals to invite to an upcoming meeting in the United States with then-Iranian President Mahmoud Ahmadinejad. In a subsequent conversation, the defendant told an individual that he had attended a meeting with Ahmadinejad and that he had left the meeting with two Iranian intelligence officers. See Ex. 7.

- In May 2010, the defendant exchanged emails with an Iranian official at the IMUN. The Iranian official asked the defendant for advice on persons in the United States to invite to a conference in Iran. The

- defendant provided a recommendation and provided information on the recommended individual's background.  See Ex. 8.

- In June 2010, the defendant exchanged emails with the same Iranian official at the IMUN.  The defendant stated that he had contacted a number of individuals about the possibility of attending the conference.  The defendant also recommended a particular person, whom he described as someone who was against an attack on Iran.  See Ex. 9.

- In December 2010, an Iranian official asked the defendant to prepare for and attend meetings to discuss the recent release of U.S. government information by the Internet site WikiLeaks.  See Ex. 10.

- In January 2012, the defendant and an Iranian official who headed the IMUN's press office exchanged emails regarding editors and reporters at the New York Times.  The defendant recommended a specific reporter for the Iranian official to contact.  See Ex. 11.

- In January 2013, the defendant discussed a meeting at the IMUN with various Iranian officials.  The defendant stated that he and Iranian officials had discussed approaching persons associated with the Council on Foreign Relations.  The defendant further stated that he had proposed a particular Iranian official in the United States who he believed could make contact with influential persons, but the defendant stated that he could not "say more on the phone" about this official.  The defendant also stated that, at the meeting, he had provided Iranian officials with information about the U.S. House of Representatives' Foreign Affairs Committee, including the names of the chairpersons of various subcommittees.  See Ex. 12.

- In October 2013, an Iranian official asked the defendant to comment on an interview by a U.S. State Department official discussing, among other things, Iran's nuclear enrichment program.  See Ex. 13.

Other telephone conversations and email communications indicate that, in addition to being tasked to obtain information on specific topics and individuals, the defendant also advised Iranian officials regarding U.S. government personnel and policy.  For example:

- In October 2007, Iranian officials at the IMUN directed the defendant to provide a report about a then-U.S. Senator.  The report was supposed to include, among other things, the names of influential Iranians who

> were close to the Senator, the names of other U.S. elected officials who supported the Senator, and the names of other individuals in media, government, and private circles who were personally or professionally close to the Senator.  See Ex. 14.
>
> - In July 2013, the defendant emailed Zarif and stated: "This is what I prepare for our weekly discussions in addition to the weekly reports." The email included an attachment entitled "American Views on Iran, 7/4/2013."  Zarif replied: "A colleague at [the Iranian Center for Strategic Research] prepares daily briefings for [Iranian President] Rouhani on framing and counter-framing of elections in the U.S. Anything that can help her in this task will be much appreciated."  The defendant responded: "I will send it to you.  The weekly analyses cover[] that.  I also make sure that I include all congressional hearing transcripts on Iran."  See Ex. 15.

Additional telephone conversations and email communications indicate that the defendant also attempted to assist Iranian officials at the IMUN with influencing U.S.-based journalists to write articles that were favorable to Iran, the Government of Iran, and the Iranian nuclear enrichment efforts.  Notably, between approximately 2009 and 2014, the defendant corresponded with a U.S.-based journalist.  In November 2009, the defendant told the journalist that he had encouraged the press attaché at the IMUN to be receptive to the journalist's inquiries.  See Ex. 16.  In the same month, the defendant and the journalist discussed an article about a Western journalist who had been imprisoned in Iran, and the journalist expressed concern about reporting in Iran, stating: "I don't think I've ever felt so unsafe about reporting in Iran."  See Ex. 17.  Shortly thereafter, the defendant encouraged the journalist to write an article on the Iranian opposition group, Mojahedin-e-Khalq ("MEK"), and he suggested that doing so could make things easier for the journalist with respect to the Iranian government, noting: "This might give you some degree of immunity[.]"  See Ex. 18. In June 2010, the defendant told an associate that the journalist had been approached by an Iranian official regarding working for the IMUN.  See Ex. 19.  In July 2010, the journalist told the defendant that Iranian officials at the IMUN had invited the journalist to travel to Iran.  See Ex. 20.  In addition, in October 2010, the defendant forwarded to the journalist an article regarding the purported futility of sanctions against Iran, and he suggested that the journalist write a similar article.  See Ex. 21.  Similarly, in January 2013, the defendant referred a report to the journalist and suggested that the journalist write an article examining the costs and adverse effects of sanctions against Iran.  See Ex. 22.

E       Recruitment of Other Individuals

In addition to obtaining information for Iranian government officials, telephone conversations and email communications also reveal that the defendant recruited other persons in the United States to provide services for the Iranian government.  Notably,

The Honorable Pamela K. Chen
June 30, 2017
Page 10

the defendant recruited a nuclear engineer who is an Iranian national and Lawful Permanent Resident of the United States (the "Scientist"). The Scientist had previously worked as a nuclear engineer at a nuclear power plant in the United States.

As described in the summaries of calls and emails below, after being recruited by the defendant, the Scientist provided two principal services to Iranian officials: (1) communicating and meeting with Iranian officials about nuclear enrichment; and (2) providing information and advice about nuclear enrichment to the defendant, who would pass on this information to others, with the goal of helping to develop and improve Iran's presentation of its nuclear agenda to the West and Iran's related negotiations with the West.

Specifically, the defendant enlisted the Scientist to advise and assist Iranian officials regarding the Iranian nuclear enrichment program. For example:

- In a series of emails in November 2005, the defendant and the Scientist discussed contacting Zarif regarding Iranian nuclear negotiations. The Scientist offered to contact Zarif directly, and the defendant advised the Scientist not to "discuss anything over the phone with the [IMUN]." The Scientist proposed a meeting with Zarif at the Scientist's home because the "house [was] clean – no bugs – and the setting is more relaxed." Later, the Scientist corresponded directly with Zarif, and he arranged to meet with Zarif at Zarif's office at the IMUN. See Ex. 23.

- Later in November 2005, the Scientist sent Zarif an email that read, in part: "It was a pleasure to meet with you today . . . . I believe we are at an inflection point with tremendous potentials [*sic*], both ways. With the right move, we can unclench the grasps of the dragons, where even a slight miscalculation, can ensue a crush under their hefts. As a Persian, as a Moslem, and as always, I offer my assistance in any capacity that may be needed." The message also contained links to multiple websites discussing nuclear reactors. See Ex. 24.

In addition, in 2005 and 2006, the defendant helped to arrange a meeting between the Scientist and Hassan Rouhani, who is the current President of Iran and who, at one time, was a senior Iranian official who previously had led multilateral nuclear negotiations for Iran. For example:

- In December 2005, the Scientist told the defendant that the Scientist was leaving for Iran, and he asked if there was anything he could do for the defendant while he was there. The defendant replied that they should try to set up a meeting with Rouhani. See Ex. 25.

The Honorable Pamela K. Chen
June 30, 2017
Page 11

- In January 2006, the Scientist confirmed that he had met with Rouhani while in Iran.[4] See Ex. 26.

Further, in 2006 and 2007, the defendant and the Scientist disseminated information in the United States regarding Iran's nuclear enrichment program, and they advised others on Iran's public statements regarding its nuclear program. For example:

- In February 2006, the defendant recommended that the Scientist be interviewed by the Islamic Republic of Iran Broadcasting agency ("IRIB"). The defendant and the Scientist discussed whether Zarif would approve of the interview. Thereafter, the defendant contacted Zarif directly, and Zarif advised against the interview. After that, the defendant advised the Scientist not to do the interview. See Ex. 27.

- In March 2006, Zarif sent the Scientist several documents regarding Iran's nuclear negotiations, including proposals submitted by Iran in connection with multilateral negotiations. See Ex. 28.

- In March 2006, the Scientist asked Zarif for guidance regarding making public statements about Iran's compliance with the Nuclear Nonproliferation Treaty. In response, Zarif provided the Scientist with detailed talking points. See Ex. 29.

- In April 2006, the Scientist suggested to Zarif that they disseminate opinion pieces or letters regarding Iran's compliance with the Nuclear Nonproliferation Treaty to media outlets in different cities throughout the United States in order to spread their message. See Ex. 30.

- In April 2006, the Scientist advised Zarif that he had been invited to speak on a panel on Iran's nuclear program sponsored by the Voice of America. Zarif responded by providing the text of a speech that he was planning to give, and he asked for the Scientist's opinion on the speech. See Ex. 31.

- In November 2006, the Scientist informed Zarif that he dined with a former United Nations weapons inspector. The Scientist also informed Zarif that he had been surveilled during the dinner. See Ex. 32.

---

[4] According to travel records maintained by the U.S. government, the Scientist did, in fact, depart the United States in December 2005 and return in January 2006.

The Honorable Pamela K. Chen
June 30, 2017
Page 12

- In March 2007, the Scientist and Zarif discussed inviting a group of U.S-based nuclear scientists to Iran. They specifically discussed one particular U.S.-based expert whom they viewed as "a very reliable reference for our position that US has opposed to [*sic*] any approach toward a fair and reasonable resolution to the nuclear dilemma of their own making."  See Ex. 33.

Finally, in his capacity as an advisor to the IMUN, the defendant obtained information relevant to Iran's nuclear enrichment program from the Scientist. For example:

- In May 2006, the defendant and the Scientist discussed Iran's bargaining position in multilateral nuclear negotiations, including the number of nuclear reactors that Iran should accept in exchange for a suspension of nuclear enrichment.  See Ex. 34.

- In November 2006, the Scientist sent the defendant and an official at the IMUN an article about risks at the nuclear power plant where the Scientist had worked. The article stated that the power plant was commencing a study designed to improve emergency planning in the event of an act of terrorism.  See Ex. 35.

- In April 2007, the defendant asked the Scientist about the number of gas centrifuges[5] that Iran would need to accomplish its nuclear enrichment goals, stating: "At what level Iran could have [*sic*] its nuclear option but does need to go further? I just want to see what is a good negotiating point(s) for Iran." The Scientist responded with his assessments of the number of centrifuges that Iran would need to achieve a desired amount of enriched uranium.  See Ex. 36.

- In July 2007, the defendant and the Scientist discussed an interview that another scientist had given regarding whether Iran should be prevented from enriching uranium. The Scientist stated: "In statement [*sic*] on Iran's nuclear program, one should never give any slight indications, either real or just for the sake of argument, of any path to

---

[5] A gas centrifuge is a device that performs isotope separation of gases. A centrifuge relies on the principles of centripetal force accelerating molecules so that particles of different masses are physically separated in a gradient along the radius of a rotating container. A prominent use of gas centrifuges is for the separation of uranium-235 from uranium-238. The result of the separation of uranium – uranium hexafluoride ($UF_6$) – is utilized for uranium enrichment. Enriched uranium is a critical component for both civil nuclear power generation and military nuclear weapons.

The Honorable Pamela K. Chen
June 30, 2017
Page 13

> nuclear weapons. Always the peaceful nature of the program must be emphasized." Subsequently, the Scientist contacted the scientist who had given the interview and said: "Please consider making it part of your vocabulary to refer to Iran's program always as 'Iran's peaceful nuclear program.'" See Ex. 37.

- In October 2010, the defendant and the Scientist discussed contacting a former International Atomic Energy Agency official to discuss Iran's nuclear negotiations. See Ex. 38.

- In December 2013, the defendant emailed the Scientist and asked whether it was "feasible to change [Iran's] Arak nuclear reactor to a light one." The Scientist replied that it was not possible and provided a detailed justification for why this was the case.[6] See Ex. 39.

In April 2008, FBI agents, acting in an undercover capacity and posing as Zarif – who was then in Iran – sent the Scientist an email message stating, in part, that "a colleague in my government here asked if I knew a trusted friend in your field that could provide technical assistance on matters that are giving us trouble as we complete our work here . . . . Answering [my colleague's] questions is vital to what we are building." The undercover FBI agents – posing as Zarif – provided a list of questions purportedly from Zarif's "colleague" concerning nuclear energy. Among other things, the questions addressed issues related to gas centrifuge design for the enrichment of fissile uranium and they included requests for information about designs used in U.S.-based nuclear reactors.

In June 2008, the Scientist told the undercover FBI agents – whom he believed to be Zarif – via email that he was planning to "come home" in July. See Ex. 40. In July 2008, the Scientist departed for Iran from John F. Kennedy International Airport ("JFK") in Queens, New York. Before the Scientist's departure, FBI agents interviewed him at JFK. During the interview, the Scientist falsely denied being in contact with Iranian government officials regarding nuclear enrichment or any other topic. The Scientist did admit to knowing Zarif, although he denied providing any specific information about nuclear issues to Zarif. He also denied that Zarif or any other Iranian official had requested information from him about nuclear enrichment. Finally, the Scientist denied that he was in possession of any information belonging to his prior employer – a U.S.-based company that operated a nuclear power plant in New York.

---

[6] Based on the context of the communication, it appears that the defendant and the Scientist were discussing the differences between light-water and heavy-water nuclear reactors.

While the Scientist was interviewed, other law enforcement agents imaged the Scientist's computer – which the Scientist had consented to a search of. Law enforcement agents discovered that the computer contained numerous files that appeared to belong to the Scientist's former employer, including, among other things: (1) nuclear reactor training materials; (2) studies regarding a potential attack by a commercial airplane on the nuclear power plant where the Scientist had been employed and the potential catastrophic impact resulting from such an attack; (3) a proprietary document regarding nuclear reactor coolant; and (4) a 2006 PowerPoint presentation entitled "Potential Development of Nuclear Weapons Technology in Iran." See Ex. 41. Further investigation revealed that these documents were not available to the public and that the Scientist was not authorized to possess them at that time (and, further, at no time had he been authorized to access or possess the impact study). According to an official at the Scientist's former employer, the materials that the Scientist was attempting to bring out of the United States would have been useful in helping to build a nuclear reactor.

V.      Discussion

In United States v. Booker, 125 S. Ct. 738, 743 (2005), which held that the Guidelines are advisory, the Supreme Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining a sentence, but also may tailor the sentence in light of other statutory concerns. After Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). In Gall v. United States, 128 S. Ct. 586 (2007), the Supreme Court held that: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall, 128 S. Ct. at 596 (internal citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, the court may not presume that the Guidelines range is reasonable. The court must make an individualized assessment based on the facts presented." Id. at 596-97 (internal citation and footnote omitted).

In this case, in light of all of the factors enumerated in Section 3553(a), the government respectfully recommends that the Court impose a custodial sentence above the applicable advisory Sentencing Guidelines range of 46 to 57 months.

With respect to the nature and circumstances of the offenses, the criminal conduct in this case is undoubtedly serious. As described above, the defendant perpetrated a multi-year fraudulent scheme whereby he purposefully failed to report over $170,000 in income from the IMUN during a six-year period between 2007 and 2012. Moreover, there is no evidence that the defendant was properly reporting his income from the IMUN before the charged time period. In addition, the defendant and the IMUN designed a complex system of

The Honorable Pamela K. Chen
June 30, 2017
Page 15

indirect and hard-to-trace cash payments that likely were designed to conceal the scope and breadth of the defendant's work on behalf of the Government of Iran.

With respect to the IEEPA violation, the defendant knowingly facilitated multiple transfers – totaling over $180,000 – from individuals in the United States to individuals in Iran. The defendant admitted that he benefitted financially from his participation in these transactions, and he admitted that he knew that facilitating the transactions without a license from OFAC was illegal. The ITSR recognize that the actions and policies of the Government of Iran constitute "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." By purposefully evading and ignoring the restrictions of the ITSR by sending significant sums of money to Iran, the defendant contributed in a tangible way to jeopardizing the national security of the United States.

The defendant's personal history and characteristics also warrant an above-Guidelines custodial sentence. Admittedly, the defendant does not have a criminal history in the sense that he has sustained no prior convictions. However, based on the evidence developed in this case, it appears that, for approximately 20 years, the defendant has worked at the direction of the Government of Iran, which has been designated as a state sponsor of terrorism since 1984. Indeed, the defendant's only source of income has been his work for the IMUN, yet he has never officially acknowledged the scope of his activities on behalf of the Iranian government. As an undeclared "advisor" or "counselor" to Iranian government officials at the IMUN, the defendant has undertaken numerous important tasks designed to further the interests of the Iranian government and, in particular, the Iranian government's efforts to develop nuclear enrichment capabilities. The defendant has spent thousands of hours preparing hundreds of reports and attending countless meetings with the goal of educating and advising Iranian government officials on their dealings with the United States and the international community. In addition, Iranian government officials repeatedly have instructed the defendant to collect strategically important information about specific topics and specific individuals – including, among others, U.S.-based politicians and scholars.

Perhaps most disturbingly, the defendant has recruited other individuals to assist the Government of Iran achieve its strategic interests. As described above, the defendant recruited the Scientist, ostensibly in order to provide assistance with respect to developing nuclear enrichment capabilities and with respect to developing a messaging strategy to the international community. As the conversations summarized above demonstrate, the Scientist provided services and advice to Iranian government officials in the United States and in Iran. These services included, among other things, a surreptitious attempt to smuggle sensitive nuclear information out of the United States to Iran, as well as concealing his activities on behalf of Iran from U.S. law enforcement authorities and lying to U.S. law enforcement authorities.

The Honorable Pamela K. Chen
June 30, 2017
Page 16

What emerges from all of the evidence is a picture of a defendant whose life appears to have been devoted to furthering the interests of the Government of Iran. While operating in the shadows and failing to report the true nature and scope of his work to U.S. authorities, the defendant has advised numerous Iranian government officials about how to achieve their strategic goals, including the development of nuclear enrichment capabilities. Moreover, the defendant has recruited others, and, in turn, these individuals were used to further Iranian strategic interests. The defendant's conduct was brazen. It must not be condoned.

An above-Guidelines sentence would also satisfy the remaining elements of Section 3553(a). Specifically, it would reflect the seriousness of the defendant's offenses and would provide just punishment. Further, it would afford adequate deterrence to others who might attempt secretly to act on behalf of a hostile nation state within the borders of this country. Finally, an above-Guidelines custodial sentence would adequately protect the public from future crimes by this defendant.

VI.     Restitution and Forfeiture

In his plea agreement, the defendant agreed to pay restitution in the amount of $63,844.92. (PSR ¶ 84.) This figure includes the losses to the IRS ($51,959.00), as well as interest and fees. The government understands that the defendant has satisfied his restitution obligation. (Id.)

Further, in his plea agreement, the defendant consented to the entry of a forfeiture money judgment in the amount of $85,000. (Id. ¶ 82.) The government understands that the defendant has satisfied his forfeiture obligation as well. (Id.)

The Honorable Pamela K. Chen
June 30, 2017
Page 17

VII.   Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a custodial sentence above the applicable Sentencing Guidelines range of 46 to 57 months. Such a sentence, would be sufficient, but not greater than necessary, to achieve the purposes of Section 3553(a).

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney

By:   /s/ Peter W. Baldwin
Peter W. Baldwin
Assistant U.S. Attorney
(718) 254-6236

cc:   Steve Zissou, Esq. (by ECF and Email)
Senior United States Probation Officer Frank Marcigliano