# Steve Zissou & Associates

42-40 Bell Boulevard | Suite 302 | Bayside | New York | 11361| 718.279.4500 | stevezissou@stevezissouesq.com

November 1, 2017

**BY ECF**

Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States of America v. Ahmad Sheikhzadeh*
        Docket Number 15-Cr-182 (PKC)

Dear Judge Chen:

For the reasons set forth below, I write to request that the Court order the government to provide the defendant with evidence relevant and material to aggravating sentencing issues raised for the first time in the government's sentence memorandum filed on June 30, 2017 (ecf 34). Because of the complex nature of the issues involved in this case, I respectfully request that the Court schedule a status conference so that the parties can be heard.

## Background

On April 13, 2015, the government filed a single count sealed indictment against Dr. Ahmad Sheikhzadeh, the defendant in this case. The single count alleged that on or about April 15, 2009, Dr. Sheikhzadeh filed a false tax return.  The allegation was that he failed to include the relatively small sum of $28,000.00 in income on his personal tax return. The following month, on May 18, 2015, the government filed a sealed superseding indictment (S-1).  The superseding indictment added other charges arising out of the same facts. The most significant of these included allegations that, between 2007 and 2013, Dr. Sheikhzadeh was involved in a conspiracy to violate the Iranian Transactions and Sanctions Regulations ("ITSR").  A so-called "IEEPA Conspiracy." And, notwithstanding the fact that Dr. Sheikhzadeh, an American citizen of Iranian descent, was living openly in the United States, as he had since he was a teenager, the superseding indictment remained sealed.

It was not until March 22, 2016, that the charges against Dr. Sheikhzadeh became public. The reason for this was quite simple – Dr. Sheikhzadeh had become a pawn in a political test of wills between the United States of America and the Republic of Iran. Equally obvious is the fact that the government filed the indictment under seal so that ongoing negotiations between the

Page **2** of **8**
Honorable Pamela K. Chen
November 1, 2017

United States and Iran would not be affected.  More importantly, the government's plan all along was to coerce Dr. Sheikhzadeh into secretly cooperating *after* the so-called Iran nuclear deal was completed. And once he unequivocally refused the invitation to do so, he became a bargaining chip in the ongoing give and take between the two governments on a variety of issues and, more recently, to coerce the government of Iran to return to the bargaining table and renegotiate parts of the agreement. An agreement that is opposed by some American politicians, including the current president of the United States.[1] Worse, he has now become "trade bait." A pawn to be used in a theoretical prisoner exchange between Iran and the United States.

## The Joint Comprehensive Plan of Action

The Joint Comprehensive Plan of Action (JCPOA) known commonly as the Iran deal or Iran nuclear deal, is an international agreement on the nuclear program of Iran reached in Vienna on July 14, 2015 between Iran, the P5+1 (the five permanent members of the United Nations Security plus Germany), and the European Union.

Formal negotiations toward the Joint Comprehensive Plan of Action on Iran's nuclear program began with the adoption of the Joint Plan of Action, an interim agreement signed between Iran and the P5+1 countries in November 2013. For the next twenty months, Iran and the P5+1 countries engaged in negotiations, and in April 2015 agreed on an Iran nuclear deal framework for the final agreement and in July 2015, Iran and the P5+1 agreed on the plan.[2]

## Dr. Ahmad Sheikhzadeh

Ahmad Sheikhzadeh was born on August 19, 1955 in Tehran, the capital city of Iran. His sister, Fatemeh Sheikhzadeh, studied biology at Tehran University and was a high school teacher. Dr. Sheikhzadeh's younger brother, Ali, received his doctoral degree in Ergonomics and Biomechanics at New York University and is the Director of its Graduate Program of Ergonomics and biomechanics. His wife, Dr. Shahrzad Moosavi is the Senior Medical Director, Global Drug Safety and Risk Management, at Pfizer in New York City. Dr. Sheikhzadeh's oldest brother, Mehdi, earned his Ph.D. in Industrial Engineering and Operations Research from the University of Minnesota and his wife is a chemical engineer.

Dr. Sheikhzadeh's father, Hossain Sheikhzadeh, was a successful businessman who died of a heart attack in 2005. His mother, Zinat Mostafavi, is in her 80s and lives in Tehran. Dr. Sheikhzadeh has lived in America for more than 43 years and has been a US citizen since March 2000. Before high school graduation in 1973, he was determined to continue his education in the United States and to explore the world. His parents were receptive to the idea of study abroad.

---

[1] https://www.nytimes.com/politics/first-draft/2015/07/14/republican-candidates-express-strong-opposition-to-iran-deal/; https://www.nytimes.com/2017/09/20/world/middleeast/trump-iran-nuclear-deal.html; http://thehill.com/opinion/national-security/355483-trumps-iran-speech-finally-sets-facts-of-sham-nuclear-deal-straight
[2] https://www.state.gov/e/eb/tfs/spi/iran/jcpoa/;https://query.nytimes.com/search/sitesearch/?action=click&contentCollection&region=TopBar&WT.nav=searchWidget&module=SearchSubmit&pgtype=Homepage#/iran+nuclear+deal/from20150713to20150720/

Dr. Sheikhzadeh journey to America was anything but easy. He did not know anyone in the United States and he had never traveled alone. Dr. Sheikhzadeh attended English language classes in Norman, Oklahoma, for two months in 1973 and moved to Texas and went to San Jacinto College in Pasadena and then transferred to the University of Houston to study Electrical Engineering. Dr. Sheikhzadeh earned his B.S. in Electrical Engineering in May of 1978. He also earned a degree in Political Science from the University of Houston in May 1979.

Dr. Sheikhzadeh was a student in the United States when American-Iranian relations began to deteriorate with the success of the Islamic revolution in Iran that brought about the downfall of the pro-Western Shah in 1979. Washington imposed sanctions on Iran following the seizure of the US embassy in Tehran in November 1979 and broke its diplomatic relations with Iran in April 1980, a break which has not been yet restored. Sanctions have been a regular component of US policy toward Iran for more than three decades, they have expanded by US Presidents, and have had a collateral impact on otherwise law-abiding Iranians and Iranian-Americans like Dr. Sheikhzadeh and his family.

The post-revolution development in Iran and its regional, as well as global effects, reinforced Dr. Sheikhzadeh's interests in theoretical aspects of international relations. He came to the New School for Social Research in New York City to take graduate courses with Professor Hans Morgenthau, who is considered one of the prominent twentieth-century scholars in the study of international politics.[3] He received his M.A. in Political Science in January 1981. He left the New School for Social Research as he was not quite satisfied with its Political Science Department and at that time it had a moratorium on its Ph.D. program.

After the New School, Dr. Sheikhzadeh was proud to learn that he had been accepted by the Political Science department at Columbia University. He chose the Middle East as his regional specialization and received a Certificate from the Middle East Institute in May 1983. He was fortunate to work as a research assistant for Dr. Sheikhzadeh's academic advisor, Dr. Zalmay Khalilzad from January to December 1986. Dr. Khalilzad became the United States Ambassador to Afghanistan, Iraq and the United Nations in the Administration of President George W. Bush.[4] Dr. Sheikhzadeh helped him in the collection and analysis of data on American policy in the Persian Gulf, domestic sources of foreign policy in the Middle East, the Iran-Iraq War, and Soviet Middle East Policy. Dr. Sheikhzadeh also worked as a research assistant to Dr. Stephanie Neuman, the Director of the Comparative Defense Studies Program, August 1989-May 1991, to assist her in data collection and analysis of security policies in the Third World, military industry, and arms transfers.[5]  Dr. Sheikhzadeh earned a MPhil, in Political Science with a major in International Relations: Security Policy and International Organization, and minor in Comparative Politics and American Government, in October 1987, and his Ph.D., in Political Science in May 1996. Dr. Sheikhzadeh's doctoral dissertation was on "Security Policy of Iran, 1941-1979." Its objective

[3] https://en.wikipedia.org/wiki/Hans_Morgenthau
[4] https://en.wikipedia.org/wiki/Zalmay_Khalilzad
[5] https://sipa.columbia.edu/faculty-research/faculty-directory/stephanie-g-neuman

was a theoretical study of the interactions of three components of security Policy: core value, threat, and strategy.  The single case study of Iran consisted of five cases: three cases – Iran-Allied power, 1941; Iran-Soviet relations, 1945-47; Iran-Egypt relations, 1952-70 – tested response to external threats. Two cases examined the Shah's reactions to internal threats during the oil nationalization crisis and the revolution.  Dr. Sheikhzadeh's dissertation amends shortcomings of the balance-of-threat theory, expands its scope; demonstrates that threat perception is affected by core value, intention, proximity, and historical experience, that balancing was more prevalent than bandwagoning in Iran, 1941-1979, that balancing and bandwagoning are not without assets and liabilities: while both strategies may keep a regime in power, they can damage its domestic legitimacy and invite foreign intervention in its domestic affairs; and contributes to a better understanding of the Shah's accession to throne, the longevity of his rule, his downfall, anti-American sentiments in Iran shaped by perceived US support for his regime, and the current contending issues between Iran and the United States.

Following Dr. Sheikhzadeh's graduation from Columbia University, he intended to apply for a postdoctoral position to turn his dissertation into a book or to join a think tank, but he had to forgo the latter since any association with an American think tank could make traveling to Iran risky for Iranian-Americans. He worked for about a year in 1997 as the Director of Research at Caspian Associates in Princeton, New Jersey, researching on energy, security, and political issues of the Caspian Sea region, and assisting with organizing conferences on energy-related issues.[6]

Taking into consideration his academic background, Dr. Sheikhzadeh was offered employment as a consultant to the Permanent Mission of the Islamic Republic of Iran to the United Nations in New York (IMUN) by Dr. Sheikhzadeh's high school teacher and old friend, Dr. Kamal Kharrazi, who was the Permanent Representative of the Islamic Republic of Iran to the United Nations and then became Iran's Minister of Foreign Affairs.[7] He worked as an outside consultant for the Mission until March 2016. He used to go there 2-3 hours for a weekly meeting and he was neither part of its local staff nor involved in any decision-making process. Dr. Sheikhzadeh's weekly talks and discussions covered major international affairs issues including Iran-American relations, US policy towards the Middle East and the Persian Gulf, terrorism, Afghanistan, Iraq, Syria, the United Nations, and energy. Dr. Sheikhzadeh hoped to provide a better comprehension of American domestic and foreign policies and that in turn could facilitate tension reductions as well as trust buildings between Iran and the United States.

There is rampant speculation that there are political motives that have fueled the government prosecution of Dr. Sheikhzadeh for what are comparatively minor sanctions violations. Foreign websites have suggested that the primary goal in the arrest is to arrange another prisoner swap. After reaching the nuclear agreement, the Joint Comprehensive Plan of Action, the United States, and Iran swapped prisoners in January 2016. Five Iranian-Americans held in Iran

---

[6] http://www.caspian-associates.com/who_we_are.html
[7] https://en.wikipedia.org/wiki/Kamal_Kharazi

were released in exchange for the pardoning of seven Iranians in the United States, most of whom were charged with violating sanctions on Iran.[8] But the prisoner swap did not lead to freedom for other Americans held in Iran. And more Americans have been taken into custody in Iran since the implementation of the nuclear deal. American citizens held in Iranian jails has remained one of the complex issues between Iran and the United States.  Considering that the indictment in this case was sealed for an unusually long period of time, this speculation is hardly unreasonable.[9]

### The Decades-Long Surveillance of Dr. Sheikhzadeh

Given his position at the IMUN, his Iranian ancestry and his association with Iranian government officials, it was hardly surprising to learn that Dr. Sheikhzadeh had been the subjects of surveillance by the Federal Bureau of Investigation, along with other parts of the intelligence community of the United States, for many years.  As recent unclassified information demonstrates, for many years, virtually every aspect of Dr. Sheikhzadeh's life has been under a government microscope.  Almost any place he went, every person he met with and every person he communicated with was the subject of government surveillance, year after year, after year. And as the nuclear agreement was being negotiated, government agents kept their eyes and ears on him.

On March 3, 2016, Dr. Sheikhzadeh was arrested, on his way to go home after his weekly meeting at Iran's Mission to the United Nations, on Fifth Avenue. Instead of taking him to the nearest available magistrate, agents secreted Dr. Sheikhzadeh in a hotel room in Manhattan and questioned him overnight.  Not surprisingly, Dr. Sheikhzadeh was open candid with the federal agents that had taken him into custody. Agents were clear about their intentions – they wanted him to cooperate with the government secretly. Dr. Sheikhzadeh explained that over the years, he had had many opportunities to work in the intelligence community, but it was not something he wanted to do.  He explained that his goal was to help the Iranians and the Americans to live in peace. And he politely, but firmly, rejected the invitation to cooperate.

At about the same time that Dr. Sheikhzadeh was being interrogated by agents, counsel received a message from an attorney for the government indicating that there was a person in custody charged in a "CIPA case" that "wanted to cooperate" and asked whether counsel was available the following day (3/4/2016).[10] The following morning, counsel appeared in the EDNY courthouse and met Dr. Sheikhzadeh for the first time.  After briefly explaining what it meant to cooperate, counsel was surprised to learn that Dr. Sheikhzadeh, in fact, did not want to cooperate and had already made that clear to the case agents. After several discussions between lawyer and client, there was no doubt about his intentions.

---

[8] https://www.newyorker.com/news/news-desk/trump-and-iran-yet-another-hostage-crisis

[9] https://www.al-monitor.com/pulse/tr/contents/articles/originals/2016/03/iran-un-mission-sanctions-violation-hostage.print.html

[10] Counsel is among the lawyers in the EDNY with the appropriate security clearance level.

### The Plea Negotiations

What followed over the next eight months was standard plea negotiations in a CIPA case. Give and take over sentencing factors and concern about the processing of classified information. When the negotiations reached an impasse, an attorney for the government described information about Dr. Sheikhzadeh's relationship with a nuclear scientist. The understanding was that this information was currently classified and that if the defendant entered a guilty, it would remain classified. No other specific information was provided to counsel about Sheikhzadeh's relationship with the scientist and the classified material had not yet been disclosed. When counsel next met with Dr. Sheikhzadeh, he, counsel, explained that if this undisclosed information were damaging, it likely would have been disclosed and, if serious, would have formed the basis of additional charges. However, it was counsel's view that the parties were close enough to an agreement that it would be prudent to leave this information out of the case. It would be one less potentially aggravating factor to explain away at sentencing. Dr. Sheikhzadeh, who was eager to plead guilty and accept responsibility, agreed. And, on November 21, 2016, he pled guilty before to Counts 2 and 6 of the superseding indictment.

### The Classified Material is Unclassified and Partially Disclosed

A short time after his guilty plea, Dr. Sheikhzadeh was interviewed by the United States Probation Department ("PSI"). The assigned probation officer, Senior United States Probation Officer, Frank Marcigliano, asked no questions about Dr. Sheikhzadeh's relationship with any "nuclear scientists" nor was this issue raised at any time with counsel. Approximately four months after the PSI, the presentence report ("PSR") was completed and sent to the parties. Not surprisingly, no mention was made of nuclear scientists or any of the other relationships that were disingenuously made to appear nefarious in the government's sentence memo dated June 30, 2017 (ecf 34). Instead, on or about May of 2017, counsel for Dr. Sheikhzadeh was advised that additional information had been "declassified." The material that was belated declassified included information about a man named Dr. Behrad Nakhai. Dr. Nakhai is a nationally known nuclear scientist who has worked, among other places, at Oak Ridge National Laboratory located in Roane County, Tennessee.[11]

Now retired, Dr. Nakhai was educated in and has lived and worked in the in the United States since he was a teenager. He is a married father with one grown son and resides in Westchester County, New York. His expertise is on nuclear safety issues, not bomb building. He is an outspoken supporter of JCPOA and advised the Iranian Foreign Minister, Dr. Javed Zarif, on nuclear safety issues while the agreement was being negotiated with Iran and the United States and its allies. As an Iranian citizen, he is well-known to the Iranian government and a frequent visitor to the IMUN. Indeed, a simple "google" search reveals that Dr. Nakhai's involvement with the IMUN goes back decades and exits independently of his friendship with Dr.

---

[11] See: https://www.ornl.gov/

Sheikhzadeh.[12]  In fact, an interview given by Dr. Nakhai in 2005 independently confirms his long-term relationship with the IMUN.  In the live interview, available on "youtube," Dr. Nakhai explains that in 1998, Iran's mission to the U.N. informed him that the government of newly-elected Iranian President Mohammad Khatami wanted him to put together a group of American scientists to visit Iran to inspect the Iranian nuclear program. However, the United States Defense Department objected, and the effort failed. [13]

### A.    The Discovery Waiver in The Plea agreement

Having belatedly raised an issue that has unfairly tarnished the defendant, the government has refused to provide the defense with the information necessary to respond adequately. The information that *has* been provided is selective and incomplete. And in response to a demand for additional information, the government takes the position that a waiver of further discovery contained in the plea agreement supports its refusal to provide *any* additional information.  The plea agreement provides that *"[T]he defendant waives any right to additional disclosure from the government in connection with the guilty plea"* (plea agreement at *5).

### B.    The Waiver is Unenforceable

While waivers, such as the right to appeal or collaterally attack a conviction are "presumptively enforceable," *United States v. Arevalo*, 628 F.3d 93, 98 (2d Cir. 2010), citing, *United States v. Gomez-Perez*, 215 F.3d 315, 319 (2d Cir. 2000), waivers are unenforceable "when the waiver was not made knowingly, voluntarily, and competently, when the sentence was imposed based on constitutionally impermissible factors, [or] when the government breached the plea agreement," Id. (emphasis added); see also, *United States v. Rosa*, 123 F.3d 94, 98 (2d Cir. 1997) (holding that waivers are unenforceable if they are not knowing and voluntary or if the Government breaches the plea agreement); *United States v. Garcia*, 166 F.3d 519, 521 (2d Cir. 1999) (same).  Moreover, "Plea agreements are subject to the public policy constraints that bear upon the enforcement of other kinds of contracts," *United States v. Yemitan*, 70 F.3d 746, 748 (2d Cir. 1995), and "a waiver of the right not to be sentenced on the basis of a constitutionally impermissible factor may be invalid," *United States v. Jacobson*, 15 F.3d 19, 23 (2d Cir. 1994).

Furthermore, the waivers provisions of a plea agreement are unenforceable when there are reasons to "call into question the constitutionality of the process by which the defendant waived his appeal [or collateral challenge] rights in the first place." *Panah v. United States, Docket* No. 02 Cr. 147S, 2006 WL 2056728 (WDNY July 21, 2006), citing, *United States v. Hernandez*, 242 F.3d 110, 113-14 (2d Cir. 2001); *United States v. Djelevic*, 161 F.3d 104, 107 (2d Cir.1998) (per curium); *United States v. Ready*, 82 F.3d 551, 555 (2d Cir. 1996).

---

[12] See, e.g., https://www.google.com/search?q=dr.+behrad+nakhai&rlz=1C1CHBF_enUS760US760&oq=Dr.+B&aqs=chrome.0.69i59j69i57j69i60j35i39j0l2.6352j0j7&sourceid=chrome&ie=UTF-8
[13] https://www.youtube.com/watch?v=mQVawTZqy78

As the Second Circuit explained specifically in the context of the waiver of the right to collaterally attack a conviction pursuant to 28 U.S.C. § 2255, "[A] waiver of appellate or collateral attack rights does not foreclose an attack on the validity of the process by which the waiver has been procured, here, the plea agreement." *Frederick v. Warden, Lewisburg Corr. Facility*, 308 F.3d 192, 195-96 (2d Cir. 2002), citing, inter alia, *Hernandez*, 242 F.3d at 113-14 (declining to enforce a waiver of appellate rights where defendant sought to challenge on appeal the constitutionality of the process by which appeal rights were waived).

Of course, a waiver of rights in a plea agreement cannot be deemed intelligent and voluntary where if, as here, they are waived without knowledge of material information withheld by the prosecution. In this case, the material was classified, to begin with, and the defendant did not even have the right to review it before his guilty plea. And in any event, his decision to waive certain rights was based upon the understanding of counsel that the material would remain classified. Regardless of whether the government believed otherwise, it is the defendant's subject belief at the time that the plea agreement was executed that controls the outcome.

## C.      The Waiver Does Not Apply to Sentence Material

It is well settled that courts interpret plea agreements "in accordance with principles of contract law." *United States v. Griffin*, 510 F.3d 354, 360 (2d Cir. 2007). Since the unambiguous waiver provision relied upon by the government applies only to additional disclosure "*in connection with the guilty plea*" (plea agreement at *5), it is not a waiver of Dr. Sheikhzadeh's right to full disclosure of *sentencing* material. In any event, to the extent that it might be ambiguous, "any ambiguities in the agreement must be resolved in favor of the defendant." *United States v. Flaquer*, 361 F. App'x 222, 223 (2d Cir. 2010).

Accordingly, we respectfully request that the Court order full disclosure of sentence material or, in the alternative, a hearing to be held as soon as the Court can accommodate this request.

Thank you for your consideration in this matter.

Respectfully submitted,

/s/

Steve Zissou

cc: AUSA Peter Baldwin by ecf and email