## Steve Zissou & Associates

42-40 Bell Boulevard | Suite 302 | Bayside | New York | 11361| 718.279.4500 | stevezissou@stevezissouesq.com

December 7, 2017

**BY ECF**

Honorable Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States of America v. Ahmad Sheikhzadeh,* 15-Cr-182 (PKC)

Dear Judge Chen:

Ahmad Sheikhzadeh respectfully submits this Sentencing Memorandum to aid the Court in its determination of a fair and just sentence in this case.  A Sentencing hearing is currently scheduled for December 20, 2017.

### INTRODUCTION

Dr. Sheikhzadeh pled guilty to engaging in a handful of financial transactions with family friends in violation of 17 USC 1705, otherwise referred to as IEEPA.  He did not, however, operate a money transmitting business or a "*Hawala"* as this term is commonly understood to mean. And he was hardly a "Hawaladar." The prohibited financial transactions at issue in this case involved funds that Dr. Sheikhzadeh inherited from his recently deceased father; he did not earn a commission or "fee"; he did not solicit customers, and the transfers were among his family and the families of close friends, private citizens all. Perhaps more importantly, the transactions were for reasons that can fairly be described as humanitarian. For example, on a few occasions, Dr. Sheikhzadeh and his sister, the so-called "co-conspirator," arranged to transfer small sums of money to a sick relative so she might be able to seek medical attention and other such humanitarian purposes.

On another occasion, Dr. Sheikhzadeh agreed to help the daughter of a family friend here in the United States send money to her family in Iran for medical attention and related needs. According to the government, the most serious of these transactions was the transfer of $90,000.00 to another family friend who wanted to help his brother expand his dental office in Iran.  These acts of compassion can hardly be said to have "jeopardized the national security of the United States" as suggested by the government. In all, the transactions totaled approximately $187,000.00.

Dr. Sheikhzadeh also pled guilty to filing a false tax return.  The tax loss to the government was $51,959.00.  Dr. Sheikhzadeh also agreed to forfeit the sum of $85,000.00.  The restitution and forfeiture obligations have been fully satisfied.

His conviction, in this case, is the single blemish on a life that is in all other respects remarkable and admirable. Every sentencing factor identified by section 3553(a) calls for a sentence of time served with one possible exception: the guidelines. The applicable guidelines calculations are a source of dispute between the parties. The defense's position is that the total offense level is 12, with a Zone C range of 10 to 16 months, while the government's position, adopted by the probation department, is that the offense level is 23, with a range of 46 to 57 months. Even were the Court to accept the government's guidelines calculations, section 3553(a) still counsels in favor of a non-custodial sentence.

## Background

Dr. Sheikhzadeh arrived in the United States as a teenager in pursuit of an education.  Along the way, he faced and overcame considerable challenges.  His journey to America was anything but easy. He did not know anyone in the United States and had never traveled alone. Dr. Sheikhzadeh attended English language classes in Norman, Oklahoma, for two months in 1973 and obtained a Bachelor of Science in Electrical Engineering in May of 1978. Aside from engineering, he was also interested in social sciences, and that led him to take classes in political science. And in 1979, he earned a Bachelor of Science in Political Science from University of Houston.  In the same year, his life changed forever with the onset of the Islamic revolution in Iran that brought about the downfall of the pro-Western Shah in 1979. Washington imposed sanctions on Iran following the seizure of the US embassy in Tehran in November 1979 and broke its diplomatic relations with Iran in April 1980, a break which has not been yet restored. Sanctions have been a regular component of US policy toward Iran for more than three decades, and the suffering that the sanctions have caused have been felt by most of the Iranian-Americans living in the United States. This policy has had harsh consequences for American citizens, such as Dr. Sheikhzadeh.

As a direct result of the tension between the two countries, Dr. Sheikhzadeh decided to focus his attention in an area that would position him to try and make a difference.  He received his M.A. in Political Science in January 1981 and then earned his doctorate from Columbia University in 1996. Eventually, Dr. Sheikhzadeh was offered employment as a consultant to the Permanent Mission of the Islamic Republic of Iran to the United Nations in New York ("IMUN") by his high school teacher and old friend, Dr. Kamal Kharrazi. Dr. Kharrazi was then the Permanent Representative of the Islamic Republic of Iran to the United Nations and then became Iran's Minister of Foreign Affairs.  Dr. Sheikhzadeh worked as an outside consultant for the Mission until his arrest in March of 2016. He used to go there for weekly meetings. He was neither part of its local staff nor involved in the decision-making process. Dr. Sheikhzadeh's weekly academic talks and discussions covered international affairs, including Iran-American relations,

US policy towards the Middle East and the Persian Gulf, terrorism, Afghanistan, Iraq, Syria, the United Nations, and energy. Dr. Sheikhzadeh's goal was to provide a greater understanding of American domestic and foreign policies. This greater understanding, he hoped, would lead to a more peaceful and productive relationship between Iran and the United States.

Dr. Sheikhzadeh's is a political scientist. His work at the Mission was scholarly and educational with the objective of enhancing a better understanding between the United States and Iran. He did so by preparing and explaining a weekly report and the "American Views on Iran" from scholarly journals, congressional hearings, mainstream media accounts, and a variety of sources available on the internet. Through the weekly meetings, his goal was to explain a spectrum of American views on any issue and to address certain negative views about the United States, i.e., that the United States was intent on overthrowing the Iranian regime. Dr. Sheikhzadeh's hope was his efforts would further peaceful engagement between the two countries. Contrary to the view, held by some, that any better understanding of the United States by the Iranian government is harmful to US interests, Dr. Sheikhzadeh hoped that it could facilitate further engagement between the two countries. He rejects the zero-sum idea that anything which is good for Iran is bad for the US and vice versa.

Given his position at the IMUN, his Iranian ancestry and his association with Iranian government officials, it was hardly surprising to learn that Dr. Sheikhzadeh had been the subject of surveillance by the Federal Bureau of Investigation, along with other parts of the intelligence community of the United States, for many years. As recent unclassified information demonstrates, for many years, virtually every aspect of Dr. Sheikhzadeh's life has been under a government microscope. Every place he went, every person he met with and every person he communicated with was the subject of government surveillance. The surveillance was virtually unlimited and included Dr. Sheikhzadeh's friends' and friends of friends, even when Dr. Sheikhzadeh was not part of the conversations year after year, after year. This extraordinary level of surveillance included government agents, acting in an undercover capacity, intruding into messaging software apps and posing questions to various parties. And as the nuclear agreement was being negotiated, government agents kept their eyes and ears on him.

On April 13, 2015, the government filed a single count sealed indictment against Dr. Ahmad Sheikhzadeh, the defendant in this case. The single count alleged that on or about April 15, 2009, Dr. Sheikhzadeh filed a false tax return. The allegation was that he failed to include the relatively small sum of $28,000.00 in income on his federal tax return. The following month, on May 18, 2015, the government filed a sealed superseding indictment (S-1). The superseding indictment added other charges arising out of the same facts. The most significant of these included allegations that, between 2007 and 2013, Dr. Sheikhzadeh was involved in a conspiracy to violate the Iranian Transactions and Sanctions Regulations ("ITSR"). A so-called "IEEPA Conspiracy." And, notwithstanding the fact that Dr. Sheikhzadeh, an American citizen of Iranian descent, was living openly in the United States, as he had since he was a teenager, the superseding indictment remained sealed.

On March 3, 2016, Dr. Sheikhzadeh was arrested while he was on his way home after his weekly meeting at Iran's Mission to the United Nations, on Fifth Avenue. Instead of taking him to the nearest available magistrate, agents secreted Dr. Sheikhzadeh in a hotel room in Manhattan and questioned him overnight.  Not surprisingly, Dr. Sheikhzadeh was open and candid with the federal agents that had taken him into custody. In addition to questions concerning his charges, the agents commented about Dr. Sheikhzadeh's friends or colleagues involved in Iranian politics in Iran or the USA.  Agents were clear about their intentions, however; they wanted him to cooperate with the government and to *spy* on his employer even though the charges against him did not include anyone else employed at the Mission.  Dr. Sheikhzadeh explained that over the years, he had had many opportunities to work in the intelligence community, but it was not something he wanted to do.  He told agents that his goal was to help the Iranians and the Americans to live in peace. And he politely, but firmly, rejected the invitation to cooperate.

At about the same time that Dr. Sheikhzadeh was being interrogated by agents, counsel received a message from an attorney for the government indicating that there was a person in custody charged in a "CIPA case" that "wanted to cooperate" and asked whether counsel was available the following day (3/4/2016). The next morning, counsel appeared in the EDNY courthouse and met Dr. Sheikhzadeh for the first time.  After briefly explaining what it meant to cooperate, counsel was surprised to learn that Dr. Sheikhzadeh, in fact, did not want to cooperate and had already made that clear to the case agents. After several discussions between lawyer and client, there was no doubt about his intentions. Notwithstanding Dr. Sheikhzadeh's refused to spy on his friends and colleagues, the government continued its effort to persuade him to do so.

It was not until March 22, 2016, that the charges against Dr. Sheikhzadeh became public. In retrospect, the reason for this is quite clear – Dr. Sheikhzadeh had become a pawn in a political test of wills between the United States of America and the Islamic Republic of Iran. Equally obvious is the fact that the government filed the indictment under seal so that ongoing negotiations between the United States and Iran would not be affected. More importantly, the government's plan all along was to coerce Dr. Sheikhzadeh into secretly cooperating *after* the so-called Iran nuclear deal was completed. And once he unequivocally refused the invitation to do so, he became a bargaining chip in the ongoing give and take between the two governments on a variety of issues.[1] Now there is even speculation that he might be part of a "prisoner exchange."[2]

In fact, many have speculated that the government's prosecution of Dr. Sheikhzadeh is politically motivated and have suggested that he was the victim of selective prosecution. "A number of Iranian websites," reported *Al-Monitor*, "published analyses that the US' primary goal in the arrest is to do another prisoner swap." After reaching the nuclear agreement, the Joint Comprehensive Plan of Action, the United States, and Iran swapped prisoners in January 2016. "Four Iranian-Americans held in Iran were released in exchange for the pardoning of seven

---

1 https://www.nytimes.com/politics/first-draft/2015/07/14/republican-candidates-express-strong-opposition-to-iran-deal/;
https://www.nytimes.com/2017/09/20/world/middleeast/trump-iran-nuclear-deal.html; http://thehill.com/opinion/national-security/355483-trumps-iranspeech-finally-sets-facts-of-sham-nuclear-deal-straight
2 http://www.sandiegouniontribune.com/sdut-iranian-official-hints-at-new-us-prisoner-exchange-2016apr10-story.html

Iranians in the United States, most of whom were charged with violating sanctions on Iran." Considering that the indictment against Dr. Sheikhzadeh was filed almost two years before it was unsealed, some have interpreted his case as a possible move by the United States to build up leverage against Iran to pressure it to free Americans incarcerated in Iran.

When the government finally realized that Dr. Sheikhzadeh's character and core values would not permit him to do so, he was suddenly treated as if he was a danger to national security and the government insisted that he be prohibited from returning to his employment at the IMUN or with having any contact with his employer.  And since he was released from custody, his travel has been severely restricted, and the government insisted that his movements be tracked with a global positioning device.

### The Joint Comprehensive Plan of Action

The Joint Comprehensive Plan of Action (JCPOA), commonly known as the Iran deal or Iran nuclear deal, is an international agreement on the nuclear program of Iran reached in Vienna on July 14, 2015 between Iran, the P5+1 (the five permanent members of the United Nations Security Council plus Germany), and the European Union.  Formal negotiations toward the Joint Comprehensive Plan of Action on Iran's nuclear program began with the adoption of the Joint Plan of Action, an interim agreement signed between Iran and the P5+1 countries in November 2013. For the next twenty months, Iran and the P5+1 countries engaged in negotiations, and in April 2015 agreed on an Iran nuclear deal framework for the final agreement, and in July 2015, Iran, and the P5+1 agreed on the plan.[3] The agreement was reached after, among other things, the United States and the international community agreed to a condition that allowed Iran to continue its nuclear enrichment program with certain verification conditions in place.

### The Burden of Economic Sanctions on Iranian-Americans

The United States has consistently declared that the purpose of its sanctions on Iran is to address the actions and stances by the Iranian Government that threaten US national security, i.e., its support for terrorism or seeking to acquire nuclear weapons. A joint publication entitled "Unintended Victims: The Impact of the Iran Sanctions on Iranian Americans,"[4] suggests that the US government did not intend for the Iran Sanctions to burden Iranian Americans and that it makes no logical sense to do so. Since the target of the sanctions is the government of Iran, it is it seems "unamerican" to target a group of individuals in the US based solely on the fact that they have roots in the targeted country. Doing so would be an affront to foundational US civil rights principles and would create a second-class group of US citizens with inferior rights under the law. Thus, targeting Iranian Americans is not and could not be the goal of the Iran Sanctions.

---

3https://www.state.gov/e/eb/tfs/spi/iran/jcpoa/;https://query.nytimes.com/search/sitesearch/?action=click&contentCollection&region=TopBar&WT.nav=searchWidget&module=SearchSubmit&pgtype=Homepage#/iran+nuclear+deal/from20150713to20150720/

[4] http://www.advancingjustice-alc.org/wp-content/uploads/2012/11/Unintended-Victims_Nov-2012_FINAL-Report.pdf

However, the US sanctions on Iran have had collateral effects. And one of "the most troubling collateral effects of the sanctions is the unintended targeting of a subgroup of people in the United States – Iranian Americans. And yet, it is this community that is bearing an unjust and an unintended burden under the sanctions." This study examines "the unintended, yet harsh, impact the sanctions have had, and continue to have, on Iranian Americans and other US persons." And it points out that "the complexity of the Iran Sanctions, the lack of knowledge around what the sanctions allow and prohibit, and the lack of useful guidance for community members from agencies charged with administering and enforcing the sanctions are major factors contributing to the troubling burden on the Iranian American community."

The Iranian Transactions Regulations (ITR), now renamed the Iranian Transactions and Sanctions Regulations (ITSR),[5] were put in place, at least in part, to create division within the Islamic Republic of Iran in the hopes that the pain would be felt by the citizens of Iran.[6] This pain would, at least in theory, encourage the people to put pressure on the so-called "hardliners" to moderate their worldview.[7] The current administration, of course, has consistently been hostile toward JCPOA. The extent of this hostility has, according to recent reports, served to unite Iranians in a way that is inconsistent with American interests in the region.[8] And, ironically, inconsistent with the goals of the sanctions under which Dr. Sheikhzadeh has been prosecuted.

The overzealous prosecution of Dr. Sheikhzadeh will, no doubt, create much the same attitude among the many Iranian American Citizens in the United States. "Simply put, if the real objective of the sanctions was to hurt ordinary Iranians, they have been successful. If they were intended to compel Iran to cease its current nuclear program, they have not only failed, but have actually resulted in acceleration of the program."[9]

Recent public opinion surveys of Iranian-Americans support the conclusion that sanctions hurt American Citizens. More than eight in ten Iranian-Americans reported having immediate family members in Iran, and many maintain close ties with their family members.[10] Regarding concerns about the impact of US sanctions on the Iranian-American community, another survey discovered that more than forty percent claimed the restrictions on transferring money between Iran and the United States to be burdensome on their lives.[11] Ordinary transactions that are taken for granted by US persons are virtually nonviable if the term "Iran" appears in the transaction documents. Foremost, the sanctions have made it nearly impossible for Iranian-Americans to transfer family or personal remittances (i.e., non-commercial) between the United States and Iran. Moreover, all the Iranian-Americans that counsel has interviewed explain that even if a contemplated transfer is not prohibited or otherwise exempt from the ITSR regulations,[11]

---

5 https://www.law.cornell.edu/cfr/text/31/part-560
6 https://www.law.georgetown.edu/academics/law journals/gjil/recent/upload/zsx00313000915.PDF
7 http://thehill.com/blogs/pundits-blog/foreign-policy/345329-trump-sanctions-set-stage-for-necessary-regime-change-in
8 https://www.nytimes.com/2017/11/26/world/middleeast/iran-nationalism-saudi-arabia-donald-trump.html
9 https://www.al-monitor.com/pulse/originals/2013/04/iran-sanctions-consequences-list.html
10 http://www.advancingjustice-alc.org/wp-content/uploads/2012/11/Unintended-Victims_Nov-2012_FINAL-Report.pdf

11 http://www.paaia.org/CMS/Data/Sites/1/PDFs/2011surveyofiranianamericans.pdf.
11 https://www.law.cornell.edu/cfr/text/31/560.550

American financial institutions, not surprisingly, regularly refuse to participate in such transactions. Even today, and even with an OFAC license, there is no way to complete even a non-prohibited financial transaction because the banking system will not participate. In other words, while this does not excuse the violation of law, Dr. Sheikhzadeh is hardly alone.

### The Belatedly Declassified Material

A short time after his guilty plea, Dr. Sheikhzadeh was interviewed by the United States Probation Department ("PSI"). The assigned probation officer, Senior United States Probation Officer, Frank Marcigliano, asked no questions about Dr. Sheikhzadeh's relationship with any "nuclear scientists" nor was this issue raised at any time with counsel.   Approximately four months after the PSI, the presentence report ("PSR") was completed and sent to the parties.  Not surprisingly, no mention was made about a "nuclear scientist" or any of the other relationships that were disingenuously made to appear nefarious in the government's sentence memo dated June 30, 2017 (ecf 34).  Instead, on or about May of 2017, counsel for Dr. Sheikhzadeh was advised that additional information had been "declassified."

The selectively declassified material includes, for the most part, email exchanges without providing the complete trail of email messages. And the telephone conversations that have been provided are, at least in part, nothing more than an agent's summary recollection that, when isolated as they are, are the foundation for the government's sentencing memorandum, an artful legerdemain that attempts to transform the benign into the nefarious. And suggests that the narrative it creates are the brainchild of an office far from the Eastern District of New York. The sole purpose being the hope of obtaining a lengthy jail sentence so that Dr. Sheikhzadeh can be used as leverage to obtain information and or concessions from the Iranian government.

Revealingly, when he was taken into custody, among the very first things that the case agents did was to show Dr. Sheikhzadeh a photograph of the missing retired FBI agent, Robert Levinson. Mr. Levinson was working as a private investigator in 2007 when he disappeared while traveling to Kish, an Iranian resort island.[12]  Since his disappearance, each succeeding American administration has made his return a priority. President Trump, a frequent critic of Iran, has said that he would "guarantee" US citizens held by the country would be released. In fact, in 2015, as his electoral campaign began to gain momentum, he claimed that Levinson would be released before he even took office, "If I win the presidency, I guarantee you that those four prisoners (including Levinson) are back in our country before I ever take office," Trump said at an event on Capitol Hill on Sept. 10, 2015. "I guarantee that."[13]

In its submission, the government asks the Court to draw several inferences that are not supported by the evidence. Among these claims is the suggestion that "the defendant's work for the IMUN principally has involved.… recruiting other individuals in the United States to work on

---

[12] http://www.cnn.com/2014/03/05/world/robert-levinson-fast-facts/index.html
[13] https://www.cnsnews.com/news/article/patrick-goodenough/trump-if-i-win-presidency-i-guarantee-iran-will-return-four

behalf of Iran." And that Dr. Sheikhzadeh "has recruited others, and, in turn, these individuals were used to further Iranian strategic interests" and that this "must not be condoned." Furthermore, the government provides communication of Dr. Sheikhzadeh with Dr. Nakhai and Farnaz Fassihi as evidence for recruitment of these individuals. Dr. Sheikhzadeh was neither asked by the Mission to recruit anybody nor has he ever tried to recruit anyone. The case of the Scientist is explained in detail only to create the false impression that Dr. Sheikhzadeh's consulting work related to nuclear issues. It did not. As a political consultant, Dr. Sheikhzadeh was required to conduct research on political issues relevant to Iranian-American relations and to educate the Ambassador and other Iranian diplomats on all of them. He did this by reading material from readily available public sources. His communications with Dr. Nakhai were, for the most part, about current affairs which included discussions about nuclear energy for civilian purposes as covered in media and news. The government takes these communications out of context to create the impression of villainy. What was benign becomes "recruitment" of a "nuclear scientist." That the government would ask the Court to draw such a negative inference given the paucity of supporting evidence is not just wrong, it is shameful.

Examples of the government's tenuous hold on accuracy are easy to find. But perhaps the most egregious example is the government's unseemly effort to turn Dr. Sheikhzadeh's friendship with Dr. Berhad Nakhai into something sinister. In its sentencing memorandum, the government writes that Dr. Sheikhzadeh "has undertaken numerous important tasks designed to further the interests of the Iranian government and, in particular, the Iranian government's efforts to develop nuclear enrichment capabilities." These efforts, according to the government, revolve around his "recruitment" of Dr. Berhad Nakhai. However, as the government well knows, or at least knows now, the so-called nuclear scientist that Dr. Sheikhzadeh allegedly "recruited," Dr. Berhad Nakhai, has had a decades-long relationship with the Iranian government and is a frequent contributor on the topic of nuclear safety and is well known at the IMUN. This conclusion is supported by various material readily available on the internet[14] as well as counsel's interviews of Dr. Nakhai and Dr. Javed Zarif, the Foreign Minister of the Islamic Republic of Iran along with other individuals at the IMUN.[15]

The material that was belatedly declassified also included information about Dr. Nakhai, a nationally known nuclear scientist who has worked, among other places, at Oak Ridge National Laboratory located in Roane County, Tennessee.[16] Dr. Nakhai was introduced to Dr. Sheikhzadeh by mutual friends and staff at the IMUN during public meetings or Iranian ceremonies and gatherings. Now retired, Dr. Nakhai was educated in and has lived and worked in the United States since he was a teenager. He is a married father with one child and currently resides in Westchester County, New York. His expertise is the safety of nuclear power stations, not in developing material related to nuclear enrichment or nuclear weapons. He is an active and outspoken supporter of JCPOA and has communicated with the Iranian Foreign Minister, Javed Zarif, on nuclear safety issues while the agreement was being negotiated with Iran and the United States

---

[14] https://www.opendemocracy.net/democracy-irandemocracy/nuclear_research_3911.jsp
[15] http://www.ipsnews.net/2012/10/pentagon-nixed-1998-u-s-nuclear-scientists-probe-of-iranian-programme/
16 https://www.ornl.gov/

and its allies. He has a professional understanding of available nuclear safety policies and guidelines published by professional agencies.

As an Iranian citizen, he is well-known to the IMUN. Indeed, a simple "google" search reveals that Dr. Nakhai's involvement with the IMUN goes back decades and exits independently of his friendship with Dr. Sheikhzadeh.[17] In fact, an interview given by Dr. Nakhai in 2005, confirms his long-term relationship with the IMUN. In the live interview, available on "youtube," Dr. Nakhai explains that in 1998, Iran's Mission to the U.N. informed him that the government of newly-elected Iranian President Mohammad Khatami wanted him to put together a group of American scientists to visit Iran to inspect the Iranian nuclear program. However, the United States Defense Department objected, and the effort failed.[18]

Counsel has interviewed Dr. Nakhai regarding the allegation that he was "recruited" by Dr. Sheikhzadeh or was involved in any impropriety. He denies any such allegations and stands ready to testify under oath before this Court. Counsel has also interviewed Iranian Foreign Minister, Javed Zarif. Dr. Zarif confirms that Dr. Nakhai has been a visitor to the Mission since the 1990's. In short, the representations made by the government are entirely false.

Equally repugnant is the government's effort to tarnish a well-respected and award-winning Iranian-American journalist, Farnaz Fassihi, senior Middle East correspondent for The Wall Street Journal and a former Nieman Fellow at Harvard University. According to her bio, Ms. Fassihi began reporting on conflicts in the Middle East after 9/11, when she asked to be sent to Afghanistan to cover the war for the New Jersey Star-Ledger; a year later she was hired by The Wall Street Journal. Since 2001, she has covered the Second Intifada Palestinian uprising, the US's invasion of Iraq, the uprising and "Green Movement," the Israeli-Lebanese conflict, and the Arab Spring.

Ironically, the "hardliners" in the US are not the only ones that have targeted Ms. Fassihi for doing her job as a journalist. In 2015, the hardliners in *Iran* accused her of spying for the *US government.*[19] Now the US government suggests that she was "recruited" by an Iranian operative for some sinister purpose. Perhaps suggesting that the two governments may have more in common than either would care to admit.

Dr. Sheikhzadeh has known Ms. Fassihi for many years and communicated with on a regular basis. Obviously, as a professional journalist she has established her own sources including Iranian government officials. Dr. Sheikhzadeh's communications with Ms. Fassihi were hardly inappropriate.

---

17 https://www.google.com/search?q=dr.+behrad+nakhai&rlz=1C1CHBF_enUS760US760&oq=Dr.+B&aqs=chrome.0.69i59j69i57j69i60j35i39j0l2.6352j0j7 &sourceid=chrome&ie=UTF-8

18 https://www.youtube.com/watch?v=mQVawTZqy78

19 https://www.wsj.com/articles/the-wall-street-journal-rebuts-iranian-charges-of-spying-by-its-reporter-1440000378; http://nieman.harvard.edu/news/2015/08/nieman-condemns-attacks-against-journalist-farnaz-fassihi/; https://www.iranhumanrights.org/2015/08/fabrication-in-iranian-reports-on-wall-street-journal-reporter-exposed/; http://bit.ly/2AQyQ9U

The government also disingenuously misrepresents the scope and nature of Dr. Sheikhzadeh's work for the IMUN, spinning it in a way that is not just wrong but extremely unfair. And in any event, the proffered evidence does not demonstrate by a preponderance of the evidence that his conduct was in any way unlawful or improper or otherwise undermined the national security of the United States. Indeed, since the government has known what Dr. Sheikhzadeh has been doing on a day to day basis for more than a decade, the notion that his conduct was a threat to national security is belied by the fact that he was allowed to continue to do the same things year after year after year. In short, if his conduct constituted a threat to the United States, why was he allowed to continue?

Considering the opposition to and sensitivity of Iran's nuclear program in the United States, the government sentencing memo exaggerates the significance of this issue in Dr. Sheikhzadeh's work to sway the court into giving him a longer sentence. By constantly stating and underscoring that he was instructed to "obtain information," and to "to collect strategically important information about specific topics and specific individuals – including, among others, US-based politicians and scholars" it leaves the false impression that he was acting as a traitor and a spy. Moreover, it implies that whatever he did was directed by the government of Iran. These are irresponsible charges with no basis. It appears the report is written by those who are against any American engagement with Iran and its nuclear program and hold the view that Iran is a hostile state that must be isolated, confronted, contained, deterred, and that its regime changed. Dr. Sheikhzadeh, on the other hand, believes that the mutual distrust and hostility between the United States and Iran must be resolved through diplomatic engagement, reconciliation, trust building, and tension reduction. And the recent nuclear agreement between Iran and the United States and international community indicates that other issues should also be addressed through negotiations. His professional consulting position at the IMUN should be considered as a mitigating factor rather than an aggravating factor as suggested by the government.

## I.      DR. SHEIKHZADEH'S HISTORY AND CHARACTERISTICS

Courts routinely begin sentencing analyses with the guidelines. And, on occasion, the guidelines provide a reasonable approximation of the analysis prescribed by 3553(a). The guidelines are given weight precisely because it is assumed that the Sentencing Commission has generated them acting in "the exercise of its characteristic institutional role," in which it considers the 3553(a) factors in light of empirical data. See *United States v. Kimbrough*, 552 U.S. 85, 109 (2007). In this case, however, the guideline analysis, advanced by the government fails to capture the factors set forth in 3553 (a).

The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition, drug or alcohol addiction, employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines. See United States Sentencing Commission, Guidelines Manual

§§ 5H1.1-6, 11, and 12 (Nov.2006). These are, however, matters that § 3553(a) authorizes the sentencing judge to consider. See, e.g., 18 U.S.C. § 3553(a)(1). *Rita v. United States*, 551 U.S. 338, 364-65 (2007) (Stevens, J. and Ginsburg, J., concurring); see also Rita, 551 U.S. at 351 (a court may vary where "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

Dr. Sheikhzadeh's devotion to family and friends, his educational and vocational background, his prior good deeds and his future potential are truly remarkable. Section 3553(a)(1) mandates that these factors be considered in determining a sentence "sufficient, but not greater than necessary" to serve the purposes of sentencing. However, the guidelines expressly do not include any of these factors in calculating a sentencing range. See U.S.S.G. §§ 5H1.2 (educational and vocational skills not considered by guidelines), 5H1.5 (employment record not considered by guidelines), 5H1.6 (family ties and responsibilities not considered by guidelines), 5H1.11 (record of prior good works not considered by guidelines). To sentence Dr. Sheikhzadeh within the guideline range would be to fail to account for his remarkable personal history and characteristics; it would violate section 3553(a).

Accordingly, in this case it is particularly important to remember the guiding statutory principles referred to as the "parsimony" clause of section 3553(a). The Court must impose a sentence "sufficient, but not greater than necessary," to comply with four specified stated objectives, *Graham v. Florida*, 130 S.Ct. 2011, 2028 (identifying "retribution, deterrence, incapacitation, and rehabilitation"), considering seven non-exclusive factors. See 18 U.S.C. §3553(a). The guidelines are one – and only one – of those seven factors. That the guidelines utterly and expressly fail to account for several other specified factors – factors that in Dr. Sheikhzadeh's case are perhaps the most compelling and important in developing a reasonable sentence – renders the guidelines less useful as a starting point than in most cases. Indeed, as will be addressed below, none of the recognized objectives would be furthered by prison time.

The many detailed letters written in support of a lenient sentence testify to Dr. Sheikhzadeh's warm and generous nature and enthusiasm for the important things in his life, such as his loyal devotion to his friends and family, his professional and academic success. These letters come from a diverse group of people who have encountered Dr. Sheikhzadeh: professors, friends from college and graduate school, neighbors and family.

They describe a person of diligence, intelligence, curiosity, kindness, humility, selflessness, courtesy, integrity, enthusiasm, and excellence. While each quality, standing alone, is commonplace and to be found in countless people, the combination of these qualities found in one man distinguishes Dr. Sheikhzadeh from most. The sincerity of the expressions in the letters and the consistency of certain themes regarding Dr. Sheikhzadeh's character, they describe a man of warmth, generosity, integrity, and devotion to his friends and family. Many have known him for decades.

For example, Iftikhar Ali, has known Dr. Sheikhzadeh since 1986 and described him in a way that suggests his depth as a person:

> Few people are as attuned to the common goals and aspirations of ordinary Americans and Iranians. He is above all, a humanitarian who wanted to expose his employer to everything good about America.

And offered a personal note:

> Ahmad stepped in to help me save my home after my brother had been kidnapped and lent me the money to avoid an eviction without my even having to ask for help. He has a generous heart and did not want to see me suffer.

And the role that he plays in their West Village community:

> He is an integral part of the neighborhood we live in and is especially kind to the elderly. Ahmad is simply one of the kindest people I have ever met.

Dr. Masi Hashemian, a practicing dentist who resides in Irvine, California, has also known Dr. Sheikhzadeh for more than 30 years.  She describes his family and the values his family instilled in him as a child:

> I met Ahmad when we were in Junior High or early years of High school. Our fathers became partners in different ventures and remained partners until we left Iran and migrated to US in 1983. All through my childhood and later in my adult conversations with my dad I heard nothing but that this family has the highest standard of integrity amongst his vast group of friends and business partners. Ahmad was raised by a family who were truly caring and kind not only towards their own, but to strangers in need. Many examples of which have been etched in my mind and I cherish those as guiding principles to live by.

She also gives an anecdote about him:

> I remember when Ahmad was coming back to USA to continue his education, it was my dad who accompanied

> him. My dad has thought of Ahmad as his own son, the
> son that he never had. Throughout these last almost 4
> decades that we have had the fortune of living in the
> United States, Ahmad has kept very close contact with
> our family by calling almost every week to just make
> sure my mom and dad are doing ok. Whenever my
> parents had any medical problems, Ahmad has been so
> concerned that he would be calling to check on them
> even more than my sisters and I did!

Elahé Sharifpour-Hicks is a co-founder and executive director of Partners for Rights, a small non-governmental organization based in New York. She was the Iran researcher for Human Rights Watch (HRW), a leading nongovernmental international human rights organization in the United States, from 1994 until 2004. She met Dr. Sheikhzadeh during her time at HRW in the early 1990s through a mutual friend at Columbia University.  Given her history, she is well situated to provide some insight about the man standing before the Court:

> Dr. Sheikhzadeh arranged personally a meeting with
> Hojatoleslam Mohsen Kadivar. Dr. Kadivar was a
> reformist intellectual clergyman who had at the time
> just been released from the prison. He had been jailed
> because of his public criticisms of the Iranian
> government. Dr. Kadivar was very skeptical about the
> works of the Western human rights organizations. In our
> meeting in my office, thanks to Dr. Sheikhzadeh, I had
> the chance to have very constructive discussions
> regarding the rights of religious minority Bahai's and
> the LGBT community with Dr. Kadivar. This seemed a
> breakthrough. Both topics were seriously taboo for
> Shi'a clergymen at the time. . . After I left HRW to join
> the United Nations High Commission for Human Rights
> as a human rights officer in Iraq in 2003, I still benefited
> from Dr. Sheikhzadeh's diligent weekly collection of
> writings about Iran.

And she described the support that Dr. Sheikhzadeh provided to her when experienced a traumatic event:

> I am a survivor of a horrific terrorist attack at the UN
> compound in Baghdad in August 2003. That day, I
> could not be more grateful to hear friends and
> colleagues phone calls pouring into me. The first call

> that I received was from Ahmad to seek my whereabouts after the explosion. I never forget his tears of joy and relief, when he was realized that I am alive. His kindness and his friendship stay from that date with me and my family.

And his compassion:

> Five years ago, when my father passed away, my small family felt so lonely and for that reason Ahmad didn't leave us alone. He held our hands throughout those sad days. Ahmad even used to call my mother weekly, he was encouraging her to, step by step, recuperate from her loss.

And her assessment of his character:

> I am so proud to have a great support for my works and a kind friend like Ahmad. Knowing Ahmad to be a caring, supportive friend and a valued professional contact and colleague, I wish to emphasize that he has much to contribute to society. I know that his current situation is taking a heavy toll on him personally, and I hope you will take into consideration his good character and many valuable contributions to academic and humanitarian causes, including in the area of advancing human rights in Iran.

All the letters express similar sentiments in different ways. But the assessment of all the writers is the same, that Dr. Sheikhzadeh is a decent, humble man of great principle.  Exactly the kind of man that had the strength to say no to the FBI when he was asked to spy on his employer, no matter the cost to him personally.

Perhaps because of his own extensive biography, among the most important letters was one authored by Columbia University Professor, Gary Sick.  As he explains in his letter to the Court, Professor Sick a Senior Research Scholar and adjunct professor of international affairs at Columbia University. He is also the former director of the Middle East Institute (2000-2003). More importantly, he served on the National Security Council staff under Presidents Ford, Carter and Reagan. In addition, he was the principal White House aide for Iran during the Iranian Revolution and the hostage crisis. He is also the author of two books on U. S. -Iran relations, in addition to several other edited books and articles dealing with US Middle East policy. He is a

captain (ret.) in the US Navy, with service in the Persian Gulf, North Africa and the Mediterranean. And for five years he was the deputy director for International Affairs at the Ford Foundation, with responsibility for programs relating to US foreign policy.

Professor Sick currently teaches a graduate seminar in the School of International and Public Affairs at Columbia and he is a member (emeritus) of the board of Human Rights Watch in New York and founding chair of its advisory committee on the Middle East and North Africa. Since 1993 he has been the executive director of Gulf/2000, an international online research project on political, economic and security developments in the Persian Gulf, with some 2,000 members across the globe.

There can be no doubt that Professor Sick is a patriotic American who has served his country with distinction over a long and productive career. And, more importantly, like many of the writers, he has known Ahmad Sheikhzadeh for more than 30 years. He makes it clear in his letter that Dr. Sheikhzadeh is a man of extraordinary character:

> I am writing with regard to Ahmad Sheikhzadeh, PhD, whom I met as a student in the early 1980s, when he took a seminar on Middle East politics that I was teaching with Professor J.C. Hurewitz. I was aware that he had received a Certificate from the Middle East Institute, and I saw him from time to time on the Columbia campus as he was completing his graduate studies and working on his dissertation.
>
> I was invited to participate as a member of the committee that examined Sheikhzadeh on his doctoral dissertation in 1996. His dissertation was a very academic work. He chose a series of key points during the reign of the former Shah of Iran and examined them in light of a contemporary theory of international relations. I remember two things about that examination: first, that the facts surrounding a series of events in the Third World country did not fit very well into a theory of politics that was based primarily on Western, and especially US sources; and second, I was struck by the fact that Sheikhzadeh chose to examine the policy actions of the former Shah when he could have taken the more newsworthy and politically-charged path of examining the evolving policies of the Islamic Republic, that had overthrown the Shah and his government. His dissertation was thoroughly theoretical

and apolitical, which was unusual for Iranian-Americans at a time of great political turmoil in their native country.

My primary contact with Dr. Sheikhzadeh was in relation to the Gulf/2000 project that I was developing over those years. I started the project in 1993 with a very small number of members, mostly professional acquaintances who shared an interest and expertise in the politics of the Persian Gulf. I don't recall when Sheikhzadeh joined, but it must have been shortly after the project began, while he was working on his PhD.

The Gulf/2000 project attracted people with expertise and often very strong opinions. We have members who despise the Islamic Republic and openly call for its elimination. We have others who believe that Iran is unduly maligned and who support it against its many opponents. I am quite conscious of these differences since, as the moderator of the group, it is my task to keep the dialogue civil and professional. Sheikhzadeh never participated in these debates. Instead, he later began sending me articles relating to Iran that he had culled from a very wide range of published sources. I assumed he had a contract, probably with the Iranian Mission to the UN (which I later confirmed), preparing a digest of the American media for the staff. I have other members with similar jobs for think tanks and commercial organizations, and they frequently share the results of their work with me without compensation, as he did.

Sheikhzadeh's contributions were very useful since they covered more territory than I could manage by myself. Moreover, Sheikhzadeh sent me articles that both praised and damned the Islamic Republic, all without comment. Part of Gulf/2000 involves promoting dialogue among experts; another feature is a one-stop site to find a wide range of hard news and commentary about the region.

In all my dealings with Ahmad Sheikhzadeh over more than thirty years, it has been my strong impression that

> he is a dedicated student and researcher. Both in his work as a diligent PhD candidate and in his later documentation work that he shared with me, he was always in pursuit of facts and was never in the least partisan. In fact, I always took some satisfaction in knowing that the material he was presenting to the Iranian Mission was instructing them on all aspects of US opinion about their country, most of which was negative in tone. I am pleased to count him as a fellow American citizen.

In his simple closing, Professor Sick, who knows more than any agent or lawyer what is in Dr. Sheikhzadeh's heart, makes it unequivocally clear what his opinion of him is - *I am pleased to count him as a fellow American citizen.* What greater compliment can be given to a man or a woman?

As reflected in the extraordinary letters submitted on his behalf, there is nothing less than admirable about Dr. Sheikhzadeh's history. He is a man of great character and integrity and these characteristics alone strongly favors a non-custodial sentence.

## II.   THE NATURE AND CIRCUMSTANCES OF DR. SHEIKHZADEH'S OFFENSE ALSO SUPPORT IMPOSITION OF A NON-CUSTODIAL SENTENCE

In addition to requiring that the Court consider the characteristics of the defendant, section 3553(a) also requires that the Court consider the nature and circumstances of the offense. Dr. Sheikhzadeh was not charged with transferring weapons of mass destruction; he was not charged with providing aid and support to a terrorist organization or a country supporting such organizations. He was not charged with money laundering. Unlike the usual defendant in such cases, he had no intention of profiting from any of these transactions. He was charged with engaging in prohibited financial transactions with individuals in another country, transactions that would have been lawful had they been routed through a US financial institution rather than through private citizens.

Even accepting the government's version of the facts entirely, Dr. Sheikhzadeh's offense was for receiving his own money from his family a handful of times through a mechanism by which he knew money would be sent to individuals in Iran each time he received his family's money. Every category of crime has a heartland of offenses: Dr. Sheikhzadeh's violation of IEEPA is at the outer periphery of possible offense conduct; he did not intend to receive interest of fees and no funds were transmitted to a government or terrorist organization; his offense did not involve the transfer or attempted transfer of nuclear, biological or chemical weapons or advanced technology. The transfers were for humanitarian reasons. Dr. Sheikhzadeh aided and abetted a system by which families split by an international border and financial prohibitions exchanged money. His offense was nothing more and, of course, nothing less.

Dr. Sheikhzadeh likely could have received the money from his family precisely as he did had the license he sought from the Treasury Department been issued, as it eventually was. And once the license was issued, the informal transfers, as well as his tax avoidance, came to an end. This is evinced by his proper tax filings in the year before his arrest. Further illustrating the magnitude of offense conduct in this case is the fact, that where money transfers of the sort at issue in this case are deemed by the Department of the Treasury's Office of Financial Asset Control ("OFAC") to be problematic, they are handled civilly.[20] Because this case did not involve terrorism or money laundering and because it does not involve the Iranian nuclear, defense or oil and gas sectors, or the Government of Iran, this is the type of case that would traditionally and more appropriately have been handled in the civil penalty context. It was not. And, as described below, the reason it was not is clear: the US government wanted to coerce Dr. Sheikhzadeh into becoming a spy against his employer thereby putting his life and the lives of every member of his family in danger.

The sanctions that prevented Dr. Sheikhzadeh from legally transferring *his own money* to the United States is clearly targeted at the Government of Iran, its leadership, its various agencies, instrumentalities, controlled entities and support structure, including Iran's Revolutionary Guard Corps, and other such organizations necessary for the support and continuation of the current Governmental hierarchy. Dr. Sheikhzadeh's conduct involved families sending money across borders. And the sanctions at issue did not punish the government of Iran, it punished an American Citizen − Ahmad Sheikhzadeh. These facts place his offense conduct among the least serious targeted by IEEPA.

Moreover, as set forth above, Dr. Sheikhzadeh did not intend to profit from these transactions as a true hawaladar by receiving fees for money transferred. And even when such profit is involved, in most cases we have found – including cases with far more serious and troubling facts than Dr. Sheikhzadeh's – the sentences are rarely as severe as that recommended by the government, and they are rarely guideline sentences.

## III.   A NON-CUSTODIAL SENTENCE WILL AVOID UNWARRANTED SENTENCE DISPARITIES BETWEEN LIKE CASES

One of the seven factors set forth in section 3553(a) is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Faced with conduct comparable and sometimes more severe than in this case, Courts routinely vary or depart from the guidelines. The failure of the guidelines to capture the nuance of the offense conduct requires such a result. A sentence greater than time served would create a substantial disparity with sentences in cases involving conduct that was, if anything, more threatening to the security and foreign policy interests of the United States.

---

20 https://www.treasury.gov/resource-center/sanctions/CivPen/Pages/civpen-index2.aspx

### A. Variances from the Guidelines in Money Transfer Cases Under 18 U.S.C. § 1960 and IEEPA Are Significant and Common

The government recommends a sentence above a guideline range of 46 – 57 months. We have found no sentence of that magnitude in any comparable case. Courts sentencing in money transmittal cases under 18 U.S.C. § 1960 or IEEPA commonly depart downwards or vary, courts frequently reducing by half—if not more—the adjusted offense level prior to departures. Cases lacking such downward departure have involved facts much more egregious than and easily distinguishable from the facts in Dr. Sheikhzadeh's case.

In *United States v. Anvari-Hamendani*, No. 3:04-CR-786 (N.D. Oh. Nov. 22, 2006), the defendant was convicted on IEEPA and money laundering charges for transferring over $4 million to Iran, $650,000 of which was laundered. The Presentence Investigation Report in *Anvari-Hamendani* recommended a base level of 21 (37-46 months) based on the amount of funds laundered. The court, however, imposed a sentence of three years' probation and 60 days in a community corrections center. Although the court did not issue a written opinion, the court likely departed or varies downward given the disparity between the recommended base level and ultimate sentence.

Similarly, in *United States v. Bariek*, No. 05 CR150(JCC), 2005 WL 2334682 (E.D. Va. Sept. 23, 2005), the defendant pled guilty to transferring $4.9 million to Iran, Afghanistan, and Pakistan, in violation of 18 U.S.C. § 1960. After accounting for acceptance of responsibility, the defendant's adjusted offense level was 21 (37-46 months)**.** Id. at *3. However, the court then departed downwards and only sentenced the defendant to 18 months for several reasons, including that the defendant had "little or no mens rea" and no criminal history, the defendant had been steadily employed, and a harsher sentence would serve no deterrent function. Id. at *5. The court's departures from the adjusted offense level resulted in a sentence half as long as it would have been without departures.

And in *United States v. Habbal*, No. 05 CR 83(JCC), 2005 WL 2674999 (E.D. Va. Oct. 17, 2005), the defendant's base offense level was 24, based on his transfer of $6.4 million to Syria, Lebanon, and Europe in violation of 18 U.S.C. § 1960. After subtracting 3 levels for acceptance of responsibility, the defendant's adjusted base offense level was 21 (37-46 months). Id. at *1. Yet the court then departed sharply downwards to level 13. Id. at *4. The court noted, among other reasons, that it was the defendant's first criminal offense, the violation was unintentional at least for a period, and there was little risk of recidivism. Id. at *3-4. The court ultimately sentenced the defendant to 12 months and one day in prison—a third of what the defendant would have received in the absence of any departures. Id. at *5-6. And this in a case where the defendant was estimated to have transferred $23 million to Syria and elsewhere in a for-profit, widely-advertised enterprise.

B.     Significant Downward Departures in IEEPA Goods Cases Are Nearly Always Granted Provided the Goods Are Nonmilitary and the Government of Iran is Not the Recipient

Courts also depart downwards in IEEPA cases based on exports of goods to Iran, provided those goods are non-military and non-governmental.  These departures are both routine and significant. The reason that courts routinely depart downwards in non-military/non-governmental IEEPA cases is clear:  without such departures, the results would lack both common sense and fairness.  The sentence for exporting paperclips to Iran would be the same as the sentence for exporting nuclear weapons to Iran.  Indeed, as discussed above, it is to avoid this result that application note 2 to U.S.S.G. § 2M5.1 allows the court to "consider the degree to which the violation threatened a national security interest" (emphasis added).   Courts have seized upon application note 2 to depart downwards in IEEPA cases.  For example, in *United States v. Groos*, No. 06 CR 420, 2008 WL 5387852 (N.D. Ill. Dec. 16, 2008), the court found that the defendant's export of $25,000 worth of fire sprinkler equipment to Iran placed him at an offense level of 26. The judge then reduced the level to 20 based on application note 2, finding that the "harshest punishment [i.e., a base level of 26] should be reserved for cases where weapons or military technologies are at issue and where the threat to national security is apparent."  Id. at *5. Moreover, after subtracting another 3 levels for acceptance of responsibility, the court departed downwards significantly, imposing a sentence of 60 days in prison plus one year of probation.  Id. at *10.  In its reasoning, the court observed that "courts generally do not impose harsh punishment for sanction crimes that involve nonmilitary goods," id. at *8, and that "a long period of incarceration is not necessary to serve the goals of sentencing," id. at *10.

The court in *United States v. Sevilla*, No. 04 CR 0171, 2006 WL 3486872 (N.D. Ill Nov. 30, 2006) followed similar logic.  The court calculated a base offense level of 26 for the defendant's export of (nonmilitary) tensile strength measuring equipment to Iran, and then subtracted 2 levels for acceptance of responsibility.  At level 24, the defendant would have received 51-63 months in prison.  Id. at *3. However, the judge departed downwards to level 10 and sentenced the defendant to five years of probation.  Id. at *3-4.  The judge noted that there was no evidence of criminal or terrorist intent, that the export did not threaten controls related to nuclear, biological or chemical controls, and that the volume of commerce was minimal.  Id. At *3. The judge further noted that a term of imprisonment of 51 to 63 months was inconsistent with sentences among similar defendants, and that several positive letters had been submitted in support of the defendant.  Id.  Many of the cases show similar patterns.  See, e.g., *United States v. Gaillard*, No. 07 CR 438 (ARR) (E.D.N.Y., 2008) (sentencing defendant to 30 days in prison plus probation for export of laboratory equipment to Iran, where the government had calculated an adjusted base offense level equivalent to 46-57 months in prison); *United States v. Mahmood*, No. 1:04-CR-00365 (D.D.C. Jan. 19, 2006) (sentencing defendant to time served of 17 months plus probation where the Presentence Investigation Report had recommended an adjusted offense level equivalent to 46-57 months in prison).

Compared to goods cases, hawala cases that do not result in money going to the government of Iran should be treated even more leniently.  An export of goods to Iran results in an overall benefit to Iran's economy:  Iran is gaining the usage of products it would not otherwise have, offending the very purpose of sanctions.  In contrast, in a hawala, one person in Iran sends money to another person in Iran to offset a matching transfer between the Iranians' counterparts in the United States.

## IV.    THE PURPOSES OF PUNISHMENT WOULD BE BEST SERVED BY A NON- CUSTODIAL SENTENCE

Section 3553(a)(2) requires that the sentence be "sufficient, but not greater than necessary":

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

### A.    A Non-Custodial Sentence Reflects the Seriousness of the Offense, Promotes Respect for the Law and Provides Just Punishment for the Offense

To be sure, while there is no doubt that Dr. Sheikhzadeh understood that his conduct was unlawful, such conduct has been widely tolerated and of little concern to the federal government when the primary involvement was as a beneficiary of what are and were in this case family to family transfers for what are arguably humanitarian purposes. To impose such a harsh sentence under these circumstances would undermine respect for the law by failing to adhere to the principle that people should be held accountable for wrongful conduct where they are on fair notice that such conduct is not simply wrongful but also not tolerated.  Furthermore, there can be no doubt that had Dr. Sheikhzadeh not been employed at the IMUN, this case would never have been brought.

This case is unusual, therefore, in that there is a real risk of failing to promote respect for the law by imposition of too harsh a punishment. Having been convicted of violating trade sanctions with Iran, Dr. Sheikhzadeh's offense conduct is not significant. But, as well documented above, it is not as significant as most of offenses that would result in the same conviction. Moreover, the use of informal money transfers within the Iranian American community in the United States is widespread and well known.[21]  It is estimated that there are as many as 800,000

---

21 https://www.pbs.org/newshour/show/enforcing-iran-sanctions-still-tangles-iranian-americans-in-spiders-web-of-laws-2

Iranian nationals currently residing in the United States as dual nationals, or green card holders, the most of any country outside of Iran.[22]

### B.    A Non-Custodial Sentence Will Afford Adequate Deterrence

As described in the preceding section, Dr. Sheikhzadeh's conviction itself is a powerful signal to the general public that IEEPA violations will be penalized. Dr. Sheikhzadeh's punishment has been – for his community – extremely severe. He is a 62-year-old American Citizen with no prior record. Because of his arrest, he was not permitted to return to his long-time employment.  Indeed, he was not even permitted to *visit* the IMUN.  He has worn a GPS monitoring device and has suffered the humiliation of public prosecution.  He lives under suspicion and it is unlikely that he can ever safely visit his family Iran for the foreseeable future, if ever.   This includes his 81-year-old mother.

Any other penalty for people sending and receiving money to and from family members in Iran – not to support the Iranian government, not to support terrorist organizations and not to profit personally – will be deterred by the simple prospect of a felony conviction – with its concomitant consequences for immigration status, employment and community respect – is likely sufficient deterrent.  In Dr. Sheikhzadeh's case that is coupled with an extremely humiliating public prosecution and restrictive conditions of release. Indeed, his age alone puts him in the category of the least likely segment of society to reoffend[23] (according to a study by the United States Sentencing Commission, a federal offender over sixty years old at the time of sentence had a recidivism rate of just 14.0 percent).

No further deterrence is required.

### C.    There Is No Need to Protect the Public from Future Crimes by Dr. Sheikhzadeh

Dr. Sheikhzadeh's alleged transactions were no different than the ones that take place every day, but which occur in US financial institutions.  Though the government contends that these transactions are unlawful when facilitated by informal unregulated private financial transfers, this is hardly a case where the public was endangered in any way.  In any event, given the incredibly low likelihood of additional crimes by Dr. Sheikhzadeh, the need for any sort of incapacitating sentence is non-existent here.

### D.    Dr. Sheikhzadeh Does Not Need Educational or Vocational Training Through The BOP, and the Most Effective Manner of Correctional Treatment Would Be Supervised Release

---

22 https://www.radiofarda.com/a/f10-iranian-officials-say-more-than-2-mln-iranians-live-in-usa-and-uae/24700947.html
23 https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview

Prison will offer Dr. Sheikhzadeh nothing.  It will limit and stifle what has been an otherwise honorable life.  Section 3553(a)(2)(D) calls on the Court to consider the most effective correctional treatment.  There is simply no reasonable argument that prison time will represent an effective correctional treatment for Dr. Sheikhzadeh.  However, even were one to conclude that having committed the instant offenses he continues to require some corrective treatment to be a productive member of society, a noncustodial sentence while under the supervision of Probation with community service, would be a more effective treatment than prison time.

## V.    The Guidelines, Properly Applied, Call for a Combined Offense Level of 12, and a Sentencing   Range of 10-16 Months

### 1.    Base Offense Level

As set forth in the plea agreement and as stated at the change of plea hearing, there is a dispute over the guideline calculation in this case. And while it *only* involves the appropriate base offense level for Count Six (IEEPA), it is a significant fact in the determination of the total offense level. Dr. Sheikhzadeh was convicted of conspiracy to violate the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq. (IEEPA) (Count Six) and filing a false tax return (Count Two). The Court should calculate the base offense range for the IEEPA and false tax return offenses as set forth below.

### a.    Count Six (IEEPA)

As reflected in the PSR, the applicable Guideline for Count Two is Section 2M5.1. However, a proper application of § 2M5.1 leads to a base offense level of 14, rather than the 26 calculated in the PSR. The universe of potential IEEPA offenses covers a vast spectrum of conduct: everything from technical violations to giving nuclear weapons to terrorists. Section 2M5.1 divides that universe of conduct into two broad categories.  The first category is for more serious offenses: where "national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded" or "a financial transaction with a country supporting international terrorism" was involved.  For those, the base offense level is 26. For all other IEEPA violations sentenced under § 2M5.1, the base offense level is 14.

Common sense dictates that Dr. Sheikhzadeh's offense level belongs in the lower category. Regardless of the amounts involved, what is indisputable is that Dr. Sheikhzadeh's offense did not involve any weapons of mass destruction such as nuclear, biological or chemical weapons, or even military equipment.  It involved financial transactions involving individuals, not governments -- Iranian or otherwise.  Far from involving terrorism, Dr. Sheikhzadeh's purpose for participating in those transactions was to obtain money that he inherited from his father from Iran to spend in the United States. The government has never alleged that conduct, in and of itself, to be criminal.  Indeed, the fact that such non-commercial transfers or family remittances are authorized − at least in some circumstances − without any need to obtain a license, as reflected in

31 C.F.R. § 560.516(a)(2), demonstrates that the sorts of transactions that Dr. Sheikhzadeh was involved in lie at the least dangerous end of this offenses spectrum, far from the transactions in weapons of mass destruction, or transactions with the government of Iran, or transactions with terrorists.

This commonsense approach is supported by the specific history of § 2M5.1. The section was not adopted as a result of the usual "empirical approach, beginning with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past and then modifying and adjusting past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like." *Rita v. United States*, 551 U.S. 338, 349 (2007).  Rather, the present version of 2M5.1 is the result of a command of Congress. Guidelines Amendment. No. 633 (Nov. 1, 2001) was adopted in response to Pub. L. No. 104-201, National Defense Authorization Act for Fiscal Year 1997, sec. 1423.  By that statute, Congress instructed the Commission to increase penalties under 2M5.1 "for offenses relating to importation, attempted importation, exportation, and attempted exportation of nuclear, biological, or chemical weapons or related materials or technologies." Pub. L. No. 104-201, National Defense Authorization Act for Fiscal Year 1997, sec. 1423(b).  Congress did not recommend an increase for all offenses; it recommended an increase for those most serious offenses involving "nuclear, biological, or chemical weapons or related materials or technologies." Thus, there is no empirical or statutory support for applying § 2M5.1 to receipt of money from family members in Iran, or the concomitant aiding and abetting of incidental matching transfers going the other way.

Given that the application of common sense and the history § 2M5.1 both dictate a result quite different from the conclusion of the government and probation. Under the precise language of § 2M5.1, two categories of offenses qualify for the severest treatment. Adopting the government's position, the probation department concluded that Dr. Sheikhzadeh's offense level for Count Six is 26 because "[T] hat section provides for a base offense level of 26 for offenses which involve a financial transaction with a country supporting international terrorism." PSR ¶ 25. As shown below, principles of lenity and history suggest otherwise.

### b. Dr. Sheikhzadeh Did Not Engage in "a Financial Transaction with a Country Supporting International Terrorism"

Section 2M5.1 provides that the highest offense level of 26 points applies to financial transactions only where "the offense involved a financial transaction with a country supporting international terrorism" (emphasis added).  This clause was added by Amendment 637 in 2002 "to incorporate 18 U.S.C. § 2332d, which prohibits a United States person, knowing or having reasonable cause to know that a country is designated under the Export Administration Act, as a country supporting international terrorism, to engage in a financial transaction with the government of that country." U.S.S.G. App'x C, Vol. II, Amendment 637, Reason for Amendment (emphasis added).  The plain language of the underlying statute on which the Guideline provision was based forbids US persons from "engaging in a financial transaction" only with "the

government of [a] country" designated as supporting international terrorism.   18 U.S.C. § 2332d(a) (emphasis added).

As such, the "financial transaction" provision of § 2M5.1 applies only to transactions with the government of a country supporting terrorist organizations, not to private transactions with private individuals in Iran.  It is undisputed that Dr. Sheikhzadeh did not, directly or indirectly, engage in transactions with the government of Iran.  Therefore, this ground for a 26-point offense level under § 2M5.1 does not apply. It is consistent with both common sense and the purpose behind the sanctions to treat dealings with the government of Iran, which has been designated as a supporter of international terrorism, as a circumstance that aggravates the seriousness of the offense, compared to dealings with private individuals in Iran.

### c. Dr. Sheikhzadeh Did Not Evade "National Security Controls or Controls Relating to the Proliferation of Nuclear, Biological, or Chemical Weapons or Materials"

The alternative basis is inapplicable because Dr. Sheikhzadeh's conduct consisted only of financial transactions and did not relate to nuclear, biological, or chemical weapons or materials. Prior to the 2002 amendments to § 2M5.1, the "national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded" clause was the only 26-point category.  When the Commission added the "financial transactions" category as a separate basis for setting a 26-point level, it created a distinction between financial transactions, on the one hand, and the evasion of controls relating to the proliferation of nuclear, biological, chemical weapons or materials, or national security, on the other. The Commission in effect carved out financial transactions from the scope of the latter category. As such, the heightened offense level must stand or fall on the provision in § 2M5.1 relating to financial transactions, which, as discussed above, does not apply because Dr. Sheikhzadeh did not deal with the government of Iran.

After the 2002 amendments, interpreting the "national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded" clause to cover financial transactions with Iran would render the newly added "financial transactions" clause superfluous.  "The Guidelines must be interpreted. . . so no words are discarded as meaningless, redundant or surplusage." *United States v. Iwan*, 607 F.3d 306, 313 (2d Cir. 2010). If every transaction involving a country supporting international terrorism were considered an "evasion" of national security controls warranting the 26-point offense level, there would be no need for a separate clause addressing financial transactions with governments supporting international terrorism because those transactions would also be evasions of national security controls.

If the Court decides that offense level 26 is the correct offense level, it should depart downward.  Section 2M5.1 recognizes its own imprecision and therefore explicitly contemplates a downward departure in certain circumstances.  Application Note 2 provides that:

> In determining the sentence within the applicable guideline range, the court may consider the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences. Where such factors are present in an extreme form, a departure from the guidelines may be warranted.

U.S.S.G. § 2M5.1, app. note 2 (emphasis added).

The violation here did not threaten any security interests of the United States. In sum, the wholly private financial transactions simply cannot be treated on the same offense level as the export of a nuclear, biological or chemical weapon or assistance to the government of Iran. Both common sense and the structure of § 2M5.1(a) confirm that Dr. Sheikhzadeh's offense level should not be 26. The appropriate base offense level is 14.

### d.    Count Two (Tax Fraud)

As reflected in the PSR, the applicable guideline for Count Two is U.S.S.G. § 2T1.4(a) and 2T4.1. The base offense level is 14 based upon a tax loss $51, 959. With a reduction of 2 levels for acceptance, the total offense level is 12.

### B.    Non- Guidelines Sentence

This case did not involve a typical two-person hawala as set forth in the presentence report. That is especially true in the case of Dr. Sheikhzadeh. He was basically a beneficiary, who received money from his family. He did not find customers for a hawala, he did not find matching transactions to enable the transfers to happen, he received no commission or fee, and he personally knew all the beneficiaries. He did not solicit any money transfer business, nor was he approached directly by the customers directly and he did not intend to profit from the transactions. Rather, his goal was simply to receive his own money.

Accordingly, the offense conduct is outside the "heartland" of conduct covered by the guideline. Where the offense conduct is sufficiently different than the conduct generally covered by the guideline, departure is appropriate. See *Rita v. United States*, 551, U.S. 338, 349 (2007); U.S.S.G. §2K2.0. Because §2M5.1 is primarily concerned with "cases where weapons or military technologies are at issue and where the threat to national security is apparent*," Groos* at *5, the offense conduct in this case – involving at most the receipt of money from family members in an embargo nation – is outside the heartland and a departure is warranted.

## VII.   POLICY STATEMENTS SUPPORTS A NON-CUSTODIAL SENTENCE

The Sentencing Commission urges Courts to consider alternatives to prison sentences.  In a recent report, the Commission has described increased incarceration as a problem:

> Increasingly, criminal justice professionals have argued that dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alternative sanctions for first-time and nonviolent offenders. The appeal of alternatives to incarceration has continued to increase in the wake of reports of the ever-growing prison population. As of 2008, more than one in every 100 adults are incarcerated in the United States. That large, and still growing, population cost the states more than $49 billion in 2007.[24]

The Commission concluded its study:

> Effective alternative sanctions are important options for federal, state, and local criminal justice systems. For the appropriate offenders, alternatives to incarceration can provide a substitute for costly incarceration. Ideally, alternatives also provide those offenders opportunities by diverting them from prison (or reducing time spent in prison) and into programs providing the life skills and treatment necessary to become law-abiding and productive members of society.[25]

The efforts of the Commission to encourage courts to consider alternative to incarceration continued over the last few years.  The proposed 2017 amendments include the following:

> Part A sets forth a new Chapter Four guideline, at §4C1.1 (First Offenders), that would provide lower guideline ranges for "first offenders" generally and increase the availability of alternatives to incarceration for such offenders at the lower levels of the Sentencing Table (compared to otherwise similar offenders in Criminal History Category I). Recidivism data analyzed

---

24 United States Sentencing Commission, Alternative Sentencing in the Federal Criminal Justice System, at 1-2 (Jan. 2009), http://www.ussc.gov/general/20090206_Alternatives.pdf.
25 Id. at 20.

by the Commission indicate that "first offenders" generally pose the lowest risk of recidivism.[26]

And just recently, the recidivism data analyzed by the Commission for 2017 was just released.[27] The findings confirm that first offenders continue to pose the lowest risk of recidivism. In the category that Dr. Sheikhzadeh is in, the statistics strongly support a non-custodial sentence:

> Education level influenced recidivism across almost all categories. For example, among offenders under age 30 at the time of release, college graduates had a substantially lower rearrest rate (27.0%) than offenders who did not complete high school (74.4%). Similarly, among offenders age 60 or older at the time of release, college graduates had a somewhat lower rearrest rate (11.6%) than offenders who did not complete high school (17.2%).

Dr. Sheikhzadeh is a 62-year-old first-time, nonviolent offender. He has multiple advanced degrees and a long work history. The Sentencing Commission itself has concluded that alternatives to incarceration should be considered in such a case. This factor too supports a non-custodial sentence.

## CONCLUSION

For the foregoing reasons, Dr. Sheikhzadeh respectfully submits that a non-custodial sentence is appropriate in this case.

Thank you for your consideration in this matter.

Respectfully submitted,

Steve Zissou

cc: AUSA Peter Baldwin by ecf and email

---

26 https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20170824_rf_proposed.pdf
27 https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf#page=9

**United States of America v. Ahmad Sheikhzadeh**

**15-Cr-182 (PKC)**

**CHARACTER LETTERS**

April  21, 2017

Judge Pamela K. Chen
Individual Practices and Rules
225 Cadman Plaza, East Brooklyn

Your Honor,

My name is Inci Iftikhar Ali. I reside at 85 Christopher St. I am a writer and a translator.

This letter is plea for mercy for my friend and neighbor Ahmad Sheikhzadeh.

Ahmad has explained that there could be a sentencing. I do not fully understand the charges but know
few people with as much honor and integrity as Ahmad and I do not make the claim lightly. I have
known him for more than thirty years. We met in a Soviet Geography class at Columbia University in
1986.  I had just arrived from Moscow and he was then fulfilling the requirements for a Phd in Political
Science.  He had been a teaching assistant to Professor Khalilzad who later became the American
Ambassador to Afghanistan, Iraq and the United Nations.  I also know of several professors who taught
him at the time: Bialer, Legvold, Gary Sick, Jervis, amongst others. The famed Middle East historian,
Richard Bulliet, sat on his doctoral defense committee.

The milieu at the time I came to Columbia during the height of the Cold war was of extreme
hawkishness towards the Soviet Union. Enemy images clouded all judgments. I mention this because
now this categorization of the "other" is often reflected in everything to do with Iran, the Middle East
and Muslims.

Ahmad is above these shallow definitions. He does not shrink himself into concepts. Few people are as
attuned to the common goals and aspirations of ordinary Americans and Iranians.   He is above all, a
humanitarian who wanted to expose his employer to everything good about America.  I am myself the
daughter of an Ambassador and a former Foreign Secretary and have experienced how embassies are
run. It actually makes little difference whether an Ambassador and his subordinates are good or bad;
skilled or not.  Relationships between countries are all that matter. Ahmad was hired as an outside
consultant because of his skill and education. He told me that the Ambassador who first hired him,
Professor Kharrazi, was at one time his Physics teacher when he was in Middle School in Tehran and the
friendship was later rekindled when Kharrazi was getting his Phd at the University of Houston when
Ahmad was an undergraduate. I know of Iranian diplomats who have read Mark Twain and all the
American classics, I do not know why this is important for me to mention that not all who work at an
Embassy are troubled people who hate Americans.  I know that in his job as an outside consultant,
Ahmad strived mostly to heal a rupture between the two countries and be a bridge in helping to inform

Iranian diplomats about everything that was good about America and promote the common interests between the two countries to try to foster a sense of common humanity. He was not a diplomat and was hired as an independent consultant for the Iranian Mission to the United Nations. He is a proud and loyal American citizen and has lived here for 43 years.

On a more personal note, I know of few people with more compassion and caring than Ahmad. My youngest brother, Hayder Ali, was once kidnapped by the Taliban. Ahmad wrote him a kind note  when he was rescued for ransom. He had not even met Hayder. My brother had been badly abused and Ahmad advised him to forgive his captors. It speaks to the depth of Ahmads' character that he would advise someone to forgive all abuse. I have never heard Ahmad ever speak ill of anyone. I have never heard him even use a swear word. Respect and care for people are big values for Ahmad.

 Ahmad stepped in to help me save my home after my brother had been kidnapped and lent me the money to avoid an eviction without my even having to ask for help. He has a generous heart and did not want to see me suffer.

He is an integral part of the neighborhood we live in and is especially kind to the elderly. Ahmad is simply one of the kindest people I have ever met.

He practices yoga daily and has done so for  decades.  To my simple mind, this speaks to a yearning in him similar to the work he did as a consultant. He is always trying to break free from what is contained, to make space for what is more; to break free from what needs to be defined, to look for new definitions and change what feels stale and does not fit.

It is heart-breaking to see him wear an ankle bracelet. It is a tremendous source of humiliation for him to be treated in the manner of a common criminal.

Your Honor, I must appeal to you to please forgive my friend. His mother is elderly and aches to see her son. He is a doted Uncle to his nephews and nieces. A much-loved neighbor. A good friend.  Please forgive his shortcomings and please allow him to continue to serve his adopted land in the way he knows best, as he has always done with integrity and kindness

Thank you for receiving this letter,

Respectfully yours,

Inci Iftikhar Ali

Inci Iftikhar Ali
85 Christopher St
NY NY10014
Cell: 917.535.8646

**Louise Jane Graham**
**229 E 11th St. #12**
**New York, NY 10003**
**#917.716-5094**

April 18th, 2017

Judge Pamela K. Chen
Individual Practices and Rules 225
Cadman Plaza East Brooklyn New York 11201
Courtroom: 4F Chambers: N 631

To the Honorable Judge Pamela K. Chen,

Ahmad Sheikhzadeh and I have been good friends for about ten years. I am a wardrobe & prop stylist in both commercial and print.  Ahmad and I first met in a yoga class at Crunch Gym, where we both still practice yoga together.  Ahmad is a real gentlemen, polite, sincere, and has a generous way about him.  He's always happy to help new yoga students feel welcome, and it's this generous nature he often displays which impressed me early in our friendship.

Over the years Ahmad and I have developed a deep friendship, one where we often socialize with our respective families and friends.  However, since Ahmad's been investigated I've noticed a big change in his demeanor, especially in yoga class.  I can tell that the investigation has been very hard on him.

The presence of the ankle GPS hinders Ahmad's practice enormously. It prohibits him from performing certain poses, but he still remains diligent in his practice. Ahmad admits that the ten to twelve yoga classes he takes per week is his best way to deal with all the stress and anxiety the investigation has stirred up in his life.  Ahmad worries deeply about the investigations outcome, how it might effect future employment possibilities, and what might happen to him when he returns to Iran to visit his family, especially his mother.  It's stressful seeing my friend in so much pain and anxiety.

Thankfully, even with all the stress, Ahmad has maintained his great sense of humor, which really helped when the ankle GPS started beeping in yoga class one day and Ahmad had to make a hasty exit!  True to his honest nature, Ahmad

has informed all of his friends and yoga teachers of the GPS and the upcoming court case.

Ahmad's a very kind, generous, thoughtful man, whom I'm thankful to call my friend.  I would be eternally grateful for whatever consideration you can extend towards my dear friend Ahmad.  Thank you.

Respectfully yours,


Louise Jane Graham.

Judge Pamela K. Chen                                          April 18,2017
Individual Practices and Rules 225
Cadman Plaza East Brooklyn New York 11201
Courtroom: 4F      Chambers: N 631

Honorable Judge Pamela K. Chen;

My name is Dr Masi Hashemian. I am a practicing dentist in the city of Irvine, California.
I live with my husband of 32 years and my life has been blessed by 2 children who are
26 & 30 now.

I am an active part of our community and serve as a member of advisory board on 2
charities that are actively taking care of  less fortunate members of our community and
their families.

I am writing this letter to you as a person who has known Mr Ahmad Sheikhzadeh for
almost all my life, in hopes of shedding a little light on his true character. I do hope this
letter and my words can help bring justice to someone that, in my opinion, his true
portrait has been distorted.

As far as I can remember, I met Ahmad  when we were in Junior High or early years of
High school. Our fathers became partners in different ventures and remained partners
until we left Iran  and migrated to US in 1983. All through my childhood and later in my
adult conversations with my dad I heard nothing but that this family has the highest
standard of integrity amongst his vast group of friends and business partners. Ahmad
was raised by a family who were truly caring and kind not only towards their own, but to
strangers in need. Many examples of which have been etched in my mind and I cherish
those as guiding principals to live by.

I remember when Ahmad was coming back to USA to continue his education, it was my
dad who accompanied him. My dad has thought of Ahmad as his own son, the son that
he never had. Throughout these last almost 4 decades that we have had the fortune of
living in the United States, Ahmad has kept very close contact with our family by calling
almost every week to just make sure my mom and dad are doing ok. Whenever my
parents had any medical problems, Ahmad has been so concerned that he would be
calling to check on them even more than my sisters and I did!

There has only been one problem that my dad always has had with Ahmad.
Ahmad comes from a well off family. He was raised in comfort and one might even say
semi luxury life back in Iran. However, here in USA, he had an extremely humble life
style. Every time my dad visited him or on their weekly phone conversations my dad

always complained that: I don't understand…why Ahmad is living like a student…still after 40 years … he is living in a small apartment surrounded by books.

Numerous times I remember my dad tried futilely to convince Ahmad to buy an apartment or move to California, to get married and settle down like other men his age. But Ahmad always responded, with his own famous peaceful tone of voice and sense of humor, that he is happy in his humble apartment, doing Yoga, reflecting into his inner self.

In fact, in my few visits to NYC, I found him very much content with his style of life he had chosen. So when Ahmad was traveling with my dad to Mexico for vacation, I had to stress to my father to leave Ahmad alone as far as pressing him to earn more money to support a different lifestyle that he is not comfortable with. I remember I told my dad: Dad, Ahmad wants to live the life of Gandhi, leave the man alone please!

When I heard about legal issues that Ahmad was accused of, I was absolutely speechless; I was in shock and horrified! The man that I know is extremely honest, peaceful, caring and humble. There is NO WAY that this man does anything to jeopardize the honor of his last name. He lives a life so that his late father would be proud of him! Knowing him there is NO WAY on this planet that he would endanger the respect of his mother and sister and brothers and most importantly his little nephews.

In California, there is a very large population of Iranians who throughout the years have migrated and because of my career as well as my involvement with the charities I mentioned earlier, I get to meet many of these innocent people who are absolutely confused and distressed by the rules and regulations that is imposed on the US-Iran Relations. I do understand that our US government is trying to put pressure with sanctions on the government of Iran so they may change their political behavior.  I do however see that innocent people, meanwhile are paying a high price with their lives! Many families who have migrated to United States and need to bring their belongings and money from there or, that they have elderly parents or siblings left behind who are depending on their financial help, are extremely confused about the rules driving various US sanctions on Iran.

Now Ahmad who has been in his adopted country, USA, most of his life and has had a life of scholarly living, taking joy in sinking his head into his books and learning might have had the same confusion as these new comers! But in NO WAY I would believe he purposely and knowingly did anything illegal specially something of this magnitude that would affect his families' great reputation.

Honorable Judge Chen, I do hope that you consider my sincere testimony that Ahmad is an extremely good and honest person, a brother to me and a son to my elderly father. A source of pride in our circle of friends back home because of his "clean" life style and a character that one could count on him for his kindness and that he would be there for any one who needs him in times of hardship.

I can imagine what a devastating effect this limitation of work and movement has had on him. Some one whose pride was his integrity now has a cuff at his ankle that puts him in line with people that he has nothing in common.

Your honor, I would like to sincerely thank you for reading my letter. I hope and believe the truth should overcome any misunderstanding or shortcomings and I hope we can enjoy Ahmad's kind and peaceful tone of voice, his sense of humor and seeing him free to live his life the way he deserves once again.

With outmost respect and gratitude
Dr Masi Hashemian

#7 Taggert
Irvine, Ca 92603
(949)322-3121

Elahé Sharifpour-Hicks
44 Birchwood Lane
Hartsdale
New York, 10530

Judge Pamela K. Chen
Individual Practices and Rules 225
Cadman Plaza East Brooklyn New York 11201
Courtroom: 4F Chambers: N 631

April 26, 2017

Honorable Judge Pamela K. Chen

Re:  Dr. Ahmad Sheikhzadeh

Dear Judge Chen,

My  name is Elahé Sharifpour-Hicks.  I am a co-founder and executive
director of Partners For Rights, a small non-governmental organization
based in New York.

As the Iran researcher for Human Rights Watch (HRW), a leading non-
governmental international human rights organization in the United States,
from 1994 until 2004, part of my work was to meet with Iranian officials to
promote and protect human rights in the country.  I met with policy
makers  or  those elites who would have influence to  shape  public or
government opinion towards pressing human rights issues at the time.
I met Dr. Ahmad Sheikhzadeh during my tenure at HRW in  early 1990s
though a mutual friend at Columbia University.

For about a decade, my discussions with Dr. Sheikhzadeh about theoretical
and practical human rights issues greatly helped me to prepare and to write
HRW's research projects and reports.

Dr. Sheikhzadeh also went out of his way in assisting me to meet with some influential Iranians who used to come to visit the United States so that I could develop a better understanding on the situation of human rights in Iran. For example, Dr. Sheikhzadeh arranged for me to meet with his friend, Dr. Javad Faridzadeh, an advisor then to the reformist President Mohammad Khatami. As result of this meeting, in an unprecedented step for an international human rights organization representative, I met with President Khatami himself in New York at the United Nations event and I was able to raise  HRW's human rights concerns with him.

I always appreciated Dr. Sheikhzadeh's sincere aspiration to promote human rights.  On several occasions, he introduced his friends, who were undergraduate students, to me to do internship at the HRW to learn more about human rights.

I remember when for the first time Dr. Sheikhzadeh arranged personally a meeting with Hojatoleslam Mohsen Kadivar. Dr. Kadivar was a reformist intellectual clergyman who had at the time just been released from the prison.  He had been jailed because of his public criticisms of the Iranian government.  Dr. Kadivar, was very skeptical about the works of the Western human rights  organizations. In our meeting in my office, thanks to Dr. Sheikhzadeh,  I had the chance to have very  constructive  discussions regarding  the rights of religious minority Bahai's  and the LGBT community with Dr. Kadivar.  This  seemed a breakthrough.  Both topics were seriously taboo for  Shi'a clergymen at the time. Currently Dr. Kadivar is a research professor of Islamic Studies in the Department of Religious Studies at Duke University.

After I left HRW to join the United Nations High Commission for Human Rights as a human rights officer in Iraq in 2003, I still benefited from Dr. Sheikhzadeh's diligent weekly collection of writings about Iran.

Later, my work relationship with Ahmad developed into friendship.

I am a survivor of a horrific terrorist attack at the UN compound in Baghdad in August 2003. That day, I could not be more grateful  to hear friends and colleagues phone calls pouring into me. The first call that I received was  from Ahmad to seek my whereabouts after the explosion. I

never forget his tears of joy and relief, when he was realized that I am alive.

His kindness and his friendship stay from that date with me and my family. Five years ago, when my father passed away, my small family felt so lonely and for that reason Ahmad didn't leave us alone. He held our hands throughout those sad days. Ahmad even used to call my mother weekly, he was encouraging her to, step by step, recuperate from her loss.

I am so proud to have a great support for my works and a kind friend like Ahmad.

Knowing Ahmad to be a caring, supportive friend and a valued professional contact and colleague, I wish to emphasize that he has much to contribute to society. I know that his current situation is taking a heavy toll on him personally, and I hope you will take into consideration his good character and many valuable contributions to academic and humanitarian causes, including in the area of advancing human rights in Iran.

Thank you for your consideration.

Sincerely,
Elahé Sharifpour-Hicks

44 Birchwood Lane

Hartsdale

New York, 10530

Judge Pamela K. Chen

Individual Practices and Rules 225

Cadman Plaza East Brooklyn New York 11201

Courtroom: 4F Chambers: N 631

April 25, 2017

Honorable Judge Pamela K. Chen

Re: Ahmad Sheikhzadeh

Dear Judge Chen,

I am writing to attest to the good character of my friend Ahmad Sheikhzadeh. I have known Ahmad since the early 1990s and came to know him through my interest in human rights conditions in the Islamic Republic of Iran.

I came to live in New York in 1991 to work on human rights in the Middle East for the independent non-governmental human rights organization then known as The Lawyers Committee for Human Rights First, now Human Rights First. I am currently the Director, Human Rights Promotion for Human Rights First. I had previously been employed by Amnesty International in London, England where I had specialized in human rights issues in Iran.

I continued my interest in human rights in Iran for the Lawyers Committee and became especially interested in philosophers and theologians in Iran who were developing critiques of the political system inside Iran on the basis of more liberal interpretations of Islam. This work resulted in a project on Islam and Human Rights that I directed at the Lawyers Committee between 1996 and 1999.

Ahmad introduced me to prominent figures in what had become a political reform movement inside Iran, figures like Abdol Karim Soroush and Mohsen Kadivar, whose views have become internationally known, as well as to political figures also associated with the internal opposition like the former Foreign Minister, Ebrahim Yazdi.

Ahmad's introductions were extremely helpful to our work in the area of Islam and human rights during this period. In addition, Ahmad was helpful to the Lawyers Committee in facilitating our access to senior Iranian diplomats serving at the Mission of Iran to the United Nations, where he knew them, especially after the reformist President, Mohamed Khatami, came to power in 1997. Thanks to Ahmad's help, we were able to raise concerns about human rights conditions in Iran directly with responsible Iranian officials.

Ahmad himself is extremely well-read and informed about Middle Eastern and Iranian current affairs. He holds a Ph.D in Political Science from Columbia University. He has been a valued professional associate of mine for many years.

In my conversations and dealings with Ahmad I have always found him to be open-minded and interested in supporting the humanitarian objectives of the organization I represent.

As well as being a professional colleague, Ahmad is a friend of our family.  He has shown great kindness and consideration to my wife, who is an Iranian-American and to our son, now twenty-two, who has known him for his entire life.  He was especially supportive to our family when my father-in-law passed away in 2012, helping my wife to arrange appropriate religious services and burial arrangements.  We will always remember and be appreciative of his kindness at that time.

The Ahmad Sheikhzadeh I know is a generous colleague and a true friend.  I do not know the details of the circumstances that have placed him in the difficult situation he is now facing, but I do know that he has been a valuable member of society who has helped his friends and contributed voluntarily and generously to the humanitarian mission of Human Rights First.


Respectfully Yours,


Neil Hicks

# THE NEW SCHOOL FOR SOCIAL RESEARCH

6 East 16 Street, 10th Fl New York, NY 10003
t 212.229.5707 f 212 807.1669
www.newschool.edu/socialresearch

Department of Philosophy

In New York City
04/16/2017

Honorable Judge Pamela K. Chen
United States Eastern District of New York
Individual Practices and Rules 225
Cadman Plaza East Brooklyn New York 11201
Courtroom 4F Chambers: N631

Dear Honorable Judge Pamela K. Chen,

I am writing to you on behalf of my dear friend Ahmad Sheikhzadeh. I am Krista Johansson, a recent doctorate in Philosophy at The New School for Social Research. Besides being my dear friend for nearly a decade now, Ahmad has been an incremental part of the long and sometimes painful process of completing my doctorate in philosophy.

I met Ahmad due to our mutual interest in yoga in 2009, and as an outgoing and kind person, we started talking about what had brought him to the classes, which lead us to discuss his journey and experience of studying at the distinguished Columbia University. It was his joyful personality, a grateful attitude towards life and the discussions on his formative experiences of studying under distinguished and demanding professors that really resonated with me and that despite the age difference between us, brought us together as friends.

Since 2009, despite his own struggles, each time we have met for coffee, he has put my questions first, showing interest in my research and helping me spar my thoughts on philosophy and fine-tune my argument. I truly consider him such a positive, generous and wonderful interlocutor and friend. Instead of interrupting or telling me how to write and what I should focus on, he attentively listens to my ideas, encourages to dig deeper. More importantly, of all my discussion partners, Ahmad has been the only one who has since day one reminded me to focus on the process and to be patient. In fact, as an indication of his generosity, a few years ago, he invited me to go rafting with his friends in upstate New York – just to offer me a break from the writing process and to enjoy the beautiful weather. I do not think that I would have had such a lovely weekend had he not forced me out of my writer's cocoon.

**THE NEW SCHOOL FOR SOCIAL RESEARCH**

6 East 16 Street, 10th Fl New York, NY 10003
t 212.229.5707 f 212 807.1669
www.newschool.edu/socialresearch

Department of Philosophy

Indeed, Ahmad puts others first. When our mutual friend needed help for moving from one office to the other, and with a last minute notice, it was Ahmad who came there to help carry the boxes. I know that I can trust Ahmad to be there if I need him, any time of the day, so I have myself tried to offer emotional support in times of his distress. Even knowing about his legal troubles, it's been truly heartbreaking to watch my dear friend struggle to the extent that he has. I can see how the long legal situation has taken a high toll on his well-being and health. I do not know a more of a generous and kind person than Ahmad, and thus am sincerely concerned with his overall health.

Based upon our conversations, I also know that my dear friend has suffered immensely due to the decisions he has made, thus I would like to see him gain the chance to move forward with his life. With respect, I do not think that anyone would benefit from sentencing Ahmad Sheikhzadeh to the penitentiary and that it would put an immensely high toll not just on him but also all of us who care for him and his well-being, including his dear elderly mother. Also, I truly believe that he has endured a vast amount of suffering during the past year, restricting a pursuit of happiness, life and liberty that we grant for all citizens of this wonderful country. That is why I ask you to look at his character and the joy he has brought to other people's lives, friends and family to let him start building his life up again.

Respectfully yours,

Dr. Krista Johansson

Dr. Krista Johansson
Department of Philosophy
The New School for Social Research
6 East 16th street, fl. 10, mailbox 93.
New York City, NY 10003.
Johak139@newschool.edu

5/1/2017

Judge Pamela K. Chen

Individual Practices and Rules 225

Cadman Plaza East Brooklyn New York 11201

Courtroom :4F Chambers: N631


Honorable Judge Pamela K.Chen:

I  have known Dr. Ahmad Sheikhzadeh over 14 years. we started with a doctor  and
patient relationship.  Since we both graduated from Columbia University and  are Iranian,
we have a common ground and the patient -doctor relationship blossomed to a very close
friendship.  Our friendship has deepened through the years and now he is  like a family
member.  I have found Mr. Ahmad to be an extremely intelligent  and open-minded
person yet at the same time down to earth which makes approaching him and talking to
him very easy.  We had a routine of having dinner together once a week at a Persian
restaurant.  During our dinner conversations which were usually around politics between
Iran and Untied States ,  I noticed that he was analyzing the problems the way they were ,
pointing out the mistakes  both sides were making.  He  was always trying to find a
solution for the problems by downplaying the differences and exaggerating  the
similarities.  He was also emphasizing that both countries should put animosities aside
and try to work together.  Mr. Ahmad is a kind hearted person who wants the best for
everyone.  A characteristic which is very noble to me.  During all these times , I have
never seen him wishing  bad ill towards anybody .

Mr. Ahmad is a very caring and  supportive person .  When my sister passed away  at
young age of 42  of heart attack , her sudden death devastated me and I was extremely
depressed.  Mr.  Ahmad was genuinely worried about me  and he helped me to overcome
the depression by constantly visiting me and talking to me  and making sure that I was all

right.  Furthermore, both my  parents were sick for a very long time .  My father suffered from stroke twice  and was in coma and vegetative state for  the last 10 years of his life.  My mother  suffered from colon cancer for the last 13 years of her life.  As a result ,  I had to travel between Iran and  here to deal with their sickness.  Mr.  Ahmad was very supportive  and always encouraging me to do more for my parents.   When first my father and then my mother passed away ,   It was Mr. Ahmad who was constantly talking to me and helping  me to deal with their death and was worried about my well being and how  I handle the  situation.

Mr. Ahmad  has a  caring nature  and exceptional, uncanny ability to make other people feel comfortable when they have  problems.  My cousin met Mr. Ahmad here a few times and they became friends . To my pleasant surprise, he was calling  Mr. Ahmad from Iran and seeking his advice  and guidance about problems he had  in his personal life.  The other example of his kindness and generosity is that I  have had few patients who are under privileged and were not able to pay their bills.  Although he did not really know them he was offering to help them and pay their bills.

Unfortunately , Mr. Ahmad world got upside down after his arrest last year .  The caring , gentle, nice , cheerful person has changed to a person with an unhealthy, dark , and gloomy mood to a point that  I am really worried about his health.  This has been such a horrible and surreal experience for all of us which is more like a bad dream than the reality.  He  is especially bothered by the electronic bracelet on his foot.  This device has changed his world to a small prison and  has such a devastating effect on his mental health that I suggested that he may seek professional help.  we had traveled together many times to different parts of the world and now with this device  he cannot even leave Manhattan.

 I ,wholeheartedly, believe that Mr. Ahmad is a wonderful human being that is going through such a terrible ordeal. He is well-educated,  intellectual, trustworthy, open

minded yet very simple and honest, down to earth, with no animosities toward anybody. I think this world  really needs  more people like Mr. Ahmad.  I believe he is a wonderful blend of compassion  and  kindness  which makes him a perfect human being .  He is and has been my role model . I feel blessed  and lucky to have Mr. Ahmad as my friend .

At this junction , I believe Mr. Ahmad acknowledges  his  mistakes and  regrets doing them, but at the same time he wants to go forward with his life and close this nightmarish chapter of his life.    I strongly believe that prison is not a place for a man with his level of education and intellectual.   He has such a tender soul which will not survive a prison term.  Furthermore, he enjoys such a close relationship with his two nephews, brother , sister in law, my wife and my four year old son that sending him to prison would have detrimental effects on their mental health.  I personally do not know how I can explain to my four year old son that he will not be able to see his uncle ahead.  My wife and I are here far away from our families  back in Iran and Peru  and have nobody except Mr. Ahmad and his brother.  Mr. Ahmad is a part of my family and I honestly do not know how I can cope with him being in prison.   So, I respectfully ask you not to tear apart this small family and let my son and his nephews grow old with their uncle Ahmad at their side .

Respectfully,

Majid Rajabi Khamesi DDS

15 April 2017

Judge Pamela K. Chen
Individual Practices and Rules 225
Cadman Plaza East Brooklyn New York 11201
Courtroom: 4F Chambers: N 631


Honorable Judge Pamela K. Chen

For the 25 years that I've known him, I've always regarded Ahmad Sheikhzadeh as a good and loyal friend whom I particularly treasure for his thoughtfulness. Since he knows that I normally don't read newspapers, he often forwards to me links, if not whole texts, that I've treasured. As a fellow intellectual, he took the trouble to know what I know and then to connect me to what I should know. When a prominent classmate from both high school and college died, Ahmad forwarded to me perhaps a dozen obituaries that I wouldn't have otherwise seen.

   In the sauna at New York University's Coles Gymnasium, where I saw him most often, I would often learn from him about current developments in the Middle East. Need I add that, within that sports center, where certain competences count, he was renowned for regularly swimming miles on Sunday afternoon. (Me, only one mile is my limit.) From time to time he would also do a nifty backflip off the diving board. In more ways than one, his friends from Coles don't want him taken from us.

   May I add that I find the notion of him as a "foreign agent" ludicrous if it involved only talking to people, because talk intelligently to people, such as myself, he gladly does, to our gratitude.


Respectfully yours,

Richard Kostelanetz

Individual entries on Richard Kostelanetz's work appear in **Readers Guide to Twentieth-Century Writers**, **Merriam-Webster Encyclopedia of Literature**, **Contemporary Poets**, **Contemporary Novelists**, **Postmodern Fiction**, **Webster's Dictionary of American Writers**, and Britannica.com.Copyright 2017Richard Kostelanetz

Richard Kostelanetz
FarEast BushWick, NY 11385-5751

646-524-4810
http://richardkostelanetz.com

April 17, 2017

The Honorable Pamela K. Chen
United States District Court Judge for the Eastern District of New York
Individual Practices and Rules 225
Cadman Plaza East Brooklyn New York 11201
Courtroom: 4F Chambers: N 631

Re: Ahmad Sheikhzadeh

My name is Dennis Mahony. I am a translator, and I have twice been issued clearance by the
Federal Bureau of Investigation to work for U.S. government agencies (namely, the Social Security
Administration and the Veterans Administration).

Mr. Ahmad Sheikhzadeh is a longtime resident of my neighborhood (Greenwich Village, New
York, where I have lived for more than 52 years), and we became friends because we both have
frequented New York University's Bobst Library, as well as neighborhood shops and cafes.

We also frequented NYU's Coles Athletic Facility, I for 12 years and Ahmad for even longer.
Weekly we would meet at the rooftop running track, where Ahmad would gaze appreciatively up
at the sunny sky, and say, "The lord has given us a lovely day today," and I would concur in my
own way, saying, "We are enjoying a happy conjunction of utterly impersonal weather factors,"
and smile. (Yes, sometimes I really do talk that way.) Ahmad has never minded that I am an atheist.

Mr. Sheikhzadeh, holder of a Ph.D. from Columbia University, is a political analyst specializing
in American national security in the Middle East. I look forward to his dissemination of news and
opinion articles that cast much needed light on Middle-Eastern affairs and their relation to our
American political positions. These articles are always reasonable, a refreshing departure from the
partisan stridency altogether too prominent in the public arena.

He has told me in effect that his running afoul of the law was the unintended byproduct of
inadvertence. He meant to break no law. He has resided in the U.S. for some 40 years with an
unblemished civic record. Ahmad is in no way a sinister individual. He is a relaxed person, calm
and friendly, low-key, likes yoga and especially swimming (3 hours at a time, except that the
tracking device he must wear precludes swimming, a source of particular chagrin to him in this
difficult period of his life) and does not drink (I've given up suggesting going out for beers). Jail
would be a waste of taxpayer dollars. He is not a wild animal in need of caging. Iran, with whom
our relations are somewhat precarious, is an ancient and sophisticated nation. Mr. Sheikhzadeh has
brought to America a humanist worldliness that makes him an American citizen as well as a world
citizen. The anxiety he has endured is a burden for such a civilized person, as well as for his brother
and his mother.

Incarceration is serious at any time, but even more so when a man has seen his youth vanish and
has remaining to him only an unguessable number of years, years that may be a time of debilitating
illness. Please allow Mr. Sheikhzadeh as much lenience as Your Honor deems appropriate. His

family and friends will stand by him for now and always, and he will reward their caring oversight with civic-minded behavior.

dmahony0@gmail.com

*Rosemary A. Michaels*

December 5, 2017

Honorable Pamela K. Chen
Individual Practices and Rules 225
Cadman Plaza East Brooklyn New York 11201
Courtroom: 4F Chambers: N 631

Re: Ahmad Sheikhzadeh

Dear Judge Chen:

My name is Rosemary Antoniazzi Michaels. I am recently retired from writing and editing Web content at a two-year college in Maryland, and I am writing to you on behalf of my long-time, dear friend Ahmad Sheikhzadeh.

In 1988, following the death of my father at their home in Florida, my now-deceased mother, Anna Antoniazzi, moved back to Greenwich Village and into her apartment which was two doors down from Ahmad. After settling in, my mother would tell me about her friendly, attentive neighbor, Ahmad, a highly-educated, young Iranian-Muslim who would regularly check in on her, a seventy-year-old Italian-Catholic woman, as well as the other neighbors in the building particularly the long-time elderly tenants, ensuring all was well with them. The burgeoning friendship between them was truly endearing to behold.

I particularly recall my mother's sense of being relaxed and comfortable in her apartment, secure in the knowledge that she could always count on Ahmad at any time for any reason to help her and her neighbors if she or they needed it.

When I visited my mother regularly throughout the year, she would invite Ahmad to come over and we would have wonderful conversations about our families, my son, my brothers, my mother's sisters in the Village (the "Three Sisters"), the other neighbors in the building, and just chatting about life in the Village community. I genuinely believe that my mother considered him her "third" son.

As the years progressed, Mom would continue to tell me about how much she enjoyed her friendship with Ahmad, and how much she appreciated the invitations by his brother Ali and his family to visit their apartment, joining them as they celebrated one occasion or another. In fact, it seemed that she was never home when I would call and I would later learn that she had been invited by Ahmad or Ali or his wife, Scheherazade, to join them for the evening.

As I lived in New Orleans with my family and was not local to my mother, I immediately recognized that her friendship with Ahmad was a wonderful blessing and I was so very pleased that they were friends. Through my mother, I became friends with Ahmad, and I would occasionally call him to chat about my mother, the other neighbors, and the Village in general.

▪ 2732 Sea Grove Lane ▪ Fernandina Beach, FL 32034 ▪
▪ Cell: 410-212-5572 ▪ E-mail: rosemary.michaels@gmail.com ▪

*Rosemary A. Michaels*

In the months prior to her passing away in January 2007 at the age of 90, I became Mom's live-in caregiver, and invariably, Ahmad would always inquire about how she was. His deference to her, his gentle nature, his wonderful humor, (he would call her Nonni, the Italian word for grandmother), and his kindness was immensely appreciated by my mother and the other neighbors in the building. It was undoubtedly a huge factor in her feeling happy and content in her later years, up through her passing in 2007.

I do sincerely appreciate this opportunity to share with you my personal insights into Ahmad and into his character. I am aware of and quite shocked by the serious charges against him; however, in our conversations, he has expressed regret, and I do hope you will consider that and what I have shared with you as you impose his sentence.

Should you have questions or would like more information, I can be reached on my cell at 410-212-5572.

Thank you.

Respectfully yours,

April 20, 2017

Judge Pamela K. Chen
Individual Practices and Rules 225
Cadman Plaza East Brooklyn New York 11201
Courtroom: 4F Chambers: N 631


Honorable Judge Pamela K. Chen

I am Ahmad Sheikhzadeh's sister-in-law, the wife of Ali Sheikhzadeh the closest sibling to Ahmad. It is a pleasure to have the opportunity to describe my perspective of Ahmad's personality.
From my very first interaction with Ahmad close to 20 years ago, as my husband and I were introduced to our respective families for the first time, 4 major characteristics of Ahmad were obvious. His kindness was noticeable at the first sight; he was the one among the siblings who helped their father to enter my parent's house and to walk him around. His sense of humor led our first conversation to start with a joke that I must have been older than him since I was taller, though I was and still am 16 years younger. His unwillingness to keep surprises and at times persistence in revealing them made his family including my husband furious. His ability in derailing and skipping formal and serious discussions was so evident that he had to be bypassed at times.

Today, after all these years, my impression of him hasn't changed and I still describe Ahmad as such.

Ahmad has been the kindest brother-in-law to me and uncle to my two kids. Even though my kids see him 3-4 times a week, when Uncle Ahmad buzzes our door all one hears and feels in my house are screaming in excitement and jumping up and down. The excitement for the pizza delivery is second to the one for Uncle Ahmad. I am blessed that my kids love him so much and have the opportunity to learn kindness and generosity from him. One can imagine how much his saddened face and voice during his legal case brought gloom to my home and especially to my kids.

I have been always amazed with Ahmad's sense of humor and charm and how it has helped him communicate with others.  It is never difficult to find Ahmad in a crowd; you hear someone is laughing loud; that person must be talking to Ahmad.  This has been a great asset for me to entertain my friends even those with formal personalities when they visit. His great personality and kindness has led my friends to be his as well and at times being more in touch with him than me. That is how Ahmad's misery during his legal case touched my friends.

Professionally, I describe Ahmad as a pure scientist with no aggressive goals in his life and career. Choosing to work as a consultant at the UN while holding a PhD from a prestigious university well describes that.  His preference in living a humble life living in a simple apartment for 40 years with his own routines may provide a more complete picture of his life.

His tendency to enjoy present excitements and appreciate the moments rather than planning for the future suits his Yogi personality greatly. Nobody should expect Ahmad to be pleased with complexities and forthcoming planning. My best example to highlight his unbelief in keeping secrets and surprises is that I had to keep my husband's forty-year-old surprise birthday party from him.

As a physician working in medical safety in pharmaceutical industry, a highly-regulated environment, I can appreciate the complexity of the regulations and laws and the importance of following the policies and procedures. However, I also believe that the interpretation of laws requires more than education and awareness of the laws. Certain personalities and personal skills are also required to synthesize and interpret the laws.  Ahmad, with a political scientist degree and being a political analyst, may have missed on simple interpretations of the laws due to his personality.

I am fully aware of Ahmad admitting to his faults and misunderstanding of the law. His legal charges are the result of his misinterpretation of the law rather than personal motivation to undermine the law. One can consider that his personality (generosity and kindheartedness and his intention to help others) was proceeding the interpretation and complexity of legal procedure.

Dear Judge, I am confident that in judging Ahmad's case you will keep in mind his character as I attempted to describe above.


Shahrzad Moosavi
Shahrzad1971@gmail.com
(646)724-8211



Judge Pamela K. Chen                                        April 28, 2017
Individual Practices and Rules 225
Cadman Plaza East Brooklyn New York 11201
Courtroom: 4F Chambers: N 631


Honorable Judge Pamela K. Chen,

I am writing this letter to inform you about my relation and friendship with Dr. Ahmad Sheikhzadeh. I have known Mr., Sheikhzadeh since 1974. We both came to the United States at the same time to study electrical engineering. We both completed our engineering degrees and at the same time decided to change our majors and pursue education in international affairs. We both completed our Ph.D.'s in this area.

During the years we were educating ourselves, we stayed very close. It was one of those friendships, which was based on the love for education and contribution to the field of international affairs. We chose two different career paths but stayed very close like two family members, specifically brothers. My wife and my three children have also developed very close friendship with Mr. Sheikhzadeh.

Beyond Mr. Sheikhzadeh's charisma and friendliness, he has sincerity and honesty in life that have attracted my family and many of my friends toward him. For my children, he is an uncle and for my wife he is another brother. His family is part of our family, because of the shared values of giving back to the society. Ahmad's sincerity can be translated into a sense of selflessness that always encourages his uninterrupted attention to the welfare of others and society.

During more than forty years of friendship with Mr. Sheikhzadeh, I have never seen one incident of dishonesty, greed, disloyalty and egoism. His sense of altruism and generosity have dominated his relations with others and the friendship that he has established with many others. His much likable personality is purely based on his sincerity and altruism.

I hope that his good intention and sincerity finally become what you base your judgement on him and his case. I am sure that you will deal with this case based on the integrity of Mr. Sheikhzadeh and fairness that you are recognized for.

Sincerely,

Mehdi Noorbaksh
Professor of International Affairs and Business
Harrisburg University of Science and Technology
Vice-President, World Affairs Council, Harrisburg

Judge Pamela K. Chen
Individual Practices and Rules 225
Cadman Plaza East Brooklyn New York 11201
Courtroom: 4F Chambers: N 631

Honorable Judge Pamela K. Chen,

I am writing this letter on behest of Ahmad Sheikhzadeh whom I have known since my days as a
graduate student preparing for my Comprehensive Exam and writing my dissertation at the
Bobst Library of New York University. In those heady days of youth and enthusiasm for
obtaining a PhD (which I considered the poor man's way up the ladder of success) I and my twin
brother, Mahmoud studied hard. But we would also gather in the lounge of the basement of
that library to blow off steam, relax and shoot the breeze. This is where I found a few lifelong
friends, including Ahmad Sheikhzadeh. Right from the first meeting I found him to be
extraordinary in his sharp and unconventional sense of humor. His was the spontaneous sense
of the absurd, not the canned humor of transmitting jokes. Another distinguishing attribute of
Ahmad was his amazing ability to sit at a desk, taking notes on a yellow legal pad without
interruption for hours. He was indefatigable. The most I could stay at a desk was two hours. But
Ahmad seemed impervious to the soft siren temptations of that coffee break.

We would often go out to eat and we hanged out on weekends at various places in New York
city. Bear Mountain was a favorite if we could find someone to give us a ride. A couple of times
we went on adventures such as inner tubing with a large group of NYU students. Ahmad was
the principle organizer as well as the main entertainer of the group. There was not a single dull
moment when Ahmad was around. His presence made me aware of why kings kept
professional court jesters in their employ. One could be in a car with Ahmad, travelling for six
hours and not feel the passage of time. When he started with his hilarious questioning the logic
of everything, including religious dogma, social conventions, received wisdom of folktales,
inflated egos of our supposedly superior ancient culture and generally, any commonly held
convictions, he usually didn't stop until we were in stitches, begging him to stop.

Unlike me, Ahmad was a very focused reader in his area of academic interest and rarely read
for pleasure. But upon graduation he started to explore other areas of interest including Yoga:
An activity that he has pursued with determination for decades. In terms of politics, Ahmad
belonged to the moderate and reformist range that has become progressively isolated and
reviled in Iranian politics. For this and other reasons, Ahmad's life after graduation contains a
paradox. I could never fathom why someone with his oppositional politics (and a PhD from Columbia to
boot) would be content to work as a consultant for the Iranian Mission to the UN. I always felt that he
deserves a better and higher position. Maybe he was optimistic that he could enhance their
understanding of the US-Iran relations and that his works could contribute to regional peace and
security. This was a pipe dream. People at the Mission would never appreciate his expertise. At another
level, the work might have appealed to him. After all, he got to be a perpetual student,
tirelessly reading and summarizing articles. But someone with his politics, subversive sensibility
and education would eventually find such a dead-end job as soul crushingly stifling.

Since graduation I had kept in touch with Ahmad. Whenever I went to New York I made a point of visiting with him over a meal or coffee. His sense of humor remained sharp and he was always great company. We would also speak on the phone once or twice a year and on occasion I received a humorous email from him. Over the years, I came to think of Ahmad as a recluse yogi in his cave. His bed of nails was his Sisyphean task of summarizing articles. So, nothing prepared me for seeing the face of this humble, funny, sixty something man who had done his best to stay out of the limelight all his life, splashed all over the news in the worst possible light. What cruel irony fate had in store for him!

In conversations I have had with him on the phone since this event, I have heard the notes of profound regret in his voice. When I saw him in New York a few months ago I was taken aback. For the first time, I was not able to see that ever-present mischievous glint in his eyes.

Ahmad Sheikhzadeh knows that he has made many wrong turns in his life. He did not voice any of this in so many words but it was not difficult to read between the lines. Maybe he should never have switched from engineering to political science. Maybe he should have applied for academic jobs after graduation. Maybe he should have tried to publish instead of summarizing others' work. Surely, he should not have made the blunders that have landed him in a world of hurt and in your courtroom.

Dear Judge Chen, I wish to plead with you to be merciful on this gentle, funny, harmless and broken man. He has made big mistakes and has already paid dearly in loss of face and the utter ruin of his reputation, which for an Iranian man is a grave punishment. I especially beg you not to send him to prison, or if this is inevitable, to shorten it as much as it is your power to do. I recently (Summer of 2014) was arrested by the Iranian authorities on the absurd political charge of "propaganda against the state." My only sin was exercising my God given freedom of conscience and speech. Fortunately, I was released from jail and could leave the country, although my case went to court and I have been convicted in absentia to one year in jail for the above charge. When I was in custody, I spent some time in solitary confinement and was interrogated several times at the notorious Evin prison in Tehran. I can testify that confinement at my age (I guess Sheikhzadeh is roughly the same age) and for someone who has spent his life in academia is very hard, if not unbearable.

Cordially,
Ahmad Sadri, Professor of Sociology and James P. Gorter Chair of Islamic World Studies
Lake Forest College.
msadri@mx.lakeforest.edu

Judge Pamela K. Chen
Individual Practices and Rules 225
Cadman Plaza East Brooklyn New York 11201
Courtroom: 4F Chambers: N 631


Honorable Judge Pamela K. Chen,

I am both delighted and troubled to be asked to provide this testimony on behalf of Dr. Ahmad Sheikhzadeh: delighted because it gives me an opportunity to express that which I have never had an occasion to articulate: how much I value him as a human being and why do I hold him in such high esteem; troubled because I never imagined he would be in a position to need such a testament.

I have known Ahmad for nearly four decades.  I can say, I assure you, without even the slightest hint of hyperbole, that he is one of the most genuinely decent, loving, kind and generous human beings I have ever been blessed to know.

To me, Ahmad is full of paradoxes!  First, despite coming from a very wealthy family (his father was a prominent industrial magnet in Iran) his life has always been one of the most simple and almost ascetic lives imaginable.  He has never strived for worldly possessions, despite the fact that as the elder son of his family all these would have been available to him from a very early age.  His attitude, too, is far from that one would expect from anyone born in his economic class.  How he has achieved such a degree of worldly detachment, is a mystery to me! Second, despite having a PhD in political science from one of the most prestigious universities in the world, he is astonishingly devoid not only of false pride and self-importance but even the amount one would expect of any ordinary soul with that kind of accomplishment.  Again, how he managed to attain such verifiably high academic distinctions and avoid the vainglory or even conventional pride of his status is a true enigma to me, who have spent all my life in academia.  Third, he is at once aware of the tragedy – and frequently absurdity -- of life and its multifarious cruelties; yet he cultivates an attitude of unconcern and remains oblivious to it all by conjuring a highly original -- indeed an imitable and ingenious -- sense of humor and humility about life.

Had it not been for the fact that I am asked to keep this testimony brief, I could have gone into great detail, relating the pure humanity and kindness that courses in the veins of this unassuming gentle-man.  I beg the court's indulgence, to relate a few personal anecdotes to which I have been a witness.  As a graduate student, I had my mother visit and live with me for six months in New York, before she went back to live out the rest of her life in my native land.  I had to leave her at home, in Brooklyn and go to the BOBST library to study all day long, and sometimes into the wee hours of morning.  Ahmad, without being asked, would go to the public phone in the library, (those were 1980, before the age of cell phones) drop quarter after quarter into the phone, carrying on a conversation with my mother, making her laugh with delightful anecdotes, asking questions about recopies – things that made her feel needed – nearly every day.  He did this purely because of his remarkable sense of empathy with a friend's mother, whom he surmised would be alone and in need of someone to converse with, in her native tongue.  To this day, I have never mentioned this to him or thanked him for his kindness because I have instinctively known he would be embarrassed by having his good deeds being "revealed" and appreciated to his face.

I have dozens of memories like this and so does everyone who has been privileged to know him.  I boldly assert that Ahmad Sheikhzadeh has never wronged anyone and has no enemies whatsoever.  Whenever

there has been a conflict of interests, Ahmad has renounced his own, without complaint and ostentation.  Of course, anyone so kind, generous and humble could be exploited as well. I personally knew of roommates who abused his sense of duty, responsibility and hospitality by relegating most of the household chores unto him. To witness Ahmad's – almost saint-like – tolerance and humility in the face of such abuse astonished and, at times, outraged his close friends.

I do not know the nature of the legal case against Ahmad Sheikhzadeh and what I know puzzles me no end.  However, I can assert this much: based on my four decades of knowing him, his brothers and sister, his late father and mother, his roommates and cohort, his classmates and associated, his friends and acquaintances, Dr. Ahmad Sheikhzadeh has, and has never had even a trace, even an iota of meanness, mendacity, selfishness, greed, or malice in his entire life.  I cannot emphasize enough that I say this with utter and complete truthfulness and without a hint of exaggeration.  Ahmad has always been not only guiltless but guileless about guilt and, in this sense, almost childlike.  However, there is nothing child-like about the fact that he transforms the bitterness and the mendacity of the world around him into wisdom and humor in the crucible of his soul.

To wax a bit philosophical, please allow me to share with you how I justify to myself his present trials and tribulations.  I consider Ahmad Sheikhzadeh a tender soul, who despite all that his heredity and erudition have afforded him, has remained simple, humble and suffused with good will toward his fellow human beings.  To me, the deeper meaning of his troubles at this stage of his life can only be attributed to the inscrutable will of the providence: a battery of "divine tests and trials" from which, I have no doubt he will emerge, however damaged by outward appearances, purer in spirit.

I sincerely hope the court will consider this testimony in combination with the impression that he has projected from himself throughout these proceedings, to bestow the utmost mercy possible under law upon this endlessly giving and unassuming human being.


Respectfully Submitted



Mahmoud Sadri PhD

Professor of Sociology, Affiliate Professor of Women's Studies
Texas Woman's University and the Federation of North Texas Area Universities
Denton, Texas
Telephone: 940 898 2061
Email: msadri@twu.edu

Judge Pamela K. Chen
Individual Practices and Rules 225
Cadman Plaza East Brooklyn New York 11201
Courtroom: 4F Chambers: N 631


Honorable Judge Pamela K. Chen,

I, Ali Sheikhzadeh, the brother of Ahmad Sheikhzadeh's would like to take this opportunity to highlight Ahmad's main character and personality to you as his close brother who has had daily interaction with him and been actively participating throughout his legal case.

Ahmad and I have been fortunate to be raised in a family with good ethical and moral standards and great role models. My father as a successful businessman, with minimum academic education, always advised us on our obligations to other people.

He always encouraged us to obtain higher education/knowledge and was always emphasizing on individuals' responsibilities and duties to "be good and do the best that one can do". He continuously reminded us of such commitment in every phone call and family visits, since Ahmad and I came to the USA. This was possibly the source of our motivation to find our ways despite all difficulties in our immigrant lives. Ahmad started his education in small college in Texas, found his way to get his Engineering degree, PhD in Political Science, and the professional certificate of Middle East Studies from Columbia University. I was fortunate to find my way from a small Chicano high school in Texas, to obtain my education from a prestigious university (PhD from NYU). Today, I hold three prestigious job titles at NYU School of Medicine: Director of Research and Education, Research Associate Professor, Department of Orthopaedic Surgery, and Research Associate Professor, Department of Environmental Medicine, and Director of program of Ergonomics and Biomechanics at NYU. Similarly, my brother Mehdi earned his PhD in Operation Research from University of Minnesota and is now a Director of Graduate School of Management and Economics, Sharif University of Technology, a reputable university in Iran.

My father also always emphasized on charitable activities. He was our main role model for participating in community services. He initiated many charitable activities and funded to build schools and clinical facilities for underserved communities, and supported individuals for various charitable causes. His acts and advice encouraged us to identify various venues to participate in community services. My sister has been a member of a nonprofit organization aimed to empower single mothers to find jobs and social resources in Tehran. Mehdi, my brother, has been providing pro bono services to optimize financial and operation processes of Kahrizak Charity Foundation (KCF), a facility with 1600 beds serving physically handicapped or elderly individuals with no financial resources free of charge; the facility that my father served for more than 35 years. I have been a member of board of directors for Comprehensive Development, a non-profit organization serving 3500 students of age 14-24 in New York City, helping students through intensive individualized programs and services to graduate from high school and enter college or workforce, despite their financial and social misfortunes.

Similarly, Ahmad has continuously been participating in various voluntary activities and services, with his own unique approach and different from that of the rest of my family. He believes in individual touch and personal interactions, more than involvement in large organizations with complex structure and

long-term objectives.  He is more effective when participating in personal conversation, smaller projects, and individual day-to-day activities, rather than a large, complex and structured charitable organization without any individual touch. His charm and personal skills can often break the ice with even serious individuals. Ahmad can provide a good survey of homeless individuals' lives in his neighborhood, family challenges of people who work in the Deli and bagel store next to his apartment building, daily challenges of the elderlies in his building and neighborhood and those hanging out in the small neighborhood park.

Dear Judge, my above description may provide a different impression and story of my family, specially Ahmad "who conducted money remitting services for two co-conspirators located in the United States, whose identities are known to the Grand Jury, and who wished to make investments in Iran" and "disbursed funds at SHEIKHZADEH's direction and provided cash to a fourth co-conspirator" with the court's understanding that all these acts has been done to undermine the IEEPA Act and United States' National Security. However, dear judge, in a none-legal term, the co-conspirator is a reference to my sister, my family members, and our long family friends, without involvement of any unknown individual or stranger. "Frequent money distribution" is a reference to Ahmad's request to distribution of family money with some frequency, via my sister, to help my sick widow aunt to get medical attention and financial relief. Investment refers to our friend's contribution to assist his brother's dental practice to survive standard business competition. Frequent reference to "transfer of fund" in Ahmad's case is mainly related to his transfer of his inherited money to the US.

Ahmad has admitted to his mistake and well understands that his activities, despite his motivation and good intention, will be considered as illegal and prohibited by the law in the United States. However, dear Judge, similar to you as you asked in the plea agreement court, our American friends are curious and wondered how much profit was involved in the "frequent transfer of the fund" that made him greedy enough to act against IEEPA Act and "National Security of United State". As Mr. Steve Zissou, Ahmad's attorney, and Ahmad explained in the court, there was no financial profit involved. After all, it was the exchange of money between my family and close friends to fulfill minimum family obligations for helping family members and/or transfer personal family money. Dear Judge, similar to your response and your facial expression in questioning and hearing Ahmad's explanation, people will remain to be unsatisfied with answers and ambiguities related to his case and often puzzled given Ahmad's character and known integrity.

Ahmad's limitations in expressing  his emotional distress due to the US government's failed effort for his recruitment, my inability  to provide convincing  explanation for Ahmad's sudden inability to deal with his phone calls and social obligations, his inability to go to work and not properly explaining his absence, and then sudden Reuters' news report about Ahmad's case resulted in friends and families' confusion and mistrust and questioning Ahmad's and my family's character and reputation. This is evident by his friends' lack of efforts to contact him to learn about Ahmad's case since his case became public. Ahmad has had a relatively large pool of educated friends who follow political and social issues carefully. From internet messages and blogs and more recent communications from his friends, it is obvious that Ahmad still needs to put enormous efforts to regain families and friends' respect and trust. From the perspective of those who are the victim of "conspiracy theory", Ahmad must be serving as a government's agent and his case is nothing more than a cover-up story to mislead the public. For typical Americans or none-Iranian individuals who are familiar with IRS tax audit process for similar cases or even larger amount of taxe mishandling, Ahmad's case is too difficult to be explained. It is still not easy to explain to an average Iranian or American friend why Ahmad was picked up in the street, the reason

he was subject to such a treatment while he could be subject to standard audit process, and the necessity of using FISA Act in his case.

It is sad to see that a politically motivated government recruitment case of my brother should result in such misrepresentation of Ahmad and my family's reputation in international media, newspapers and TV reports, and commentaries on the internet. The emphasis of the prosecutor on using politically loaded words during her interview in media (working for a "hostile government" which has nothing to do with his charges) about Ahmad's case could be assumed as tactics used towards the prosecutor's professional achievements, but is remained to be a poor and unfair tactic used by the government representative to politicized Ahmad's case. The comment made by the prosecutor, "hostile government", which is inconsistent with its description in major political and legal articles, resulted in international media attention which in turn had devastating effect on Ahmad and my family.

Dear judge, I am sure you understand the emotional feeling and confusion of my 81-year mother, who suddenly saw his son's picture in internal news and Iran's government TV, as they were celebrating the Iranian New Year and early days of spring. The media attention to his case, due to interview of a US government official, and Ahmad's instruction by government's agent to not to discuss his case with anyone before the case being public, resulted in Ahmad's inability to properly and promptly informing my mother and my family when the case become public. This resulted in big emotional devastation for Ahmad and my family. My mother's frustration and stress for the possibility of not being able to see Ahmad in her life time due to the possible future Iranian government's reaction and/or the possible lengthy process of his case is the source of her emotional suffering. Ahmad's case has been extensively publicized in Iran. Friends who are familiar with internal politics in Iran are convinced that Ahmad's plea agreement will be interpreted as collaboration with the US government and, therefore, will result in Iranian government's formal reaction if Ahmad decides to visit family and specially my mother in Iran.

Dear Judge, before this legal case, Ahmad was a source of inspiration and fun for many friends and often people had telephone discussions with him just to forget their problems or a hard working day. Ahmad's social isolation due to his devastation for dealing with friend's questions, his limitations due to his ankle bracelet and technical issues, and traveling restrictions, have their own additional impacts of on his life. As Mr. Michael Illaria, Pretrial Service Officer, pointed out to Ahmad, his ankle bracelet has been showing that he is only using three or four pathways, coming to my house to see my kids, attending yoga classes, and having coffee or food after his yoga classes.

Dear Judge, Ahmad is a proud American-Iranian and happy to serve his share of responsibilities and duties.  He has accepted full responsibilities of his case from the time he was arrested in the street, interviewed in the hotel by government's agents during the government recruitment process.  He cooperated with the agents, without the presence of a legal consular, and responded to all the questions despite the emotional pressure on him including being convinced by the agents for major sentences including over 40 years of prison and further complex charges. Nevertheless, he was not hesitant in expressing his commitments in explaining about his beliefs with respect for agents, and was not ready to compromise on his core values.

Dear Judge, with no doubt 10 years of monitoring Ahmad's phone calls, emails, personal communications, and cherry picking on his life, delivered no evidence for jeopardizing the United State National Security.   He is a true believer of peace and negations between individuals, groups, and

countries. He changed his field of study form engineering to political science, as he observed raising political conflict between the US and Iran, later hostage crises, and other political confusions, while he was in Texas. He put a lot of efforts to earn higher education to appreciate technical nuances about the political issues related to Iran and America. He has unique abilities to respectfully discuss these issues with charm and anecdotal stories in simple ways for various professional and non-professional audiences. Such unique talent was the base of his years of consultation to Iranian Mission to the United Nation presenting and discussing political issues with high ranking officials who know Iranian side of the story better than him and have no interest to hear other point of views with respect to Iranian politics.

Of course, Ahmad has accepted the guilt and believes that his suffering and current condition is the result of his past actions. However, dear Judge, I am confident that you are aware of the reports and testimony of many legal experts in describing the challenges and confusions around understanding IEEPA Act for American-Iranians. Without any doubt, Ahmad has learned the issues related to the interpretation of the law, has suffered enough emotionally during government recruitment, due to his limitations because of his ankle bracelet, dealing with my 81-year mother with no hope for seeing his son. Considering his age, this legal case and potential punishment in the US and the awaiting outstanding legal procedure and punishment in Iran has left no hope for him for the future. Ahmad is a 61 year old educated man, with good upbringing and family ethics and faith, and with no doubt has learned his lesson. Therefore, dear Judge, I am confident that you are able to see Ahmad's case in totality.

Sincerely,

Ali Sheikhzadeh

395 Riverside Drive, Apartment 10B
New York NY 10025
April 17, 2017

Judge Pamela K. Chen
Individual Practices and Rules 225
Cadman Plaza East Brooklyn New York 11201
Courtroom: 4F Chambers: N 631

To Honorable Judge Pamela K. Chen:

My name is Gary Sick. I am a professor at Columbia University, where I am Senior Research
Scholar, adjunct professor of international affairs, and former director of the Middle East
Institute (2000-2003). I served on the National Security Council staff under Presidents Ford,
Carter and Reagan. I was the principal White House aide for Iran during the Iranian Revolution
and the hostage crisis and I am the author of two books on U.S.-Iran relations, in addition to a
number of other edited books and articles dealing with U.S. Middle East policy. I am a captain
(ret.) in the U.S. Navy, with service in the Persian Gulf, North Africa and the Mediterranean. For
five years I was the deputy director for International Affairs at the Ford Foundation, with
responsibility for programs relating to U.S. foreign policy. I teach a graduate seminar in the
School of International and Public Affairs at Columbia. I am also a member (emeritus) of the
board of Human Rights Watch in New York and founding chair of its advisory committee on the
Middle East and North Africa. Since 1993 I have been the executive director of Gulf/2000, an
international online research project on political, economic and security developments in the
Persian Gulf, with some 2,000 members across the globe.

I am writing with regard to Ahmad Sheikhzadeh, PhD, whom I met as a student in the early
1980s, when he took a seminar on Middle East politics that I was teaching with Professor J.C.
Hurewitz. I was aware that he had received a Certificate from the Middle East Institute, and I
saw him from time to time on the Columbia campus as he was completing his graduate studies
and working on his dissertation.

I was invited to participate as a member of the committee that examined Sheikhzadeh on his
doctoral dissertation in 1996. His dissertation was a very academic work. He chose a series of
key points during the reign of the former Shah of Iran and examined them in light of a
contemporary theory of international relations. I remember two things about that examination:
first, that the facts surrounding a series of events in the Third World country did not fit very well
into a theory of politics that was based primarily on Western, and especially U.S. sources; and
second, I was struck by the fact that Sheikhzadeh chose to examine the policy actions of the
former Shah when he could have taken the more newsworthy and politically-charged path of
examining the evolving policies of the Islamic Republic, that had overthrown the Shah and his
government. His dissertation was thoroughly theoretical and apolitical, which was unusual for
Iranian-Americans at a time of great political turmoil in their native country.

My primary contact with Dr. Sheikhzadeh was in relation to the Gulf/2000 project that I was
developing over those years. I started the project in 1993 with a very small number of members,
mostly professional acquaintances who shared an interest and expertise in the politics of the

Persian Gulf. I don't recall when Sheikhzadeh joined, but it must have been shortly after the project began, while he was working on his PhD.

The Gulf/2000 project attracted people with expertise and often very strong opinions. We have members who despise the Islamic Republic and openly call for its elimination. We have others who believe that Iran is unduly maligned and who support it against its many opponents. I am quite conscious of these differences since, as the moderator of the group, it is my task to keep the dialogue civil and professional. Sheikhzadeh never participated in these debates. Instead, he later began sending me articles relating to Iran that he had culled from a very wide range of published sources. I assumed he had a contract, probably with the Iranian Mission to the UN (which I later confirmed), preparing a digest of the American media for the staff. I have other members with similar jobs for think tanks and commercial organizations, and they frequently share the results of their work with me without compensation, as he did.

Sheikhzadeh's contributions were very useful since they covered more territory than I could manage by myself. Moreover, Sheikhzadeh sent me articles that both praised and damned the Islamic Republic, all without comment. Part of Gulf/2000 involves promoting dialogue among experts; another feature is a one-stop site to find a wide range of hard news and commentary about the region. With the help of Sheikhzadeh and a number of other members, the latter dimension of the project has become increasingly important.

In all my dealings with Ahmad Sheikhzadeh over more than thirty years, it has been my strong impression that he is a dedicated student and researcher. Both in his work as a diligent PhD candidate and in his later documentation work that he shared with me, he was always in pursuit of facts and was never in the least partisan. In fact, I always took some satisfaction in knowing that the material he was presenting to the Iranian Mission was instructing them on all aspects of U.S. opinion about their country, most of which was negative in tone. I am pleased to count him as a fellow American citizen.

I would be pleased to discuss this matter further with you or others. My home telephone is 212-600-0016 and my email address is <ggs2@columbia.edu>.

Sincerely,

Gary G. Sick, PhD
Columbia University

April 12th 2017

Judge Pamela K. Chen
Individual Practices and Rules 225
Cadman Plaza East Brooklyn New York 11201
Courtroom: 4F Chambers: N 631

To the Honorable Judge Pamela K. Chen,

I have known the defendant Ahmad Sheikhzadeh for several years.  He was a consistent and steady student of mine in a Wednesday and FridayYoga class at Crunch Gyms in Manhattan.  It was very rare for Ahmad to miss class in fact rare enough that when he was absent the whole class would inquire as to his whereabouts.

It's been brought to my attention that he has a legal case against him and I very much desire to present you my own experience with him.

I am a Teacher with sixteen years experience in New York City.  In my work I encounter a wide array of diverse City dwellers seeking breath, strength, movement, and spirituality.  In my classes it is customary to have a safe and brief moment of partner work in which groups of students work together to achieve a pose.
Most New Yorkers approach this part of class with aversion and then once engaged in the exercise enjoy the amaraderie.  Ahmad was the best at making newcomers feel safe and included in these exercises.  I always knew that whoever worked with him would be tended to and I could move about the room.  My Friday class in particular had a very set group of "Regulars" who were very comfortable with each other.  So much so I was concerned that new comers to this class would feel excluded.  Ahmad was so helpful to me and this community in making everyone feel welcomed and maintaining a spirit of "inclusiveness" it really was my favorite class of the week to teach.

Teacher's can control most elements in a classroom but the overall spirit of the classroom becomes up to the students in the long run.  Ahmad helped create a very special, social home base for many people who looked to Friday's at 10AM as their touchstone for equanimity.

Ahmad is very gifted in his ability to connect with people and create community.  It would be a great loss to New York City to lose such an essential force of friendliness.
In sanskrit we have a word that describes the practice of friendliness.
The word is "Maitri".  It is the most unselfish and unarmored practice to genuinely invite and include people without conditions.
This is who Ahmad is and how he participates in our big, crowded, lonely City.
Thank you for your consideration and your time as well as what you do to serve our City.

Respectfully yours,

Vanessa Spina
113 Prince St.
Suite 2E
New York, NY 10012
917-805-6148
vanessayoga@yahoo.com

April 20, 2017


Honorable Judge Pamela K. Chen
Individual Practices and Rules 225
Cadman Plaza East Brooklyn, NY 11201
Courtroom: 4F Chambers: N 631


Dear Judge Chen:

It is my pleasure to write a letter on behalf of my friend, Ahmad Sheikhzadeh.
I have known Ahmad since the mid-nineteen eighties and consider him one of my oldest and
dearest friends. We first met at the New York University library where he was working on his
Ph.D. dissertation in Political Science at Columbia University, and I was a freshman in Film and
Television Studies at NYU. I remember our meeting vividly; I had just finished a phone call
from the NYU Library to my parents in Norway.  Ahmad, who was standing nearby, asked what
language I was speaking. First I thought this was a "pick-up line," but when I told him it was
Norwegian he offered to introduce me to one of his friends, Kristine, who is also Norwegian. To
make a long story short, because of this introduction, Kristine and I became lifelong friends.

Another story about Ahmad that particularly touched me was his warm and caring relationship to
his much older neighbor, Anna. She was one of the old-time Italian Catholics born and raised in
Greenwich Village. Towards the end of her life, Ahmad was both her lifeline and caretaker. On
Anna´s eighty-fifth birthday he wanted to do something special for her. I knew his apartment was
too small for a social gathering so my partner Marianne and I offered to have the birthday party
in our spacious apartment. He was thrilled and consequently made his friend Anna very happy
that day! He shows the same kind of thoughtfulness and dedication to his family both here in
New York and back in Iran.

I mention these stories about everyday caring, because this is the Ahmad I know, a kind, polite
man who loves to bring people together and willingly extends a helping hand to family and
friends. He is the most selfless person I have ever met, so for him to be on the other end of the
stick and actually have to ask for help this last year has not been easy for him! This is a cruel
irony for someone who has spent his life helping others.  I would like to mention that Ahmad´s
great passion in life is yoga and he devotes himself to that practice and community. He is not
someone who cares a lot for material or superficial adornment, instead he is a living embodiment
of the loving kindness, health practices, and simplicity yoga requires.

Throughout our now close to 30-year friendship, Ahmad has always lived in the same tiny
apartment on Grove Street in the Greenwich Village. As in most of the City, his rent has
skyrocketed, however his salary has not; to be over 60 years old and facing retirement, that is a
very scary reality.  However, Ahmad was too proud to ask family and friends for advice or

support, and this unfortunately led to the situation he is in today. One year with an ankle bracelet tracking detector and an uncertain future is not something any of us ever envisioned for our dear kind friend.

I sincerely hope that these few lines give you some insight into the character of our friend Ahmad, and why we are so concerned about his plight. To put such a kind, gentle person in prison would serve absolutely no one. If you need any further information or more stories to support Ahmad´s case, please do not hesitate to contact me.

I sincerely hope, your Honor, as you preside over this case, that you find it in your heart and mind to be kind and lenient in my friend´s case.

Respectfully yours,


Helen Tschudi


**HELEN TSCHUDI**
260 W. 10th Street, #1E,
New York, NY 10014
Tel. 917-414-4748
E-mail: htschudi@me.com



*Clark Hall, Suite 208   3400 N. Charles Street   Baltimore MD 21218   410-516-8006   CBID.bme.jhu.edu*

April 20, 2017

Honorable Judge Pamela K. Chen
Cadman Plaza East Brooklyn New York 11201
Courtroom: 4F, Chambers: N 631

Dear Judge Chen,

First, thank you for your service on the court.  Also, thank you for taking the time to read and consider this appeal for leniency for my long-time friend and a man I admire, Ahmad Sheikhzadeh.

I first met Ahmad when I was in elementary school in Houston, where I grew up, the child of immigrants from Iran.  Ahmad had arrived from Iran in the mid 70's to become an undergrad student at a university in Houston. My mother especially took a liking to him.  What struck me and I still recall with fondness is his constant joyfulness and very funny and irreverent sense of humor.  This was not common at all for Iranians in our circle of acquaintances, who were mostly self-important, self-righteous religious radicals. But Ahmad was then and to this day is a breath of fresh air.

To this day, I continue to admire Ahmad's progressive values and open-mindedness. In discussions on evils endemic in traditional Iranian society, such as misogyny, homophobia and anti-Semitism, Ahmad is always the one who best expresses our need to fight these old bigotries and see how much harm and pain they cause. He is effective because he does so with a gentle good humored manner and pays respect to traditions, while helped backward-thinking people open their eyes.

People in our old circle of friends took many paths.  Some became sell-outs to the new regime.  Some became militant anti-regime fighters. But a brave minority, like Ahmad, sought to work for change by trying in influence insiders. I know from many years of conversations with Ahmad that he hates injustice and hypocritical religiosity.  He also knows the harm that extreme radicalism has caused. That has motivated him to try to work with *relative* moderates to steer their thinking.  If there is even a little moderation inside the discourse of political leaders in Iran today, Ahmad has helped to make that happen.

Dear Judge Chen, I don't know the details of Ahmad's case or what he has done to run afoul of the law.  I do know that he admires the rule of law and it pains him that he would be considered disrespectful of it.  Having an independent judge like yourself is a dream that Ahmad and many Iranians wish for Iran someday.  I know that the past year, with this case and all





the financial and emotional hardships it has caused, has been a hellish one for Ahmad.  He's has suffered greatly, at an age where it has taken its toll physically.

But when I speak Ahmad on the phone, I still hear his joyful energy come through.  I beseech you to please be lenient with my old friend.  He's a good man and has tried to do good in the world, and has a positive influence on me and many others.

Sincerely,

Youseph Yazdi, PhD, MBA
Executive Director, Johns Hopkins Center for Bioengineering Innovation & Design
Assistant Professor, Johns Hopkins School of Medicine
Assistant Professor, Johns Hopkins School of Business





# LAW OFFICES OF TSUI H. YEE, P.C.

32 BROADWAY, SUITE 601                                          212-785-8383
NEW YORK, NY 10004                                             212-785-8366
TSUI@YEEIMMIGRATION.COM

April 20, 2017

Judge Pamela K. Chen
Individual Practices and Rules 225
Cadman Plaza East
Brooklyn, New York 11201
Courtroom: 4F Chambers: N 631

To the Honorable Judge Pamela K. Chen,

Thank you for taking the time to read this letter in support of Ahmad Sheikhzadeh.  I am an immigration attorney with my own solo practice in the Financial District, New York City.  I am an active member of several bar associations, including the Asian American Bar Association of New York (AABANY), where I chaired the Immigration and Nationality Law Committee and the Solo and Small Firm Committee, and the New York County Lawyers Association, where I chaired the Solo and Small Firm Committee, for several years.  As an immigration attorney, I represent a diverse range of clients from various countries and socioeconomic backgrounds and assist them with their goal of establishing better and more fulfilling lives for themselves and their families in the United States.

I met Ahmad about one year ago at my local Crunch gym in a yoga class.  I discovered yoga several years ago when I was going through a particularly challenging time personally.  Yoga has since then become an essential and indispensable part of my life, and has enriched and altered my life in many ways.  Through the course of a year, I have come to know Ahmad well and have benefited greatly from his friendship and kindness.

For instance, when I left my law firm partnership of six years roughly two months ago, Ahmad volunteered to help me with packing up all of my files, office equipment and other ephemera.  Ahmad insisted on helping me to move my office on a weekend and would not leave until I was settled in to my new office space.  This is no small feat for a solo practitioner who had no staff or assistants to aid in this process.  Leaving a partnership, and physically moving to a new office space was an incredibly stressful and anxiety-inducing process, but Ahmad helped make the transition as seamless as possible.

In our yoga classes, Ahmad is the first person to welcome new students; the first to introduce and make friends; and the first to volunteer to help the yoga teacher whenever assistance is needed.  I noticed that this is a characteristic that has been consistent for as long as I have known him.

This is the Ahmad who I have come to know and to respect.  I am tremendously grateful for his friendship, and from my personal observations, there are many people who feel similarly about Ahmad.

Thank you for your consideration and if you require any additional information from me please feel free to contact me at 212-785-8383.

Respectfully yours,

_____

Tsui H. Yee

Tsui H. Yee
Law Offices of Tsui H. Yee, P.C.
32 Broadway, Suite 601
New York, NY 10004
212-785-8383
212-785-8366