

*U.S. Department of Justice*

*United States Attorney*
*Eastern District of New York*

PB
F. #2013R01046

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 15, 2017

**By ECF**

The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Ahmad Sheikhzadeh
                Criminal Docket No. 15-182 (PKC)

Dear Judge Chen:

      The government respectfully submits this letter in response to certain arguments raised in the sentencing memorandum filed by defendant Ahmad Sheikhzadeh in the above-captioned matter.  (See Docket ("Dkt.") No. 38).  The sentencing hearing is scheduled for December 20, 2017, at 2:00 p.m.

    I.    The Defendant's Crimes Are Serious and Warrant a Custodial Sentence

      Rather than accept responsibility for his crimes, the defendant spends much of his sentencing submission calling into question the government's motivation for prosecuting him.  He argues that he is a "victim of selective prosecution" that is "politically-motivated." (Dkt. No. 38 at 4).  He claims he is a "pawn in a political test of wills between the United States of America and the Islamic Republic of Iran."  (Id.).  He argues that, but for his work for the Government of Iran's Permanent Mission to the United Nations ("IMUN"), he would not have been charged.  (Id. at 21).  Finally, he maintains that the only reason the government is seeking a custodial sentence is to use the defendant as leverage for political concessions from Iran.  (Id. at 7).

      The Court should not indulge the red herring that is the defendant's baseless attacks on the government's prosecutorial motivations.  There is simply no evidence to support the defendant's self-serving claims that his prosecution was motivated by politics.  In addition, there is nothing remarkable about the fact that the defendant's indictment was under

The Honorable Pamela K. Chen
December 15, 2017
Page 2

seal before he was arrested or that arresting agents from the FBI inquired about whether the defendant would be interested in cooperating with law enforcement. Similar actions have been taken in countless other cases, and they are done for reasons too numerous to list in this submission. The defendant is no different from any other criminal defendant who appears before this Court. He committed crimes, and he was prosecuted for them.

When the defendant actually does address his crimes in his sentencing submission, what is most notable is that he seemingly shows no remorse, and he does not accept responsibility for the crimes to which he has pleaded guilty. Specifically, he ignores his multi-year tax fraud scheme and he minimizes the significance of his violation of the International Emergency Economic Powers Act ("IEEPA").

With respect to the IEEPA violation, the defendant claims that he engaged in only a "handful" of illegal transactions with family and friends and that he did not earn a fee for his money transfer services. (See Dkt. No. 38, at 1, 17). He argues that the illegal money transfers were done for "humanitarian" reasons and that they did not jeopardize the national security of the United States. (Id.) The defendant also attacks the Iranian Transactions and Sanctions Regulations ("ITSR") by claiming that the sanctions are overly confusing and unfairly target Iranian-Americans like himself. (See id. at 6).

Despite his protestations to the contrary, the defendant's crimes were quite serious and they do warrant a significant custodial sentence. With respect to the tax fraud, the defendant perpetrated a multi-year fraudulent scheme whereby he purposefully failed to report over $170,000 in income from the IMUN. Moreover, the defendant utilized a complex system of indirect and difficult to trace cash payments that likely were designed to conceal the scope and breadth of his work on behalf of the IMUN.

With respect to the IEEPA violation, the defendant knowingly and intentionally facilitated multiple money transfers – totaling over $180,000 – from individuals in the United States to individuals in Iran. Despite the statements in his sentencing memorandum, when the FBI interviewed him after his arrest, the defendant admitted that he benefitted financially from his participation in the transactions. Even if the defendant did not receive a "fee" for his service, this would not make his transgressions any less serious. See United States v. Banki, 660 F.3d 665, 673-74 (2d Cir. 2011) (noting that the ITSR do not distinguish between a service where a provider receives a fee and one where he does not because both services have the same impact on Iran). The defendant also admitted that he knew that facilitating the transactions without a license from OFAC was illegal. What made the defendant's actions even more glaring is that, during the relevant period, he had obtained a license from OFAC in order to effect a financial transaction involving Iran. Thus, he was aware of the circumstances under which a license could be obtained and how to obtain one. Moreover, the defendant was a Ph.D. and self-professed expert on U.S.-Iran relations. He was not confused about the ITSR; he just chose to ignore the sanctions for his own benefit.

"The Iranian embargo is intended 'to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States' posed by 'the actions and policies of the Government of Iran.'" Banki, 660 F.3d at 673. "[T]o reform the actions of the government of Iran . . . the [ITSR] adopt a blunt instrument: broad economic sanctions intended to isolate Iran." Id. (internal citations omitted). By repeatedly evading and ignoring the restrictions of the ITSR by causing significant sums of money to be disbursed to individuals in Iran, the defendant undermined in a real and tangible way the efficacy of the economic sanctions that are intended to protect the national security of the United States. Persons who evade national security controls or who engage in transactions with countries that support international terrorism should be punished, regardless of whether the conduct at issue directly furthers Iran's nuclear program or military. See, e.g., United States v. Homa Int'l Trading Corp., 387 F.3d 144, 146 (2d Cir. 2004).

In addition, the seriousness of the defendant's crimes warrants a significant prison term that would deter others from undermining the foreign policy and national security interests of the United States by flouting sanctions such as those against Iran. Through its just punishment of the defendant in this case, the Court can send an appropriate message that sanctions violations are grave matters that warrant real punishment.

II.     The Government's Proposed Sentencing Guidelines Calculation is Correct

The defendant argues that his Sentencing Guidelines base offense level should be 14, as opposed to 26. (See Dkt. No. 38 at 23). He is wrong. An unlicensed transfer of money to a counter-party in Iran implicates both prongs of Section 2M5.1(a) of the Sentencing Guidelines. As such, a base offense level of 26 is appropriate.

Section 2M5.1(a)(1)(A) provides that a base offense level of 26 applies if "national security controls . . . were evaded." Because the ITSR were promulgated pursuant to IEEPA following the issuance of, among others, Executive Orders 12170, 12957, 12959, and 13059, wherein it was determined by the President that the Government of Iran constituted an unusual and extraordinary threat to the national security of the United States, "any violation of the embargo is necessarily an offense that 'involves' national security." United States v. Hanna, 661 F.3d 271, 294 (6th Cir. 2011). When a President recognizes a threat to national security and uses the power granted to the President under IEEPA to address that threat through economic sanctions, those sanctions constitute "national security controls" for the purpose of Section 2M5.1(a), regardless of what goods or services the offending transaction actually involved. Id., at 292-93. Thus, "[e]very court to consider the issue has held that . . . such sanctions are national security controls." Id. at 293 (internal citations and quotations omitted); see also, e.g., United States v. Elashyi, 554 F.3d 480, 509 (5th Cir. 2008) ("regulations targeted against state sponsors of terrorism are 'national security controls' under 2M5.1(a)"); United States v. McKeeve, 131 F.3d 1, 14 (1st Cir. 1997) ("Section 2M5.1(a) applies to any offense that involves a shipment (or proposed shipment) that offends the embargo, whether or not the goods shipped actually are intended

for some innocent use"); United States v. Hosseini, 2014 WL 2905918 (E.D. Va. June 13, 2014) (imposing a 30-month custodial sentence consistent with a finding of a base offense level of 26 in a case involving the shipment of commercial goods to private parties in Iran); United States v. Sevilla, 2006 U.S. Dist. LEXIS 872852 (N.D. Ill. Nov. 29, 2006) (applying a base offense level of 26 where a defendant shipped to Iran a machine used to test the tensile and compression strength of materials); United States v. Min, 2000 WL 1576890 (S.D.N.Y. Oct. 23, 2000) (holding that a base offense level of 26 applies whenever goods are shipped to an embargoed country).

Alternatively, Section 2M5.1(a)(1)(B) applies if "the offense involved a financial transaction with a country supporting international terrorism." Iran has been designated as a state sponsor of terrorism since 1984. See United States Department of State, State Sponsors of Terror, 13 Jun. 2017 (https://www.state.gov/j/ct/list/c14151.htm). In United States v. Groos, 2008 WL 5387852 (N.D. Ill. Dec. 16, 2008), the defendant was convicted of IEEPA violations after he shipped sprinkler equipment to a private company in Iran. Id. at *3. At sentencing, the court held that, even though the counter-party was a private party, the defendant's actions constituted "a financial transaction with a country supporting international terrorism," and Section 2M5.1(a)(1)(B) applied. Id. Moreover, the plain language of the Executive Orders providing the basis for the ITSR indicate an intention to prohibit more than just financial transactions involving the Government of Iran or entities controlled by the Government of Iran. See, e.g., Executive Order 13059 (prohibiting, among other things, "any new investment by a United States person in Iran or in property . . . owned or controlled by the Government of Iran") (emphasis added).

The defendant's financial transactions with Iranian counter-parties implicate both prongs of Section 2M5.1(a). Thus, a base offense level of 26, with a resulting advisory Sentencing Guidelines range of 46-57 months, is appropriate in this case.

III. A Significant Custodial Sentence Would Not Result in an Unwarranted Sentencing Disparity

The defendant argues that the Court should impose a non-custodial sentence in order to avoid unwarranted sentencing disparities between this and similar IEEPA cases. As an initial matter, while there are examples of IEEPA cases where courts have imposed below-Guidelines custodial sentences, several of the cases cited by the defendant are not IEEPA cases, but instead are cases where the defendant has been convicted of operating an unlicensed money remitting business under 18 U.S.C. § 1960. See United States v. Bariek, No. 05-CR-150 (JCC), 2005 WL 2334682 (E.D. Va. Sept. 23, 2005); United States v. Habbal, No. 05-CR-83 (JCC), 2005 WL 2674999 (E.D. Va. Oct. 17, 2005). In addition, there are numerous examples in this and other districts where courts have imposed Guidelines-range or otherwise significant custodial sentences in IEEPA cases of a similar nature, including, among others, the following:

- United States v. Kuyumcu, 16-CR-308 (DLI) (E.D.N.Y.) – Judge Irizarry imposed a custodial sentence of 57 months (the high end of the Guidelines range) on a defendant who pled guilty to exporting specialty metals to a private company in Iran.

- United States v. Ma, 13-CR-804 (SLT) (E.D.N.Y.) – Judge Townes imposed a within-Guidelines range custodial sentence of 46 months on a defendant who pled guilty to exporting carbon fiber to China.

- United States v. Zhang, 12-CR-66 (NGG) (E.D.N.Y.) – Judge Garaufis imposed a custodial sentence of 57 months (the high end of the Guidelines range) on a defendant who pled guilty to exporting carbon fiber to China.

- United States v. Phillips, 11-CR-757 (SLT) (E.D.N.Y.) – Judge Townes imposed a within-Guidelines range custodial sentence of 92 months on a defendant who pled guilty to attempting to export carbon fiber to Iran.

- United States v. Wang-Woodford, 03-CR-70 (SJ) (E.D.N.Y.) – Judge Johnson imposed a custodial sentence of 46 months (the high end of the Guidelines range) for a defendant who pled guilty to exporting aircraft components to a customer in Iran.

- United States v. Hosseini, 2014 WL 2905918 (E.D. Va.) – The court imposed a 30-month custodial sentence on a defendant who pled guilty to shipping commercial goods to private parties in Iran.

- United States v. Sarvestani, 13-CR-214 (S.D.N.Y.) – The court imposed a 30-month custodial sentence on a defendant who pled guilty to shipping satellite technology and hardware to customers in Iran.

- United States v. Khorramshahgol, 13-CR-199 (E.D. Va.) – The court imposed a 36-month custodial sentence on a defendant who was convicted at trial of exporting industrial machine parts to Iran.

- United States v. Tsai, 12-CR-829 (N.D. Ill.) – The court imposed a 24-month custodial sentence on a defendant who pled guilty to exporting tools to North Korea.

The Honorable Pamela K. Chen
December 15, 2017
Page 6

- United States v. Hashemi, 12-CR-804 (S.D.N.Y.) – The court imposed a 46-month custodial sentence on a defendant who pled guilty to exporting carbon fiber to a customer in Iran.

- United States v. Tamimi, 12-CR-615 (S.D.N.Y.) – The court imposed a 46-month custodial sentence on a defendant who pled guilty to exporting helicopter components to a customer in Iran.

- United States v. Hajian, 12-CR-177 (M.D. Fla.) – The court imposed a 48-month custodial sentence on a defendant who pled guilty to conspiring to export computers and computer equipment to Iran.

- United States v. Shemirani, 12-CR-75 (D.D.C.) – The court imposed a 48-month custodial sentence on a defendant who pled guilty to conspiring to export electronic components to Iran.

- United States v. Liang, 10-CR-116 (C.D. Cal.) – The court imposed a 46-month custodial sentence on a defendant who pled guilty to exporting camera equipment to China.

- United States v. Amirnazi, 08-CR-429 (E.D. Pa.) – The court imposed a 48-month custodial sentence on a defendant who was convicted at trial of providing database and software services to Iranian companies.

- United States v. Homa Int'l Trading Corp., 387 F.3d 144 (2d Cir. 2004) – The court upheld a 70-month custodial sentence imposed after the defendant was convicted at trial of, inter alia, IEEPA violations in connection with the transfer of approximately $277,000 to Iran.

- United States v. McKeeve, 131 F.3d 1 (1st Cir. 1997) – The court upheld a 51-month custodial sentence imposed after the defendant was convicted at trial of sending computer products to Libya.

The defendant's argument that cases involving financial transactions – as opposed to the export of goods or provision of services – should be treated "more leniently," has no support and is logically unsound. "[T]he execution on behalf of others of money transfers from the United States to Iran is a 'service' under the terms of the Embargo." Homa, 387 F.3d at 146. By repeatedly engaging in unlicensed financial transactions with counter-parties in Iran, the defendant was undermining the efficacy and intended purposes of the ITSR. The defendant's actions directly benefited Iranian citizens and, thus, indirectly benefited Iran. The fact that the defendant's financial transactions were not specifically related to Iran's nuclear program or military objectives is of little significance. In his own

way, the defendant was thwarting important economic controls that were put in place to protect the national security of the United States. Id. (the government's "broad export ban reflected the President's appraisal of the nation's interest in sanctioning Iran's sponsorship of international terrorism, its frustration of the Middle East peace process, and its pursuit of weapons of mass destruction."). These actions should be punished.

The Sentencing Commission has established reasonable and reliable Guidelines for IEEPA violations. A sentence within or above the applicable advisory Guidelines range is particularly warranted here, where, in addition to serious IEEPA violations, the defendant also has pled guilty to criminal tax charges stemming from his efforts to hide from the U.S. government the money that he was receiving from his employment at the IMUN. As such, a significant custodial sentence is warranted and would be in line with sentences imposed by other courts in similar cases.

IV. The Defendant's Arguments About the Nature of His Work for the IMUN are Belied by the Evidence Proffered by the Government

Finally, the defendant argues that the government has improperly misrepresented the scope and nature of his work on behalf of the IMUN. The defendant claims that his work was "scholarly and educational" and that it was designed to further "peaceful engagement" between the United States and Iran. He further claims that the government is relying on "incomplete" records of his correspondence and is asking the Court to draw conclusions about the defendant's work – e.g., that he is a traitor or a spy – that are not warranted. Again, the defendant is incorrect.

The government's initial sentencing letter included a section entitled "Additional Information Regarding the Defendant's Activities on Behalf of the IMUN." (See Dkt. No. 34, at 5-14). This section of the letter discussed information that was not included in the Presentence Report ("PSR") but that was relevant to explaining the circumstances of the defendant's work for the IMUN and why he had not reported his earnings from his work for the IMUN on his personal income tax returns. Specifically, the government's sentencing letter discussed in detail the following topics: (1) the defendant's production of weekly reports for the IMUN; (2) the defendant's presence at weekly meetings at the IMUN; (3) the defendant's gathering of information for Iranian officials, including information about United States persons and information that would assist in advocating for Iran's ability to achieve nuclear enrichment; and (4) the defendant's recruitment of other individuals in the United States to work on behalf of Iran. (Id.). In support of the statements

The Honorable Pamela K. Chen
December 15, 2017
Page 8

in this section, the government cited 41 exhibits, the substantial majority of which were emails and English-language translations of recorded telephone conversations.  (Id.).[1]

Ultimately, the Court will determine the significance of the additional materials referenced in the government's sentencing letter.  However, the government respectfully submits that the evidence before the Court demonstrates that the defendant has, for an extended period, worked at the direction of the Government of Iran.  The defendant's only source of income has been his work for the IMUN, yet, until he was arrested, the defendant never publicly or officially acknowledged the scope of his activities on behalf of the IMUN.  Furthermore, the evidence establishes that the defendant has undertaken tasks designed to further the interests of the Government of Iran and, in particular, Iran's efforts to develop nuclear enrichment capabilities.  The defendant spent thousands of hours preparing reports to educate and advise Iranian government officials, and he has repeatedly followed instructions given by Iranian officials to collect strategically important information about specific topics and individuals – including, among others, U.S. politicians and scholars.

The defendant also has interacted with other individuals on behalf of the IMUN.  A particular point of contention is the defendant's relationship with Dr. Berhad Nakhai.  The defendant claims that the government has taken his communications with Dr. Nakhai out of context.  The defendant also argues that he never "recruited" Dr. Nakhai to work for the IMUN and that Dr. Nakhai had an independent, decades-long relationship with the IMUN.  The defendant further proffers that Dr. Nakhai would be willing to testify to these facts at the sentencing hearing.

The government respectfully submits that the evidence supports a different conclusion about the nature of the relationship between the defendant and Dr. Nakhai.  The conversations referenced in the government's initial sentencing letter show that the defendant and Dr. Nakhai were in communication about strategically significant topics, including Iran's efforts to achieve nuclear enrichment.  Moreover, the conversations establish that Dr. Nakhai provided services to Iranian government officials, including an attempt to surreptitiously smuggle sensitive nuclear information out of the United States to Iran.

To be clear, if Dr. Nakhai does testify on behalf of the defendant at the sentencing hearing, the government would welcome the chance to question him under oath.  Specifically, the government would interested to understand why several of the statements attributed to Dr. Nakhai in the defendant's sentencing memorandum are inconsistent with statements that he made to the FBI during an interview in 2008.

---

[1] Contrary to the defendant's claims, he was provided with the full email chains and actual audio recordings (in their original language) of the intercepted telephone conversations referenced in the sentencing letter.

The Honorable Pamela K. Chen
December 15, 2017
Page 9

His relationship with Dr. Nakhai aside, the government respectfully submits that the evidence before the Court establishes that the defendant's life has been dedicated to furthering the interests of the Government of Iran. While failing to report the true nature and scope of his work for the IMUN to U.S. authorities, the defendant has advised numerous Iranian government officials about how to achieve their strategic goals. Moreover, the defendant has acted as a liaison between the IMUN and other individuals who similarly were used to further Iranian strategic interests. When considered along with the defendant's very serious crimes, such conduct cannot be condoned.

V.    Conclusion

For the foregoing reasons, as well as the reasons articulated in its initial sentencing letter, the government respectfully requests that the Court impose a custodial sentence above the applicable Sentencing Guidelines range of 46 to 57 months. Such a sentence, would be sufficient, but not greater than necessary, to achieve the purposes of Section 3553(a).

    Respectfully submitted,

    BRIDGET M. ROHDE
    Acting United States Attorney

By:    /s/ Peter W. Baldwin
    Peter W. Baldwin
    Assistant U.S. Attorney
    (718) 254-6236

cc:    Steve Zissou, Esq. (by ECF and Email)
    Senior United States Probation Officer Frank Marcigliano